UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 16-23148-CV-WILLIAMS

UNITED STATES OF AMERICA,

     Plaintiff,

v.

PHILIP ESFORMES,

     Defendant.

_____/

## CIVIL INTERVENORS' MOTION FOR AN ORDER TO SHOW CAUSE OR FOR AN INJUNCTION UNDER THE ALL WRITS ACT AND INCORPORATED MEMORANDUM OF LAW

The Civil Intervenors,[1] through undersigned counsel, hereby submit their Motion for an

Order to Show Cause why the United States of America Centers for Medicare & Medicaid

---

[1] The Civil Intervenors are Adirhu Associates LLC; ADME Investment Partners LTD d/b/a Oceanside Extended Care; ALF Holdings Inc.; Almovea Associates LLC d/b/a North Dade Nursing and Rehabilitation Center; Ayintove Associates LLC d/b/a Harmony Health Center; Courtyard Manor Retirement Investors Ltd.; Courtyard Manor Retirement Living, Inc.; Fair Havens Center, LLC; Eden Gardens LLC; Flamingo Park Manor LLC d/b/a The Pointe; Jene's Retirement Living, Inc. d/b/a North Miami Retirement Living; Kabirhu Associates LLC d/b/a Golden Glades Nursing and Rehabilitation Center; La Hacienda Gardens LLC; Lake Erswin LLC d/b/a South Hialeah Manor; Lauderhill Manor LLC; Morsey LC; The Pointe Retirement Investors Ltd.; Rainbow Retirement Investors Ltd.; Jene's Retirement Investors Ltd.; Sefardik Associates, LLC d/b/a The Nursing Center at Mercy; Sierra ALF Management LLC; and Takifhu Associates LLC d/b/a South Dade Nursing and Rehabilitation Center. ADME, Sefardik, Ayintove, Fair Havens, Kabirhu, Almovea and Takifhu own and operate skilled nursing facilities ("SNFs"). Courtyard Manor, Flamingo Park, La Hacienda, Lake Erswin, Lauderhill Manor, Eden Gardens, and Jene's Retirement own and operate assisted living facilities ("ALFs"). Morsey owns the real property for South Hialeah Manors/Lake Erswin. The Pointe Retirement Investors owns real property for Flamingo Park Manor. Rainbow Retirement Investors owns the real property for La Serena/La Hacienda. Courtyard Manor Retirement Investors and Jene's Retirement Investors own the real property of their same-named facilities, respectively. Adirhu Associates LLC is a management company which does not operate any ALF or other facility but

CASE NO.: 16-23148-CV-WILLIAMS

Services ("CMS") should not be held in contempt of this Court for interfering in the effect of this Court's Orders (DE 20, DE 22, DE 37 and DE 40) (the "Court's Orders"), or for an injunction under the All Writs Act and in support state:

## I.      Introduction

The United States, acting through two different agencies, has worked at cross-purposes to the will of this Court as expressed and given effect in the Court's Orders. On the one hand, the Department of Justice ("DOJ"), having obtained an *ex parte* Temporary Restraining Order that threatened the lives and wellbeing of hundreds of at risk elder care residents, appeared before the Court to agree to the Court's vital modifications of that TRO and to appoint an Interim Financial Manager, for the very purpose of ensuring residents' safety and wellbeing. Meanwhile, CMS – every bit as much "the United States of America" as is the DOJ – is actively working to thwart the intent of those orders by strangling the flow of funds needed for precisely that resident safety and wellbeing. Now two skilled nursing facilities – Fair Havens Center, with some 267 residents, and Harmony Health Center, with 202 (collectively "the Threatened SNFS") – face an imminent threat of failure.[2]

The Court has the authority to protect and to give effect to its Orders, either by demanding that the United States appear before it – in either or both of the guises in which the

---

does books for some of the SNFs. ALF Holdings, Inc. manages the ALFs. Sierra ALF Management LLC manages La Hacienda.

[2] In fact, because these two facilities are parties to loans cross collateralized with two other facilities – Oceanside Extended Care and The Nursing Center at Mercy – the real effect if the Threatened SNFs fail will be to close four of the seven SNFs where the most physically dependent residents of the Civil Intervenors reside.

DEVINE GOODMAN RASCO & WATTS-FITZGERALD, LLP
2800 PONCE DE LEON BOULEVARD | SUITE 1400 | CORAL GABLES, FLORIDA 33134 | P 305.374.8200 | F 305.374.8208

CASE NO.: 16-23148-CV-WILLIAMS

government has acted here – to show cause why it should not be held in contempt for interfering with the Court's Orders, or by appropriately directing the United States under the Court's inherent authority or under the authority of the All Writs Act, 28 U.S.C. § 1651.

## II.     Facts and Background

This matter arose before this Court when the United States sought to sequester the funds contained in some 200 bank accounts associated – however loosely – with Defendant Philip Esformes and numerous elder care facilities in which he is alleged to have an ownership or other interest.[3] Esformes is the subject of a parallel criminal matter (*United States of America vs. Philip Esformes, et al*, Case No.: 16-20549-CR-LENARD) ("the Criminal Matter") in which he is alleged, *inter alia*, to have defrauded the United States of Medicare payments related to the SNFs. The United States is pursuing Esformes criminally, and suing in this Court, through its agency, the DOJ.

Soon after the United States sought and received an *ex parte* Temporary Restraining Order (DE 11) in this matter on 22 July 2016, the Civil Intervenors appeared before this Court on 25 July 2016 via their Unopposed Emergency Motion to Intervene (DE 14) and its associated Emergency Motion to Dissolve or Modify the TRO (DE 14-1). Therein, the Civil Intervenors – in a motion supported by sworn evidence – advised the court that freezing money in the operating accounts of the affected facilities:

> . . . [put] at risk the lives and safety of thousands of residents – many of whom are medically fragile – in fourteen skilled nursing and assisted-living facilities across

---

[3] Including the Threatened SNFs bringing this motion, there were, among the account-holders and the Civil Intervenors here, seven SNFs and seven Assisted Living Facilities. Assisted Living Facilities are not, for the most part, funded by Medicare and, accordingly, the CMS conduct complained of herein has not much impacted those Civil Intervenors.

3

CASE NO.: 16-23148-CV-WILLIAMS

South Florida. The funds contained in the frozen accounts are necessary to pay for the medications, food, utilities, and salaries of the hundreds of employees providing vital and necessary care to meet the needs of each facility resident according to his or her individualized care plan. Either an interruption or diminution in the amount or quality of the care on which those residents' lives depend, will create the potential for increased morbidity or even mortality of the residents in a matter of mere days.

\* \* \*

All of these operations are employee-intensive and employees must be paid . . . every two weeks. . . .

If unpaid, those staff may very well cease working. And even if staff continues to work . . . they will have no supplies with which to work. . . . Disruption – or even cessation – of resident care would necessarily follow. And that disruption would have profoundly deleterious impacts on the residents – and on workers who would suddenly and without notice have no paycheck. . . . Unpaid employees are likely not to continue to care for the residents. . . . This disruption, or a sudden move to new facilities, could cause "transfer trauma" to many of the approximately 1,800 residents. . . .

DE 14-1 at 5 – 7 (declaration citations omitted).[4]

The Court granted the intervention and directed the Civil Intervenors and the United States to confer at once with respect to modifying the TRO. The next day, upon an agreement between the Civil Intervenors and the United States, the Court modified the TRO, releasing various bank accounts to ensure the continued operation of various facilities for the protection of the residents. (DE 20) Thereafter, as other vital operating accounts were identified, the United States twice more agreed with Civil Intervenors on two subsequent modifications of the TRO.

---

[4] The Civil Intervenors hereby re-adopt the factual allegations contained in DE 14 and its associated declarations, as if fully set forth herein. Those declarations were prepared by Jacob Benigo, CFO for the seven SNFs among the Civil Intervenors, and by Daniel Roth, Director of Finance for the seven Assisted Living Facilities.

4

CASE NO.: 16-23148-CV-WILLIAMS

(DE 22 and DE 41) In each of its orders modifying the TRO, the Court found that "[t]he Facilities need[ed] access to the Subject Accounts . . . for the operation of the Facilities and the *safety and wellbeing of their residents* . . ." (Emphasis supplied.) Likewise the Court approved appointment of the Interim Financial Manager (DE 37) on the same grounds.

So, the Court having modified the TRO and installed the Interim Financial Manager to ensure the wellbeing of the Facilities' residents, it at first appeared the Court's purpose had been fulfilled. Following the Court's modifications of the TRO, the various facilities were able to continue or resume near-normal operations by expending the funds in the accounts. But, unfortunately, they were able to do so only for a very brief time. Because, it was later learned that on 25 July – the very same day the Civil Intervenors and the United States, through the instrument of the DOJ, appeared before this Court with respect to the need to modify the TRO – the United States, this time through the instrument of its agency, Centers for Medicare and Medicaid Services (CMS),[5] instituted a suspension of Medicare payments pursuant to 42 C.F.R. § 405.371(a)(2). This cut off vital funds to the SNFs.[6]

The amounts withheld varied from SNF to SNF, and from week to week, but some facilities at some points were receiving as little as 15% of the CMS money otherwise due to

---

[5] CMS is an agency of the United States of America, operating within the Department of Health and Human Services. CMS was established in 1977 as the "Health Care Financing Administration" and is based in Baltimore, Maryland. It has oversight over broad aspects of American healthcare policy and administration, including control over where and how Medicare funds are expended.

[6] Officials at CMS were provided copies of the Court's Orders, if they did not already have them, via correspondence on 21 September 2016.

them for services already rendered to Medicare beneficiaries. The current withholding picture, and its existential threat to Fair Havens and Harmon, was set forth by Joseph Mitchell, the Interim Financial Manager appointed pursuant to the Court's Orders (and in accord with similar modification of the Ex Parte Restraining Order in the Criminal Matter). A copy of the Interim Financial Manager's Report and Notice of Concern (DE 53) is attached to this Motion as Composite Exhibit "A". In it, Mr. Mitchell expresses grave concerns about the facilities.

CMS has been persuaded to make some modification of its withholding of funds, but the two Threatened SNFs are in dire positions. Fair Havens is receiving only 62 percent of the payments CMS would otherwise provide; Harmony is receiving only 76 percent. The terminal posture of the two Threatened SNFs was highlighted for CMS in correspondence from Mr. Mitchell (his correspondence of November 3, 2016 is attached as Exhibit "B") and by counsel for the facilities (correspondence of November 3, 2016 from Brian Flood, Esq. to CMS is attached as Exhibit "C"). But CMS has been essentially radio silent about the prospect for saving the Threatened SNFs.[7] As set forth by Mr. Mitchell, without additional release of CMS funds, the two Threatened SNFs will face unsupportable negative cash balances in the next week or two.[8]

Crucially, the funds being withheld are for services already rendered, goods already provided, meals already served, treatments already given, rent already paid, and so on for

---

[7] CMS's one-line reply to Mr. Mitchell is attached as Exhibit "D".

[8] When the Threatened SNFs fail, the result will be a default of a mortgage loan on each property which is cross-collateralized with mortgage loans for two other SNFs, Oceanside Extended Care and The Nursing Center at Mercy. When that loan defaults, those two additional SNFS will fail as well. A copy of the relevant loan document is attached as Exhibit "E".

DEVINE GOODMAN RASCO & WATTS-FITZGERALD, LLP
2800 PONCE DE LEON BOULEVARD | SUITE 1400 | CORAL GABLES, FLORIDA 33134 | P 305.374.8200 | F 305.374.8208

residents well ensconced in their respective facilities. Medicare reimbursements constitute the vast majority of the SNFs' operating funds and, if meaningful payments do not immediately resume, then these facilities will imminently have to begin the processes necessary to close.

Accelerating these concerns, when a facility is forced to close, it is required by law to give its residents 30 days' notice and it must also give a 60-day Worker Adjustment and Retraining Notification Act (WARN)[9] notice to its employees under Federal law. This means that the *decision* to close the Threatened SNFs is essentially already upon the managers. To comply with these requirements and safely relocate its residents to another facility, a facility still needs the resources to pay staff, utilities, rent and vendors to ensure vital services are maintained. The current percentage payments the United States has authorized be made to the Threatened SNFs will not be sufficient to meet these legally required notice deadlines, or to maintain the minimum operational requirements.

Most seriously, sudden displacement of the Threatened SNFs' residents, will assuredly have all the detrimental and dangerous effects that Civil Intervenors set forth in their initial motion to this court – including, possibly, fatal transfer trauma.

Underlying all of this is the United States' stated reason for withholding these funds: the fact that Philip Esformes is under indictment, a fact of which CMS was informed by the DOJ. In an attempt to assuage the concerns of CMS regarding his involvement, the relevant Intervenors acted to divest Philip Esformes from any ownership of, control over, or even voice in all of the facilities, including the Threatened SNFs and to assure he was receiving no money

---

[9] 29 U.S.C. Chapter 23

from their operation. Thus, the CMS branch of the United States was to be assured that its stated basis for cutting off funds to the SNFs had been eliminated. Meanwhile, the Civil Intervenors, with the approval of the United States in the persons of its Assistant United States attorneys, presented to the United States Department of Justice a detailed plan for securing Philip Esformes' interests in a trust, so that any value they have or may have in the future will be preserved – either for the government's efforts at forfeiture if Mr. Esformes is convicted in the Criminal Matter, or for Mr. Esformes' use if he is acquitted.[10]

The facilities have corresponded extensively, but fruitlessly, with the United States in the guise of CMS, to ameliorate the payment suspensions so that the Court's Orders, intended to maintain the safe and orderly operation of the SNFs, could be vindicated. But the United States has failed even to offer any rationale for the wildly varying, seemingly random, levels of withholding and payment being applied. On Thursday 22 September – nearly two months after its suspension of payments – the United States CMS CPI at last met (albeit telephonically) with representatives of the SNFs. During this call, it was apparent that CMS CPI does not understand the resources necessary to provide care and services to Medicare beneficiaries in need of intensive care, nor how these beneficiaries differ in terms of resource intensity they require, as opposed to those non-Medicare residents receiving care of a more custodial nature. It is reimbursement for the substantially higher cost of providing care to the former which is being

---

[10] While this preservation of value for the eventual prevailing party in the Criminal Matter is not at the heart of the Orders this Motion seeks to have vindicated, it is an undeniable concern for the United States as embodied in the Department of Justice – while evidently not so for the United States as embodied in CMS. The trust plan is still under review by the United States.

DEVINE GOODMAN RASCO & WATTS-FITZGERALD, LLP
2800 PONCE DE LEON BOULEVARD │ SUITE 1400 │ CORAL GABLES, FLORIDA 33134 │ P 305.374.8200 │ F 305.374.8208

CASE NO.: 16-23148-CV-WILLIAMS

denied Intervenors. Mr. Mitchell clearly explained the burgeoning insolvency of the SNFs, and set forth the minimum funds the facilities need to be able to operate safely. He further advised CMS that the facilities had begun deferring necessary payments past the solvency dates, and that complete insolvency was imminent.

In sum, the United States, appearing in one guise before this Court, agreed to the entry of vital Orders modifying the *ex parte* TRO the United States had obtained despite the great risk to the lives and wellbeing of hundreds of innocent elderly residents. But, at the same time, the United States, acting in another guise, has simultaneously stripped those Orders of their effect, by suspending a substantial portion of the payments into those very unfrozen accounts that would keep the SNFs running. This should not be permitted. The Court has the authority to demand that its Orders not be stymied, and to demand the United States to appear before it to explain why it has done so.

## III.    MEMORANDUM OF LAW

### A. The Court's Inherent Authority

From the earliest days of the Republic, to modern times, "[i]t has long been understood that 'certain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991), *quoting United States v. Hudson*, 11 U.S. 32, 34 (1812). Accordingly, "[c]ourts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, *and submission to their lawful mandates*." *Anderson v. Dunn*, 19 U.S. 204, 227 (1821) (emphasis supplied). As one commentator put it:

DEVINE GOODMAN RASCO & WATTS-FITZGERALD, LLP
2800 PONCE DE LEON BOULEVARD | SUITE 1400 | CORAL GABLES, FLORIDA 33134 | P 305.374.8200 | F 305.374.8208

CASE NO.: 16-23148-CV-WILLIAMS

> Inherent powers consist of all powers reasonably required to enable a court to perform efficiently its judicial functions, to protect its dignity, independence and integrity, ***and to make its lawful actions effective***. These powers are inherent in the sense that they exist because the court exists; the court is, therefore, it has the powers reasonably required to act as an efficient court.

Judge J.R. Carrigan, INHERENT POWERS OF THE COURTS, National Judicial College, American Bar Association (1980) (emphasis supplied).

This Court, upon an emergency petition by the Civil Intervenors, granted a hearing within hours, granted intervention, clearly expressed its intent that these elder care resident be held safe, directed the United States to confer with the Civil Intervenors and – within a single day – modified the TRO obtained by the United States because the Court recognized that access to operating funds was essential for the "safety and wellbeing" of the residents. This – preservation of the residents' safety and wellbeing – was the gravamen of the Court's Orders and the reason it acted with such alacrity. But now, the same party, the United States (albeit wearing a different institutional hat), has acted to render this Court's Orders – its "lawful mandate" – *in*effective.

The Court has the inherent authority to do what it must to give effect to its own orders.

## B.  An Order to Show Cause is Proper

At the very core of the Court's authority, and essential to its power to give meaning to its orders, is its power to punish. No one is immune to this power, including the government.

"The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders and writs of the courts, and consequently to the due administration of justice." *Bessette v. W. B. Conkey Co.*, 194 U.S. 324, 327 (1904).

10

CASE NO.: 16-23148-CV-WILLIAMS

The United States, a party to this action, is a singular entity. *United States v. Techno Fund, Inc.*, 270 F. Supp. 83, 84 (S.D. Ohio 1967) (When the United States acts through an agency, "all things done by the agency inure primarily to the benefit of the United States" and render the United States the real party in interest); *see also Rogers v. Pitt*, 535 F. Supp. 2d 29, 30 n.1 (D.D.C. 2008) (the United States is one entity and therefore individuals sued in their official capacity only cannot be liable for conspiracy). The United States may appear through the agency of the DOJ, or through the agency of CMS, but the Plaintiff in this action is "The United States of America," and so it must answer for the actions of any of its agents and it must give meaning to the Court's Orders. Even insofar as CMS and DOJ might wish to *portray* themselves as separate parties, or even might consider themselves at odds or parties to some internecine squabble, it wouldn't make a difference.

It is of no import that "CMS" does not appear in the style of this case. Firstly, because CMS *is* the United States, and secondly, because this Court may find even a *nonparty* in contempt of a court order if that person has "actual knowledge" of the court order and "either abets the [party named in the court order] or is legally identified with [it]." *See, e.g., Quinter v. Volkswagen of Am.*, 676 F.2d 969, 972 (3d Cir. 1982) (finding that an expert witness was "legally identified" with both the plaintiff and the plaintiff's attorney, justifying a finding of contempt); *see also NLRB v. Sequoia Dist. Council of Carpenters*, 568 F.2d 628, 633 (9th Cir. 1977). In addition, the Court can assert jurisdiction over non-parties, or order contempt proceedings, where it is alleged that the non-party violated an order in active concert or participation with a named party. *Blanco GmbH + CO. KG v. Vlanco Indus. LLC*, 992 F. Supp. 2d 1225 (S.D. Fla. 2013); *United States v. Barnette*, 902 F. Supp. 1522, 1542 (M. D. Fla. 1995). Here, even if CMS

11

CASE NO.: 16-23148-CV-WILLIAMS

and DOJ are viewed as separate parties – and, really, they are not – CMS relied upon and acted in concert with DOJ, basing its suspension on the DOJ indictment. And the DOJ, even as it appeared before the Court and conferred with the Intervenors, knew full well what CMS was planning to do with that information.

The bottom line is that the United States, in whatever form, is utterly thwarting the intent of the Court's Orders. The Court can and should order the United States to show cause why it is not in contempt for doing so.

### C. The All Writs Act

A federal court has the power to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained. *United States v. New York Tel. Co.*, 434 U.S. 159 (1977). The power conferred by the All Writs Act, 28 U.S.C.S. § 1651(a),[11] extends even to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice. *Id.* In fact, the power of the Act encompasses even those who have not taken any affirmative action to hinder justice. *Id.*

The Act applies: 1. Where there is an absence of other remedies; 2. Where the Court already has a separate basis for jurisdiction; 3. Where application of the Act is necessary to preserve the court's jurisdiction or to preserve the court's ability to enforce orders it has already

---

[11] The Act reads, in pertinent part: "(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

12

CASE NO.: 16-23148-CV-WILLIAMS

entered; and 4. Where its application, in the words of the Act, is "agreeable to the usages and

principles of law." *See, e.g., Syngenta Crop Protection, Inc., v. Henson,* 537 U.S. 28 (2002);

*Allapattah Servs. V. Exxon Corp.,* 2004 U.S. Dist LEXIS 27978, *22 (S.D. Fla.). So if the Court

declines to order the United States to show cause, then all of those elements are manifestly

satisfied here.

In *Klay v. United Healthgroup, Inc.,* 376 F. 3d 1092 (11th Cir. 2004), the court discussed

the Act in detail. It characterized injunctions under the All Writs Act as a codification of the

federal courts' traditional, inherent power and authority to protect jurisdiction they already have.

Injunctions under the Act are not subject to the required considerations under Fed. R. Civ. P

65.[12] Instead, a court "may grant a writ under this act whenever it is 'calculated in [the court's]

sound judgment to achieve the ends of justice entrusted to it,' and not only when it is

"'necessary'" in the sense that the court could not otherwise physically discharge its . . . duties."

*Klay,* 376 F. 3d at 1100, *quoting Adams v. United States,* 317 U.S. 269 (1942). Furthermore:

> Such writs may be directed toward not only the immediate parties to a proceeding,
> but to "persons who, though not parties to the original action or engaged in
> wrongdoing, are in a position to frustrate the implementation of a court order or the
> proper administration of justice, and encompasses even those who have not taken
> any affirmative action to hinder justice."

*Id.,* quoting, *United States v. New York Tel. Co.,* 434 U.S. 159, 174 (1977).

Thus:

> Whereas traditional injunctions are predicated upon some cause of action, an All
> Writs Act injunction is predicated upon some other matter upon which a district

---

[12] The traditional "four factors" to weigh respecting an injunction under Rule 65 are: the
movant's likelihood of success on the merits, irreparable harm to the movant absent an
injunction, substantial harm to others if the injunction is issued, and considerations of the public
interest.

court has jurisdiction. Thus, while a party must "state a claim" to obtain a "traditional" injunction, there is no such requirement to obtain an All Writs Act injunction – *it must simply point to some ongoing proceeding, or some past order or judgment, the integrity of which is being threatened by some action or behavior.* The requirements for a traditional injunction do not apply to injunctions under the All Writs Act because the historical scope of a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns.

*Id.* (emphasis supplied), *citing United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977)

(affirming grant of injunction under the All Writs Act *without regard to traditional four factors*

*required for an injunction*).[13]

Here, it is the integrity of this Court's Orders – implemented to preserve the lives and

wellbeing of the SNF residents – which is being threatened. The Court patently has the authority

– both inherent and as codified in the All Writs Act – to take the steps necessary to prevent that

---

[13] Indeed, it is one of the salient features of an order under the All Writs Act that the party seeking it *does not* have to satisfy the traditional four conditions required for an ordinary injunction. *See, e.g., Kelly v. Merrill Lynch, Pierce, Fenner & Smith*, 985 F.2d 1067 (11th Cir. 1993) (affirming grant of injunction under the All Writs Act without regard to traditional four factors), rev'd in part on other grounds *Howsam v. Dean Witter Reynolds*, 537 U.S. 79 (2002); *Keishian v. Buckley*, 752 F.2d 1513 (11th Cir. 1984) (same); *In re Macon Uplands Venture*, 624 F.2d 26, 28 (5th Cir. 1980) (same); *Teas v. Twentieth Century Fox Film Corp.*, 413 F.2d 1263, 1266-67 (5th Cir. 1969) (same); *and see ITT Community Development Corp. v. Barton*, 569 F.2d 1351, 1359 (Fifth Cir. 1978) (setting forth the circumstances which an All Writs Act injunction may be issued without mentioning the traditional criteria for issuing an injunction). Injunctions under the Act have been deemed proper by the Eleventh Circuit even in cases where the traditional four standards for an injunction could not have been applied. Indeed, in some cases in which the Eleventh Circuit has approved the grant of writs under the Act, it is unclear how those traditional standards would even be applicable. *See, e.g., Riccard v. Prudential Ins. Co. of Am.*, 307 F.3d 1277, 1295 n.15 (11th Cir. 2002) (injunction under the All Writs Act prohibited party who had filed multiple and vexatious complaints against the same defendant before various courts, attorney disciplinary bodies, and state agencies from filing any more complaints without the leave of the court).

CASE NO.: 16-23148-CV-WILLIAMS

from happening. And, although the All Writs Act would allow the Court to reach out even to non-parties to do so, here, as we have contended, the United States, whatever agency hat it wears, is already a party.

### D. Jurisdiction Over the United States as Embodied in CMS

It is true that the Medicare statute, 42 U.S.C. § 405(h), would typically bar the SNFs from obtaining judicial relief in a *payment dispute* with CMS until after they had exhausted their administrative remedies. *See, e.g., Heckler v. Ringer*, 466 U.S. 602 (1984); *American Fed'n of Home Health Agencies, Inc. v. Heckler*, 754 F.2d 896, 897-98 (11th Cir. 1984). So that if this were a claim by a provider for reimbursement arising under the Medicare Program, the Court would lack jurisdiction over such a claim. *See, e.g., Westchester Management Corp. v. U.S. Dept. of Health and Human Services*, 948 F.2d 279, 282 (6th Cir. 1991), cert. denied, 504 U.S. 909 (1992).

But that immunity is not without limits,[14] this is not a payment dispute, and Civil Intervenors do not have any administrative remedies to exhaust.

Here, the Threatened SNFs are not seeking to have the Court intervene in the ultimate CMS administrative decision-making process before the SNFs have exhausted their

---

[14] For example, in *In re University Medical Ctr.*, 973 F.2d 1065 (3d Cir. 1992) (holding that the Medicare provider agreement is an executory contract for bankruptcy purposes, the Bankruptcy Court properly *did not* require exhaustion of administrative remedies for an adversary proceeding based on Bankruptcy Code, and not involving a dispute within agency's normal review process), superseded by statute on other grounds as noted in *In re Mu'min*, 374 B.R. 149 (E.D. Pa. Bankr. 2007). *And see Fla. Agency for Health Care Administration v. Bayou Shores SNF*, 2015 U.S. Dist. Lexis 83390 *17 (M.D. Fla. June 26, 2015) (Court was barred by Section 405(h) from exercising jurisdiction over Medicare dispute "[a]s no other independent basis for jurisdiction existed."), *aff'd Fla. AHCA v. Bayous Shores*, 2016 U.S. App. Lexis 12727 (11th Cir. July 11, 2016). Here, unlike in *Bayou Shores*, the Court has an independent basis for jurisdiction.

DEVINE GOODMAN RASCO & WATTS-FITZGERALD, LLP
2800 PONCE DE LEON BOULEVARD | SUITE 1400 | CORAL GABLES, FLORIDA 33134 | P 305.374.8200 | F 305.374.8208

CASE NO.: 16-23148-CV-WILLIAMS

administrative remedies. Rather, they are seeking to have the Court prevent the United States, through a precipitate and crippling payment suspension, from thwarting the very purpose of the Court's Orders – orders to which the United States *consented* – issued with the intention of ensuring the safety and the wellbeing of the residents in the SNFs. The United States' agency CMS may or may not ultimately decide that Medicare overpaid the SNFs for services. That decision can come only after there is a finding of liability on the part of the Intervenors, who have not even been sued, let alone charged with any fraud.  If CMS ultimately does make that claim, it is fully capable of demanding those funds be clawed back. But if CMS acts precipitously now, as fully set forth herein, there is the real possibility that the very people the Court sought to safeguard with its orders will be put in jeopardy and the assets from which to obtain any claw back will no longer exist.

Furthermore, it is an exercise worthy of Kafka to suggest that, before they can seek intervention of the Court, the Intervenors must "exhaust their administrative remedies," since Intervenors *do not in fact have administrative remedies to exhaust*. There is no proscribed set of criteria which CMS applies (nor does CMS state what, if any, criteria it has employed). There is no standard of review, nor even any promise of even a standardless review. There is, in short, no meaningful administrative process at all. While the facilities are free to write a letter to CMS rebutting CMS's withholds, CMS has chosen to refrain from making a decision or a substantive response to the rebuttal information, to the detriment of the facilities and their residents.

Without direction of this Court to CMS, this Court's consideration of the Unopposed Emergency Motion to Intervene (DE 14) and its associated Emergency Motion to Dissolve or Modify the TRO (DE 14-1), and the Court's Orders fashioned to address those motions –

16

CASE NO.: 16-23148-CV-WILLIAMS

including, crucially, the life safety issues the motions raised and the Court's Orders were meant to secure – will all be rendered meaningless. The Court can and should act to vindicate its inherent power, and to protect and give meaning to its own Orders.

## IV.   Conclusion

This Court acted on an emergency basis, with the consent of the United States, to render its Orders to preserve the safety and wellbeing of SNF residents. But, at the very same moment, the United States – albeit wearing a different agency hat – was acting to thwart the very purpose of those Orders. Now the Court has the inherent power – and the necessary tools – to see that its Orders are vindicated and given effect. It should do so.

WHEREFORE, and based upon the foregoing, the Intervenors respectfully request the Court to:

1. Order the United States of America to show cause why it should not be held in contempt for defiance of this Court's Orders, and/or

2. Render, in accord with the All Writs Act, such additional orders as it deems necessary to protect and effectuate its prior orders; and/or

3. Grant such other relief as the Court deems just and meet in the premises.

Respectfully submitted,

Guy A. Rasco, Esq., F.B.N. 727520
grasco@devinegoodman.com
Robert J. Kuntz, Jr., Esq., F.B.N. 94668
rkuntz@devinegoodman.com
DEVINE GOODMAN RASCO
& WATTS-FITZGERALD, LLP
2800 Ponce de Leon Blvd., Suite 1400
Coral Gables, Florida 33134
Tel: (305) 374-8200; Fax: (305) 374-8208
*Counsel for Civil Intervenors*

17

CASE NO.: 16-23148-CV-WILLIAMS

And

Harvey M. Tettlebaum Esq.
Husch Blackwell, LLP
235 East High Street
P.O. Box 1251
Jefferson City, MO 65102-1251
Tel: (573) 761-1107
Email: harvey.tettlebaum@huschblackwell.com
*Appearing Pro Hac Vice*

Brian G. Flood, Esq.
Husch Blackwell, LLP
111 Congress Avenue, Suite 1400
Austin, TX 78701
Tel: (512) 370-3443
Email: brian.flood@huschblackwell.com
*Appearing Pro Hac Vice*

18

CASE NO.: 16-23148-CV-WILLIAMS

## Request for Hearing

Pursuant to Local Rule 7.1(b)(2) movant requests a hearing and oral argument to further address the complex issues herein and to ensure the questions of the court. A hearing of one hour would be sufficient.

## Certificate Pursuant to Local Rule 7.1(a)(3)

Undersigned counsel certifies that he has conferred with Assistant United States Attorney Susan Torres, counsel for the Plaintiff, which party *opposes* this Motion. Undersigned counsel certifies that he has conferred with Michael Pasano, counsel for the Defendant, which party *does not oppose* this Motion.

_____
Robert J. Kuntz, Jr., Esq.

19

CASE NO.: 16-23148-CV-WILLIAMS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _10_ day of November, 2016, the foregoing document was electronically filed with the Clerk of Court by utilizing the CM/ECF System.  I also certify that the foregoing document is being served this day on all counsel of record identified on the below Service List either via transmission of Notices of Electronic Filing generated by CM/ECF, or in some other authorized manner for those counsel of parties who are not authorized to receive electronically Notices of Electronic Filing. In addition, notice was given to the Centers for Medicare & Medicaid Services via USPS and email to: Karen Roe, Division of Provider Investigations and Audits, Investigations and Audits Group, Center for Program Integrity, Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, MD 21244, Mailstop AR 21 55, Karen.Roe@cms.hhs.gov and via email to Lori Bellan, Deputy Director, Investigations and Audits Group, Centers for Medicare & Medicaid Services, Lori.Bellan@cms.hhs.gov

Robert J. Kuntz, Jr., Esq.

20

CASE NO.: 16-23148-CV-WILLIAMS

## Service List

Susan Torres, Esq.
Assistant United States Attorney
Susan.torres@usdoj.gov
99 N.E. 4th Street, Third Floor
Miami, Florida 33132
Tel: (305) 961-9331
*Counsel for United States of America*

Michael S. Pasano, Esq.
mpasano@carltonfields.com
Marissel Descalzo, Esq.
mdescalzo@carltonfields.com
Carlton Fields
Miami Tower
100 S.E. Second Street, Suite 4200
Miami, Florida  33131
Tel. (305) 530-0050
*Counsel for Philip Esformes*

21