**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 16-23148-CIV-WILLIAMS**

UNITED STATES OF AMERICA,

      Plaintiff,

v.

PHILIP ESFORMES,

      Defendant.

_____/

**UNITED STATES' RESPONSE IN OPPOSITION TO CIVIL INTERVENORS'**
**MOTION FOR AN ORDER TO SHOW CAUSE OR FOR AN INJUNCTION**
**UNDER THE ALL WRITS ACT, AND SUPPORTING MEMORANDUM OF LAW**

      Unhappy with the lawful administrative process followed by the Centers for Medicare & Medicaid Services ("CMS"), the Civil Intervenors seek an end-run around that process by essentially asking this Court to usurp the role of CMS in implementing Medicare payment suspensions.   As the United States details further below, the Civil Intervenors not only fail to present the full factual picture to the Court, but also fail to demonstrate any legal entitlement to the extraordinary relief they seek in their motion for an order to show cause or for an injunction under the All Writs Act (the "Motion").

**BACKGROUND**

**I.      Procedural Background**

      On July 20, 2016, the United States filed this civil action pursuant to 18 U.S.C. § 1345 to freeze the assets of the defendant, Philip Esformes, up to the amount of the health care fraud scheme for which he was criminally charged in a parallel case.   *See* Ex Parte Complaint & Ex

Parte Motion for TRO (DE 1, 4).   Esformes is accused of masterminding a scheme to cycle

patients through a network of hospitals, skilled nursing facilities ("SNFs") and assisted living

facilities ("ALFs") that he controlled, pharmacies, home health care companies, and other

providers.   *See United States v. Esformes*, No. 16-20549-Cr-Lenard (S.D. Fla.) (Indictment, DE

3).   Esformes paid kickbacks to physicians to refer patients to his SNFs, so he could bill

Medicare for them.   Esformes then sold these patients to any provider willing to pay him

kickbacks, allowing those providers to bill Medicare and Medicaid for services purportedly

provided to these patients as well.   *See* Decl. of FBI Special Agent Terence G. Reilly (DE 5) at

¶ 21.   The scheme was incredibly lucrative, as Medicare paid Esformes' SNFs, hospitals, and

other providers involved in the scheme $464 million between January 2009 and June 2016 as a

result of claims stemming from the conspiracy.   *See id.* ¶ 60.

    The purpose of this injunctive action is to freeze Esformes' assets up to the amount of the

fraud so that, if the government secures criminal convictions against Esformes, assets will be

available for restitution to the victims – the Medicare Trust Fund and Medicaid Trust Fund –

either through forfeiture or restitution.   At the request of the government, the Court entered a

Temporary Restraining Order ("TRO") on July 22, 2016, which prohibited Esformes or anyone

acting on his behalf from "alienating, withdrawing, transferring, removing, dissipating, or

otherwise disposing of, in any manner" any of his assets.[1]   *See* TRO (DE 11) at 3.   Because of

---

[1] The United States' motion for preliminary injunction is scheduled for an evidentiary hearing on
January 27, 2017.

Esformes' vast wealth and holdings, the asset freeze covered businesses in which he had an ownership interest.   *See id.* (Attachment A).

Shortly after the TRO was entered, the Civil Intervenors filed an emergency motion to intervene and motion to dissolve or modify the TRO.   *See* Emergency Mot. to Dissolve or Modify TRO (DE 14-1).   The Civil Intervenors are the SNFs and ALFs in which Esformes has an ownership interest and related management and real estate companies.[2]   *See id.* 1-2.   In their motion to modify the TRO, the Civil Intervenors asked the Court to release from the TRO thirty-five bank accounts that were used to operate the facilities.   *See id.* at 3.   They did not ask that the Court provide for the indefinite operation of the facilities; to the contrary, they recognized that "*whatever the ultimate fates of the Facilities*, they have to be able to operate for the time being."   *Id.* at 4 (emphasis added).   Thus, at the conclusion of their motion, they requested a modification of the TRO to "unfreeze the accounts appearing below [and] to release the funds therein for the purpose of Operators paying the necessary costs to maintain operations at the Facilities."   *Id.* at 11.   The Civil Intervenors never demanded that they be paid, but rather that payments already made to them be released from the frozen accounts.   *Id.*

As soon as it was notified by the Civil Intervenors of the concerns regarding the facilities' accounts, counsel for the government engaged in discussions with the Civil Intervenors

---

[2] Esformes is technically no longer an owner of some of the facilities as a result of a transfer he executed for no consideration in favor of his father, Morris Esformes, without prior notification to or approval from this Court or the government.   *See United States v. Esformes*, No. 16-20549-Cr-Lenard (S.D. Fla.) (Order Denying Defendant's Motion to Revoke Detention Order & Detaining Defendant Pending Trial, DE 133) (finding that Esformes violated this Court's TRO when he effectuated that transfer).   The parties continue to discuss how to unwind those unauthorized transfers.

to reach a resolution.    On July 25, 2016, the Court held a telephonic status conference on the Civil Intervenors' emergency motion.    *See* DE 16.    During that hearing, the government confirmed for the Court and the Civil Intervenors that CMS had implemented payment suspensions on nine of Esformes' skilled nursing facilities.[3]    *See* Transcript of July 25, 2016 Hearing at 3 (attached as Exhibit A).    The day after the hearing, the government submitted an agreed order to modify the TRO and release the accounts at issue.    *See* DE 19.    The Court entered the Order the next day.    *See* DE 20.    The Order provided, "The Facilities need access to the Subject Accounts in Appendix A for the operation of the Facilities and the safety and wellbeing of their residents."    *Id.* at 2.    The Order then modified the TRO to exclude the accounts identified by the parties and specified that "Defendant Philip Esformes is to have no control over any Subject Account and no funds from any Subject Account may flow to him or to anyone else on his behalf."    *Id.*    Finally, the Order memorialized the parties' agreement to appoint an Interim Financial Manager to manage the accounts from which funds were released. *Id.* at 2-3.

The government continued to be responsive to requests by the Civil Intervenors to release additional accounts from the TRO for the operation of the Facilities, submitting to the Court three additional agreed orders for that purpose, *see* DE 21, 28, 40, all of which the Court granted, *see* DE 22, 29, 41.    The second and third agreed orders modifying the TRO recognized the

---

[3] The nine facilities are Fair Havens Center, LLC; Ayintove Associates, LLC (Harmony); Almovea Associates, LLC (North Dade); Sefardik Associates, LLC (Mercy); ADME Investment Partners, LTD (Oceanside); Terrace of Kissimmee, LLC; Terrace of St. Cloud, LLC, Kabirhu Associates, LLC (Golden Glades), and Takifhu Associates, LLC (South Dade).   They will be referred to hereafter as the "Facilities."

possibility that the Facilities would close, stating that "[i]f the Facilities cease to operate . . . the original terms of the TRO [DE 11] shall apply to any remaining balance in all Subject Accounts." *See* DE 22 at 3, DE 29 at 2.

**II.     CMS Medicare Payment Suspensions**

After Esformes was indicted, CMS implemented Medicare payment suspensions on the Facilities pursuant to federal statute and regulations authorizing suspension of payment where there is a credible allegation of fraud.    The Facilities were notified by letter dated August 5, 2016 of the suspensions and the basis for such suspensions.    *See* Exhibit B (letters for Fair Havens and Harmony, noting suspensions were put into effect as of July 25, 2016).    As those letters explained, CMS initially implemented complete payment suspensions, meaning no Medicare payments were being made to the Facilities.    *See id.*    However, CMS determined to release a portion of the individual suspensions in part "to allow adequate operating funds to provide Medicare patients with uninterrupted care."    *Id.*    The Facilities were invited to provide any information showing that the suspensions were negatively impacting their ability to provide adequate care.    The Facilities were also notified of their right to submit a rebuttal statement in writing to CMS.    *Id.* (citing 42 CFR § 405.372(b)(2) (provider has "opportunity to submit a rebuttal statement as to why the suspension should be removed")).

Each of the nine Facilities exercised their right to submit rebuttal statements, in which they urged CMS to release additional funds.    *See* Exhibit C (rebuttal statements for Fair Havens and Harmony, requesting that 84% of Medicare payments be released for Fair Havens and 89% of Medicare payments be released for Harmony) (attachments omitted).    CMS responded to all

of the rebuttal statements and notified the Facilities of the percentage of future payments that it would be releasing for each Facility.   *See* Exhibit D (CMS rebuttal responses for Fair Havens and Harmony).   CMS continued to proactively contact the Interim Financial Manager to obtain relevant financial information needed to continue its ongoing assessment of the appropriate percentage of Medicare payments to the Facilities.   As the Interim Financial Manager provided additional information, CMS determined what adjustments, if any, should be made to the Medicare payment suspension percentages based on its internal analysis of the information provided.   Each time it adjusted the percentages, CMS notified the Facilities.   Indeed, beyond the rebuttal responses, CMS has engaged in extensive communication with the Interim Financial Manager and the Facilities, through numerous email communications as well as conference calls, and responded to all inquiries posed by their counsel.   All of the information presented by the providers and the Interim Financial Manager was carefully reviewed and considered by CMS prior to making a determination regarding the appropriate percentage of payment suspension for each Facility.

In determining what percentage of Medicare payments to withhold, CMS has considered a wide range of factors, including the number of Medicare beneficiaries at each facility and extensive financial information regarding the operation of the Facilities as furnished by the Interim Financial Manager.   At Fair Havens presently, approximately 9% of its patients are Medicare beneficiaries; at Harmony, approximately 15% of its patients are Medicare beneficiaries.

6

The Interim Financial Manager submitted to CMS a monthly listing of expenses for the operation of each of the Facilities.    Those expenses included significant rent and management fees.    *See* Exhibit E.    For example, at Harmony, monthly management fees totaling $85,000 were being paid to a company owned by Esformes' father (Morris Esformes), two companies owned by Esformes' cousin, a company owned by Esformes' aunt, and a company owned by Esformes' uncle (Sheldon Neidich).    At Fair Havens, monthly management fees totaling $95,000 were being paid to a company owned by Esformes' father and two companies owned by Esformes' cousin.    Both facilities paid rent (well in excess of $100,000 monthly for each) to companies owned by multiple Esformes family members as well.

Presently, CMS is releasing 62% of Medicare payments to Fair Havens and 76% of Medicare payments to Harmony, the two skilled nursing facilities at issue in the Civil Intervenors' motion.    CMS has determined that this level of funding is adequate to provide care to the Medicare beneficiaries at those facilities.    As a result, CMS has released approximately $2.6 million to these two facilities since the payment suspensions were implemented. Additionally, funds were released after the Medicare payment amounts were adjusted based on concerns raised by the providers.    The percentage of payments released to the other Facilities varies, up to 89% for two of them (Golden Glades and South Dade).    In total, CMS has released over $10.8 million in payments to the nine Facilities since the implementation of the payment suspensions.    CMS continues to evaluate information recently provided by the Interim Financial Manager in order to reassess the appropriate funding amounts for each of the Facilities.    If

7

CMS' review results in additional percentage changes, CMS will notify the providers and Interim Financial Manager.

## ARGUMENT

Despite implementing lawful payment suspensions, CMS has determined to release a majority of future Medicare payments to Fair Havens and Harmony, 62% and 76%, respectively. The Civil Intervenors, however, believe that CMS has not released enough.    Because they want to force CMS to pay them more, they have contrived an argument that CMS is thwarting the will of this Court.    They are wrong, because the Court's prior Orders released Medicare funds *that had already been paid* and did not address in any way CMS' authority to suspend future payments.    That authority is governed by an administrative process that precludes, at this point, the judicial review the Civil Intervenors seek in their Motion.    Neither an order to show cause nor an injunction under the All Writs Act is available to the Civil Intervenors to circumvent the proper administrative process associated with the Medicare payment suspensions.    Their Motion should therefore be denied.

### I.    The Court Lacks Subject Matter Jurisdiction Over the Civil Intervenors' Motion Because They Failed to Exhaust Their Administrative Remedies

The Civil Intervenors are essentially asking this Court to force CMS to lift the payment suspensions entirely or pay them more.    Payment suspensions are governed by the Medicare Act (the "Act"), and a large body of case law provides that parties may not bring claims arising under the Act to court unless they have first presented the claim to the agency and exhausted the agency's administrative appeals process.    Only when a party has received a final agency decision may it bring a challenge to a Medicare matter to court.    Because the Civil Intervenors

8

have failed to satisfy these fundamental requirements, the Court lacks jurisdiction over their

requests for relief.

A. **Claims Arising Under the Medicare Act Are Subject to a Jurisdictional Bar Under 42 U.S.C. Sections 405(g) and 405(h).**

The Medicare Act, at 42 U.S.C. § 1395ff(b)(1)(A), provides the jurisdictional basis for

courts to review Medicare decisions, by making the Social Security Act's judicial review

provision, 42 U.S.C. § 405(g), applicable to the Medicare program.   42 U.S.C. §

1395ff(b)(1)(A) ("any individual dissatisfied . . . shall be entitled to . . . judicial review of the

Secretary's final decision after such hearing as is provided in section 405(g) of this title").   The

text of § 405(g), in pertinent part, specifies how an individual may obtain judicial review:

> Any individual, *after any final decision* of the [Secretary] made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision.

42 U.S.C. § 405(g) (emphasis added).

The next section of the statute, § 405(h) makes clear, in relevant part, that § 405(g) is the

*exclusive* vehicle for federal court jurisdiction:

> No findings of fact or decision of the [Secretary] shall be reviewed by any person, tribunal, or governmental agency *except as herein provided*. *No action* against the United States, the [Secretary], or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover *on any claim arising under this subchapter*.

42 U.S.C. § 405(h) (emphasis added).[4]

Thus, Section 405(h) "circumscribe[s]" judicial review of Medicare Act claims, making

§ 405(g) "the *sole avenue* for judicial review for all claims for benefits 'arising under' the

---

[4]  Section 405(h) is made applicable to Medicare matters by 42 U.S.C. § 1395ii.

Medicare Act." *See Am. Acad. of Dermatology v. Dep't of Health and Human Servs.*, 118 F.3d 1495, 1498 (11th Cir. 1997) (emphasis added).   When "Congress waived sovereign immunity by giving the federal courts jurisdiction to review" decisions of the Secretary, it made clear in § 405(h) that § 405(g) was "the *exclusive source* of federal court jurisdiction."   *Jackson v. Astrue*, 506 F.3d 1349, 1353 (11th Cir. 2007) (citations omitted) (emphasis added) (social security case).

In *Heckler v. Ringer*, the Supreme Court applied these principles to a Medicare challenge. 466 U.S. 602 (1984) (constitutional and statutory challenge to Secretary's instruction to deny claims for a surgical procedure).   In *Ringer*, the Court specified that it does not matter whether a claim is substantive or procedural in nature or whether the relief sought is declaratory or injunctive.   *Id.* at 614-15.   Rather, the key "inquiry in determining whether § 405(h) bars federal-question jurisdiction must be whether the claim 'arises under' the Act."   *Id.* at 615.

Indeed, the Supreme Court has stated that § 405(h) demands the channeling of "*virtually all legal attacks* through the agency."   *Shalala v. Illinois Council on Long Term Care, Inc.,* 529 U.S. 1, 13 (2000) (emphasis added) (constitutional and statutory challenge to nursing home enforcement regulations).   A party that has failed to meet this requirement "cannot establish jurisdiction under § 405(g)."   *See id.* at 15.   Thus, § 405(h) creates a sweeping jurisdictional bar to claims "arising under" the Medicare Act.   Litigants must channel claims that arise under the Act through the agency as specified in § 405(g); otherwise, they cannot establish jurisdiction in federal court.

### B.    The Civil Intervenors' Claims Arise Under the Medicare Act.

A claim arises under the Act if "'both the standing and the substantive basis for the

10

presentation' of the claim[] is the   . . . Act."   *Ringer*, 466 U.S. at 615 (citation omitted).   This is

a "broad test." *Id.*; *see Bodimetric Health Servs., Inc. v. Aetna Life & Casualty*, 903 F.2d 480,

483 (7th Cir. 1990).   This broad analysis precludes distinctions based on:

> the 'potential future' versus the 'actual present' nature of the claim, the 'general
> legal' versus the 'fact specific' nature of the challenge, the 'collateral' versus
> 'noncollateral' nature of the issues, or the 'declaratory' versus 'injunctive' nature
> of the relief sought.

*Illinois Council*, 529 U.S. at 13-14.

Here, the Civil Intervenors' claims fall squarely within the terms of the Supreme Court's

broad test: the Medicare Act supplies the standing and substantive basis for their claims.   Based

on the statute itself and regulations promulgated pursuant to the Act, CMS has the authority to

implement a payment suspension when, among other things, it determines the existence of a

credible allegation of fraud.   *See* 42 U.S.C. § 1395y(o), 42 U.S.C. § 1395hh, 42 CFR § 405.371.

The Civil Intervenors are challenging those payment suspensions and seek to have CMS lift them

entirely or release to them additional funds.

This precise type of claim has previously been dismissed in this district because it arises

under the Medicare Act.   In *Allstar Care Inc. v. Blue Cross Blue Shield of So. Carolina, Corp.*,

the plaintiff Allstar alleged that the Medicare contractor that processed its payments "used

allegations of fraud and abuse to deny claims for the reimbursement of funds and thus force

Plaintiff out of business." 184 F. Supp. 2d 1295, 1297 (S.D. Fla. 2002).   The court first

confirmed that actions arising under the Medicare Act fall outside the jurisdiction of the court.

*Id.* at 1298.     It then held that "the specific claims brought by Plaintiff in the instant action are

barred as they 'arise under' the Medicare Act."   *Id.* at 1299.   The court explained that the

plaintiff's allegations of harm resulting from payment suspensions and audits were firmly within the orbit of the Medicare program and "inextricably intertwined" with a Medicare benefits determination.   *Id.*   Thus, pursuant to *Ringer*, the claims were barred, and the court lacked subject matter jurisdiction.   *Id.* at 1300.

Yet another case from this district reached the same conclusion.   In *Home Care Services Provider, Inc. v. Leavitt*, a home health agency challenged CMS' decision to implement a complete payment suspension.   No. 08-22930-Civ-Huck (S.D. Fla. July 18, 2008) (DE 31) (unpublished) (attached as Exhibit F).   Judge Huck held:

> This Court lacks jurisdiction over plaintiff's challenge to the suspension regulations because Medicare has not yet issued a final determination or decision on Home Care's claims.   In 42 U.S.C. § 405 subsection (g) through (h), Congress barred judicial review of all claims which arise out of the Medicare Act that are not inextricably intertwined with Medicare payments until Medicare has made a "final decision."

*Id.* at 8.

The Civil Intervenors make a half-hearted attempt to argue that "this is not a payment dispute."   Motion at 15.   But in the very next paragraph they acknowledge that they are asking the Court to prevent CMS from implementing what they describe as a "precipitate and crippling payment suspension."   *Id.* at 16.   They do not explain the difference between a "payment dispute" and a challenge to a "payment suspension" because there is none.   The Civil Intervenors' Motion asking this Court to force CMS to pay them more or lift the payment suspensions entirely falls squarely within the Medicare Act.

## C.   The Civil Intervenors' Failure to Exhaust Their Administrative Remedies Cannot Be Excused

The Civil Intervenors then claim that the Medicare Act's exhaustion requirement should

not apply because, in their view, there is "no meaningful administrative process at all."   Motion at 16.   Extensive case law, however, refutes the notion that the exhaustion requirement should be excused because a party is unhappy with the administrative process available.

Courts look instead to whether channeling review through the agency amounts to "total preclusion of review."   *Illinois Council*, 529 U.S. at 19 (an exception to the jurisdictional bar applies only where "application of § 405(h) would not simply channel review through the agency, but would mean *no review at all*") (emphasis added); *Am. Acad. of Dermatology*, 118 F.3d 1500-01 (rejecting plaintiffs' total preclusion argument because judicial review of the challenged policy would be available if claims are first presented to Secretary and denied).   This principle holds even where the plaintiff believes the potential for eventual judicial review is remote.   *See Cochran v. Health Care Financing Admin.*, 291 F.3d 775, 779-80 (11th Cir. 2002) (requiring Cochran to follow the administrative exhaustion path mandated by § 405(h), despite her contention that her claims against Medicare subrogation would be resolved before reaching federal court).

The mandatory exhaustion requirement is not subject to "judge-made exceptions" where a "particular court might find the requirement too burdensome or futile."   *Lifestar Ambulance Service, Inc. v. United States*, 365 F.3d 1293, 1296 (11th Cir. 2004); *Weinberger v. Salfi*, 422 U.S. 749, 766 (1975) (Section 405(g) is "more than simply a codification of the judicially developed doctrine of exhaustion, and may not be dispensed with merely by a judicial conclusion of futility"); *Cochran*, 291 F.3d at 780 ("[J]udge-made exceptions do not apply . . . to a statutorily-mandated exhaustion requirement" like § 405(g).)   Thus, the Civil Intervenors cannot

13

expect this Court to jettison the exhaustion requirement, simply because "postponement would mean added inconvenience or cost." *Illinois Council*, 529 US at 22; *New Vision Home Health Care v. Leavitt*, 581 F. Supp. 2d 802, 813 (E.D. Mich. 2008).   In this case, the applicable regulations clearly provide that no final decision has yet been made.   *See* 42 CFR § 405.375. The Civil Intervenors will have the opportunity to appeal once the agency makes a final decision on their entitlement to the funds being held in suspense.   *See Neurological Assocs. v. Bowen*, 658 F. Supp. 468, 471 (S.D. Fla. 1987) (describing the administrative process when a payment suspension is implemented).

Even accepting the Civil Intervenors' claims of financial distress, such a showing would not be sufficient to overcome the administrative exhaustion requirement.   *See Cathedral Rock of North College Hill, Inc. v. Shalala*, 223 F.3d 354, 363, 365 (6th Cir. 2000) (alleged "severe economic impact" was not sufficient under the "colorable claims" analysis because a provider's financial need "is only incidental to the purpose and design of the . . . program") (internal quotations omitted); *see also Home Care*, No. 08-22930 at 11 (attached as Exhibit F) (noting that "a prudent provider knows the risk when it chooses to be dependent upon the Medicare system") (citation omitted).[5]  Because the Civil Intervenors have not exhausted their administrative remedies, this Court lacks subject matter jurisdiction over their claims, and their Motion should be denied.

---

[5] To the extent that the Civil Intervenors claim a due process violation, established case law is again unavailing to them.   "All Circuits that have addressed the issue have determined that a *temporary* suspension of Medicare or Medicaid payments does not implicate due process and that no pre-suspension hearing is required."   *ABA, Inc. v. District of Columbia*, 40 F. Supp. 2d 153, 167-68 (D.D.C. 2014) (citations omitted).

14

II.    **The Civil Intervenors Cannot Evade the Medicare Act's Jurisdictional Bar by Seeking Contempt or an Injunction Under the All Writs Act**

Because the Civil Intervenors know that this Court does not have subject matter jurisdiction over their claims, they have repackaged their grievances as attempts to vindicate this Court's prior orders.   The fundamental flaw in their argument is that the United States has not, in fact, violated any Court Order.   To the contrary, the United States agreed and submitted to the Court proposed orders that would release funds already paid to the Facilities but frozen by the TRO.   Those Orders in no way required CMS to ignore its own payment suspension authorities and continue to fund the Facilities indefinitely.

**A.  The Civil Intervenors Are Not Entitled to an Order to Show Cause**

A finding of contempt here would require a showing that the government actually violated a Court Order.   It did not.   The Court's TRO froze substantial assets that the defendant owned or in which he had an ownership interest.   The Court's subsequent Orders released from the TRO accounts that held funds already paid to the Facilities by CMS.   That is all that the Civil Intervenors requested in their original request to the Court.   In its Order modifying the TRO, the Court specified that the purpose of the release was to protect residents currently in the Facilities: "The Facilities need access to the Subject Accounts in Appendix A for the operation of the Facilities and the safety and wellbeing of their residents."   DE 20 at 2.   This made clear the reason for the release and specified that the released funds were not to benefit Esformes in any way.

The Civil Intervenors are now conflating the Court's *release* of funds already paid to the Facilities with a mandate to actually *pay* the Facilities.    But the Court's Orders never directed

15

CMS to take any action, never ordered the Facilities to remain indefinitely in operation, and never required the government to fund the Civil Intervenors' businesses.   The Orders only released funds that the Facilities had already been paid, and the government worked with both the Civil Intervenors and the relevant banks to ensure that those releases took place.   It continued to do so through the subsequent three Orders that released additional accounts. Indeed, both the Civil Intervenors and the Court's Orders recognized that the Facilities may very well be forced to close.

An order to show cause is entirely inappropriate when the Civil Intervenors cannot make even a colorable claim that the United States – through any of its agencies or departments – has violated an Order of this Court.

### B.  The Civil Intervenors Are Not Entitled to an Injunction Under the All Writs Act

#### 1.  The Court's Prior Orders Have Not Been Violated

The request for an injunction under the All Writs Act is similarly inappropriate.   It is true, as the Civil Intervenors argue, that the All Writs Act can be used by a federal court under certain circumstances to safeguard its orders and judgments.   *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1099 (11th Cir. 2004).   As described above, however, here no violation of the Court's prior Orders has taken place.   Those Orders released available funds to the Facilities, but did not require that CMS continue to fund them.   The real issue is that the Civil Intervenors disagree with CMS' determinations regarding the payment suspensions and the percentages of funds that are being released to the Facilities.   Looking for a different result, they are now accusing CMS of violating Court Orders that never addressed payment suspensions or the

16

propriety of decisions CMS is entitled to make under its statutory and regulatory authorities.

While the Civil Intervenors repeatedly argue that they seek only to protect the Facilities' residents, the facts tell a larger story.   The Civil Intervenors have been on notice of the payment suspensions since July 25, 2016.   Since then, they have been paying the Interim Financial Manager and others to assess the financial condition of the Facilities.   In response to concerns about their finances, the government has proposed a sale of the Facilities, especially in light of the interest expressed by at least one potential buyer (*see* Decl. of Stephen Rosenberg of Greystone Management Corp., attached as Ex. G), or a sale of Esformes' interest in the Facilities (appropriately valued) to another owner.   The Civil Intervenors have rejected these options and continued to rely instead on their ability to convince CMS to release additional funds.   And, despite being in "dire straits," they have taken no actions to notify employees and residents of a potential closure, even though federal regulations require administrators to take specific steps if a facility is to close.   *See, e.g.*, 42 CFR § 483.75(r), (s).

The Civil Intervenors also complain that Fair Havens and Harmony "are parties to loans cross collateralized with two other facilities" and that the failure of Fair Havens and Harmony will therefore necessarily mean the failure of the other two facilities as well.   The Civil Intervenors do not claim, however, that this financing arrangement was due to any government requirement; it was another business choice made by the Civil Intervenors.[6]

---

[6] Additional CMS funding is not the only way to prevent default on these loans.   Esformes' father and uncle, both of whom extract rent and management fees from Fair Havens and Harmony and have an ownership interest in them (Morris Esformes owns 30% of Harmony and 50% of Fair Havens, and Sheldon Neidich owns 30% of Harmony), have a collective net worth of over $91 million.   This figure is based on M. Esformes' and Neidich's personal financial

In any event, CMS is releasing 62% of payments to Fair Havens and 76% of payments to Harmony, well more than the majority of payments due.   And Medicare payments to these facilities are meant for a small fraction of their patients – approximately 9% at Fair Havens and 15% at Harmony.   CMS has determined, based on its extensive review of financial information, that this level of funding is sufficient to serve those patients, and it has notified the Facilities of CMS' determinations every step of the way.   Meanwhile, the Facilities intended to continue paying significant rent and management fees to companies owned by Esformes' relatives.   It is difficult to accept the Civil Intervenors' claims of existential crisis when they appear to have shunned alternative solutions to their financial situation while relying exclusively on attempting to convince CMS to release additional payments and, now, accusing it without basis of violating Court orders.   CMS' actions in this matter have been, at all times, authorized by federal statute and regulation and do not undermine this Court's prior Orders releasing from the TRO funds that had already been paid to the Facilities.

## 2.   The All Writs Act Is Not an Appropriate Vehicle to Challenge a Payment Suspension

The Civil Intervenors fail to cite a strikingly similar case where the Eleventh Circuit denied a requested injunction under the All Writs Act "to enjoin the Secretary's suspension of reimbursement payments to a Medicare provider, before the provider has exhausted the administrative remedies required by the act to precede judicial review."   *V.N.A. of Greater Tift County v. Heckler*, 711 F.2d 1020, 1022 (11th Cir. 1983).   In *Tift*, the provider, a home health

---

statements as of 2014 and 2012, respectively.   The government can make them available for the Court if needed.

company, argued that jurisdiction was not precluded because it "simply want[ed] to preserve the status quo (i.e., its solvency and ability to operate)" until the point when the district court would have jurisdiction.   *Id.* at 1027.   If it was forced out of business, the provider argued, then the future ability of the court to exercise jurisdiction would be fruitless because it would no longer exist as a provider.   *Id.* at 1031.

The court found that the requested injunction would be "fundamentally at odds with the Medicare Act."   *Id.* at 1032.   It went on, however, to evaluate the provider's request for an injunction under heightened standards, requiring

> (1) a virtual certainty of irreparable injury, (2) a similar certainty of success on the merits, for example, outrageous or entirely unauthorized (*ultra vires*, so to speak) agency action, (3) minimal harm to the agency, in the sense of disruption of its processes, and (4) the public interest clearly favoring the assumption of jurisdiction

*Id.* at 1033-34.   *Tift* ultimately could not meet this standard, and neither can the Civil Intervenors.   First, the court in *Tift* rejected the provider's claim of irreparable injury, finding, among other things, that "providers do not lack notice of these review provisions.   Having chosen to operate within the system on a cash-poor basis, they take a knowing risk that a [contractor's] determination might delay payment."   *Id.* at 1034.   The Civil Intervenors advance a similar argument here – that their financial situation is dire – and it fails for the same reason. As to the second factor, the Civil Intervenors have not advanced any argument as to why they would succeed on any potential claims against CMS.   And the facts detailed above do not show any *ultra vires* conduct; to the contrary, they show careful and methodical agency action that has been more than responsive to the Facilities' questions and concerns.   Ultimately, the Civil

Intervenors simply disagree with CMS' determinations.

With regard to the third factor, the *Tift* court recognized that "disruption of the agency" was a critical factor, and that the court's need to hold a hearing on the merits "seriously disrupts the congressionally mandated process and in effect tells [the agency review board] how to decide." *Id.* at 1035.   Finally, the fourth factor counsels against an injunction here.   In *Tift*, the court saw "no independent public interest consideration that clearly favors the assumption of jurisdiction."   Here, the public interest favors allowing CMS to complete its administrative review so that Medicare funds do not continue to be paid for potentially fraudulent claims at these Facilities at taxpayers' expense.   The residents at these Facilities can be adequately cared for based on the current level of funding being provided by CMS.   As in *Tift*, "it would be inappropriate for a district court to exercise its All Writs Act jurisdiction to grant a status quo injunction in this case." *Id.* at 1035.

## **CONCLUSION**

The Civil Intervenors have no legal basis for securing an order to show cause against the United States or an injunction under the All Writs Act.   They simply are dissatisfied with CMS determinations that are authorized by law and that CMS has taken only after careful review and extensive communication with the Facilities.   This Court should not allow them to short-circuit that process in an attempt to obtain a more favorable outcome here.

Dated:   November 18, 2016                  Respectfully submitted,

                                            WIFREDO A. FERRER
                                            UNITED STATES ATTORNEY

                                    By:     *s/Susan Torres*
                                            Susan Torres
                                            Assistant United States Attorney
                                            Florida Bar No. 133590
                                            Susan.Torres@usdoj.gov
                                            99 N.E. 4th Street, Third Floor
                                            Miami, Florida   33132
                                            Telephone: (305) 961-9331
                                            Facsimile: (305) 530-7139
                                            *Counsel for United States of America*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing document was served this 18th day of November,

2016 via CM/ECF.

                                            *s/Susan Torres*
                                            Susan Torres