UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-23148-CV-WILLIAMS

UNITED STATES OF AMERICA,

    *Plaintiff,*

v.

PHILIP ESFORMES,

    *Defendant.*

_____/

---

## ESFORMES'S HEARING MEMORANDUM

---

**ROY BLACK, ESQ.**
  Fla. Bar No. 12608
**HOWARD M. SREBNICK, Esq.**
  Fla. Bar No. 919063
**JACKIE PERCZEK, ESQ**.
  Fla. Bar No. 0042201
**G. RICHARD STRAFER, ESQ.**
Fla. Bar No. 389935
**BLACK, SREBNICK, KORNSPAN
  & STUMPF, P.A.**
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131
Tel:  (305) 371-6421

**MICHAEL PASANO, ESQ.**
  Fla. Bar. No. 0475947
**CARLTON FIELDS**
100 S.E. 2nd Street
4200 Miami Tower
Miami, Florida 33131-2114
Tel: (305) 530-0050

**MARISSEL DESCALZO, ESQ.**
  Fla. Bar. No 669318
**TACHE, BRONIS, CHRISTIONSON
  & DESCALZO, P.A.**
150 S.E. 2nd Avenue, Suite 600
Miami, Florida 33131
Tel: (305) 537-9565

# TABLE OF CONTENTS

**Page**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.   BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   A.   The Allegations In the Complaint and Fed. R. Civ. P. 9(b). . . . . . 8

   B.   The Government's Motion and Special Agent Reilly's
        Declaration.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.  STATUTORY CONSTRUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   A.   The Government May Restrain Only a Sum Equaling
        the Amount of Pecuniary Loss Suffered by the
        Medicare Program Which, in Kickback Cases, is Zero. . . . . . . . 11

   B.   Alternatively, the Government May Restrain Only the
        Portion of the Paid Claims Traced To Mr. Esformes,
        Not To the Facilities Generally or To Coconspirators. . . . . . . . . 13

   C.   Alternatively, the Government May Restrain Only the
        Amount of the Claims Traced to Mr. Esformes'
        Currently Held Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        1.   The Plain Meaning of § 1345. . . . . . . . . . . . . . . . . . . . . . . 16

        2.   Legislative Intent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        3.   The extraordinary nature of prejudgment attachments.. . . 31

        4.   The disfavored nature of forfeitures. . . . . . . . . . . . . . . . . . 34

III.    THE SIXTH AMENDMENT........................................... 34

    A.    Funds To Pay Counsel of Choice Should Be Released
       Under *Luis*. ........................................... 34

    B.    Alternatively, *Monsanto* Should Be Overruled. .............. 37

IV.    PROCEDURAL ISSUES. ........................................ 38

    A.    The Burden of Proof.................................... 38

    B.    Gross Proceeds Versus Net Profits......................... 42

    C.    The Hearing Itself..................................... 44

CONCLUSION................................................. 48

CERTIFICATE OF SERVICE....................................... 49

## HEARING MEMORANDUM

### Introduction

Philip Esformes respectfully  submits this Hearing Memorandum in order to outline the legal issues pertaining to the injunction hearing under 18 U.S.C. § 1345. See DE 63 (Order setting briefing schedule).  In this case, the government seeks an expansive restraining order freezing all of Mr. Esformes' assets under the theory that the so-called "Esformes network" of 18 health care facilities were allegedly paid at least $464 million in total claims by Medicare. DE1.:15.  As demonstrated below, however, the government has misread the scope of § 1345 in multiple respects.

First, § 1345 was designed to freeze, not potentially *forfeitable* "proceeds" (a defendant's unlawful "gain"), but to freeze assets up to the amount of "injury" to the relevant government program, in this case, Medicare. *See generally United States v. Genova*, 333 F.3d 750, 761 (7th Cir. 2003) ("Restitution is loss based, while forfeiture is gain based."). Medicare is not financially injured – much less "substantially" injured as required by § 1345 – when a provider merely pays someone a kickback in order to secure the referral of bona fide patients. *See United States v. Porter*, 591 F.2d 1048, 1055 (5th Cir. 1979) (noting that the government conceded that it did not suffer any "pecuniary loss" from a pure kickback scheme). This case is largely, if not

entirely, a "kickback" case.[1] In pure kickback cases – *i.e.*, where the services are, in fact, performed, medically necessary and subject to *fixed rates* under the Medicare coding system –  the Eleventh Circuit has squarely held that the restitution due Medicare is zero. *See United States v. Liss*, 265 F.3d 1220, 1231-32 (11th Cir. 2001). *Accord United States v. Pikus*, No. 13 CR. 25 BMC, 2015 WL 3794456, at *3-4 (E.D.N.Y. June 17, 2015) (adopting the *Liss* holding).

Second, the government also erroneously seeks to restrain the full amount of the claims received by the "Esformes network" of facilities plus the amount received by alleged coconspirators, primarily the Delgado brothers.  However, § 1345 may restrain only funds obtained by Mr. Esformes personally. He was only a part owner of those facilities which have intervened in this proceeding to protect their interests, and the government has waived any demand to seek anything related to the Delgados due to its complete abandonment of the forfeiture provisions of their plea agreements.

Third, the government also erroneously seeks to restrain the full amount of the claims *ever* received by the "Esformes network" of facilities from 2009 to the present. Bur the plain and unambiguous language of  § 1345 authorizes federal courts to

---

[1] As discussed *infra*, while the Complaint on occasion contends that the kickback scheme produced *some* amount of unnecessary services, the only specificity as to that allegation are in Counts 2-5 involving a *total* of $157.00. Other than that, the Complaint is insufficiently particularized in violation of Fed. R. Civ. P. 9(b). Other than the minuscule $157.00, the Complaint does not identify (1) the names of the patients it claims received unnecessary services, (2) the nature of those alleged services, or (3) the amount(s) Medicare paid for them.

freeze assets only when a person is "alienating or disposing of property, or intends to alienate or dispose of property" that is traceable to certain federal offenses. *Id*. § 1345(a)(2). Where a defendant *no longer has* some or all of the property traceable to a federal offense that he can alienate, the amount equivalent to the amount already spent is not subject to restraint.  Under the Act, a court may freeze actually tainted property - *i.e.*, property traceable to a federal offense. Or a court may freeze *untainted* property - *i.e.*, property that is not connected to any crime but is equal in value to the actually tainted property that a person currently possesses. This untainted property may be restrained as a substitute for restraining tainted property controlled by the defendant – if, for example, "the property obtained through fraud is not as easily identified." *United States v. DBB, Inc.*, 180 F.3d 1277, 1284 (11th Cir. 1999). At all times, however, the Act requires a freeze to be tied to the amount of tainted property that a defendant presently controls (and thus can alienate).  The Act does not authorize the freezing of a defendant's untainted property based on the sum value of property that the defendant allegedly obtained improperly in the past but no longer controls. Thus, the Act instead requires the government to show the total amount of assets currently held by Mr. Esformes that is traceable to the alleged fraud. The Act then enables the court to freeze either the tainted assets he still controls (and could theoretically dissipate) or untainted property belonging to Mr. Esformes of equivalent value - but not both.

Fourth, the Sixth Amendment prohibits the court from freezing untainted (i.e., untraced) assets needed to obtain counsel of choice. *Luis v. United States*, 136 S.Ct. 1083 (2016). Whether Mr. Esformes has any untainted assets available for legal fees depends, in large part, on how the Court decides the issues previously outlined. The government's position is that an amount up to at least $464 million can be frozen as either tainted or as substitute assets. Not even the government contends that Mr. Esformes still has access to $464 million in assets. Therefore, a restraining order covering $464 million would necessarily encompass all of Mr. Esformes's assets (and then some), and he could not have any unrestrained assets with which to pay counsel of choice. Under *Luis*, Mr. Esformes should be free to use any of the untraced assets (the so-called substitute assets) to pay counsel of choice to defend the parallel criminal case. Alternatively, Mr. Esformes contends that he should have access to even allegedly tainted assets to fund his defense. *See Luis*, 136 S.Ct. at 1112 (Kagan, J., dissenting) (inviting the Court to reconsider / overrule its decision in *United States v. Monsanto*, 491 U.S. 600 (1989)).

Finally, this memorandum addresses the procedural requirements of § 1345, including the burden of proof (preponderance of the evidence, not just "probable cause") and Mr. Esformes's rights to call and cross-examine witnesses, including, if necessary, the Delgado brothers.

# I.   BACKGROUND

## A.   The Allegations in the Complaint and Fed. R. Civ. P. 9(b)

This civil case for injunctive relief was filed by the government against Mr. Esformes alleging that he and his "network" of specifically identified skilled nursing facilities ("SNFs") and assisted living facilities ("ALFs") violated the anti-kickback statute,  42 U.S.C. § 1320a-7b and the health care fraud statute, 18 U.S.C. § 1349, during the seven year period between January 2009 and June 2016. DE1:4- 6, 17. The Complaint specifically alleges that: (1) the scheme involved 18 listed SNFs and ALFs; (2) the kickbacks resulted in referrals of 14,412 Medicare beneficiaries to these 18 facilities; and (3) Medicare paid the 18 facilities a gross figure of $221 million in claims.[2] DE1:15. Of that total, the government has traced only $19,160,000 directly to Esformes but speculates that he must have "dissipated tens of millions of dollars" more. DE:16-17.[3]

In addition to the precise allegations described above concerning the 18 SNFs and ALFs and 14,412 patients in the so-called Esformes network of facilities, the Complaint makes several other vague and largely unsubstantiated claims. In

---

[2] The $221 million figure represents *paid* claims. The Complaint also asserts that these came from $265 million in *billed* claims, presumably meaning that $44 million in billed claims were not paid.

[3] One sentence in the Complaint alleges that some subset of the 14,412 was patients who received services that were not "medically necessary" but no details are alleged other than the $157 in Counts 2-5. DE1:14.

particular, the Complaint asserts that Esformes also billed Medicare a total of $678 million through local "hospitals, and other providers" for which Medicare allegedly paid $185 million. DE1:15. However, the only paragraph of the Complaint discussing "hospitals" – see DE1:7-8, ¶ 26 – does not identify them and refers only to the patients of a single Physician Assistant, Arnaldo Carmouze, who allegedly billed Medicare for "more than $2 million." DE1:7, ¶¶ 25-26. The Complaint , however, is silent as to how much, if any, of the $2 million was actually *paid* by Medicaid. Similarly, the only other "providers" identified in the Complaint are the Delgado brothers and Nelson Salazar who, together, operated "Nursing Unlimited 2000." DE1:9-12. And, the Complaint traces only $8.7 million in claims paid by Medicare to the Delgados (through a pharmacy allegedly linked to them). DE1:13. No other "hospitals" or "providers" are identified either by name or Medicare claim figures.

Accordingly, while the total amount of *paid* claims referred to in the Complaint is $406 million (*i.e.*, $221 million + $185 million), of the $185 million only $10.7 million ($2 million + $8.7 million) was documented by any particularized allegations in the Complaint. Accordingly, the Court should consider the total of viable paid claims alleged in the Complaint as $231.7 million ($221 million + $10.7 million) – a figure less than half of the grandiose sum of $464 million trumped, without any factual averments, in the Complaint. Since the government has failed to plead with particularity its broader assertions, as required by Fed. R. Civ. P. 9(b), the Court

should not consider them. *See Altenel, Inc. v. Millennium Partners, L.L.C.*, 947 F. Supp. 2d 1357, 1362-63 (S.D. Fla. 2013) (Williams, J.) (dismissing fraud claims, in part, because they were "not sufficiently pleaded under the heightened pleading standard applicable to fraud claims").

### B.    The Government's Motion and Special Agent Reilly's Declaration

Along with the Complaint, the government has filed a motion for a TRO and preliminary injunction (DE4) and a Declaration by FBI Special Agent Terence G. Reilly (DE5).   Both documents appear to be largely "cut and pasted" from the Complaint (or vice versa).   The motion makes clear that the government is seeking to freeze assets up to at least $464 million even though, as previously discussed, the Complaint pleads at most $231.7 million with sufficient particularity to satisfy Rule 9(b). The only support for extending the injunction beyond the $231.7 million is the government's *ipse dixit* assertion that Esformes had other unidentified companies which engaged in fraud, other than just the 18 listed in the Complaint and government's supporting pleadings. Yet, the motion expressly "seeks an injunction that encompasses all fraud perpetrated by the Defendant and those acting in concert and participation with him, irrespective of the specific corporate vehicle used for that purpose." DE4:13. We know of no authority, and the government cites none, for the proposition that this Court has the authority to freeze more assets (or their equivalent)

based on fraud allegations that were *not* plead with sufficient particularity to satisfy Fed. R. Civ. P. 9(b).

## II.   STATUTORY CONSTRUCTION

### A.   The Government May Restrain Only a Sum Equaling the Amount of Pecuniary Loss Suffered by the Medicare Program Which, in Kickback Cases, is Zero

When the government wants to freeze a defendant's assets for future *forfeiture*, the government may seek an indictment with an accompanying motion for a restraining order under 21 U.S.C. § 853(e)(1)(A), precisely what the government has done by including a request for forfeiture in the indictment filed in United States v. Esformes, Case No. 16-20549-CR-LENARD (DE 8).[4] Section 1345, however, is untethered from any parallel civil or criminal forfeiture case. That should not be surprising as its purpose is unrelated to forfeiture. Rather, its purpose, as the government itself recognized in its Eleventh Circuit brief in *United States v. Sila Luis*,

---

[4] Every circuit that has addressed the issue, with one exception, has held that substitute assets may not be restrained under § 853. *See, e.g., United States v. Parrett*, 530 F.3d 422, 431 (6th Cir. 2008) ("We conclude . . . that the plain language of 21 U.S.C. § 853 conveys Congress's intent to authorize the restraint of tainted assets prior to trial, but not the restraint of substitute assets. . . . [A]ll but one of our sister circuits who have addressed this question have come to a similar conclusion."). The only outlier is the Fourth Circuit. *See In re Billman*, 915 F.2d 916, 921 (4th Cir. 1990). In 2015, the United States effectively conceded before the Supreme Court at oral argument in *Luis v. United States*, 136 S.Ct. 1083 (2016), that *Billman* was wrongly decided. *See Luis v. United States*, No. 14-419 (U.S.), Oral Argument Transcript, Nov. 10, 2015, at pp. 45-46 ("JUSTICE SOTOMAYOR: Mr. [Deputy Solicitor General] Dreeben, you're taking Monsanto out of context, because [21 U.S.C. §] 853, by its nature, was limited to tainted funds. . . . MR. DREEBEN: So 853, Justice Sotomayor, does permit forfeiture of substitute property. JUSTICE SOTOMAYOR: Yes, but not pretrial. MR. DREEBEN: Not -- not pretrial.")).

11th Cir. No. 13-13719, at p. 39, is to "directly further[] the recovery of assets *for victims*." (Emphasis added.)

In the context of health care fraud, therefore, the purpose is to prevent future losses by the Medicare program. The focus on potential "losses" versus the defendant's "gain" is demonstrated by the plain language of the statute itself. Thus, 18 U.S.C. § 1345(b) provides that courts are to determine whether the issuance of a "restraining order ... is warranted to prevent a continuing and **substantial injury** to the United States...." (Emphasis added.) Pursuant to the goal of preventing "injury" or loss to the United States, the court may, under § 1345(a)(2), restrain "property[] obtained as a result of ... a Federal health care offense...."  In other words, from the gross amount of claims paid by Medicare and "obtained" by Mr. Esformes, the Court May Restrain Only an amount up to the pecuniary loss suffered by Medicare. In kickback cases, the Eleventh Circuit has held that the amount of restitution due to Medicare in kickback cases is zero. *United States v. Liss*, 265 F.3d 1220, 1231-32 (11th Cir. 2001) (where "the medical necessity of the referrals is unquestioned"[5] and

---

[5] As previously discussed, while the government purports to question the medical necessity of some portion of the services at issue in this case, the Complaint only particularizes $157.00 worth of such services.  Apparently in an attempt to circumvent the *Liss* line of authority, the Complaint contends that the provider agreements were themselves violated when the facilities certified that they were in compliance with all Medicare statutes and rules, including the anti-kickback Act. Hence, under the government's theory, every claim traced to a kickback would be fraudulent. However, those same certifications were made in *United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007), and later in *Liss* but that fact only assisted the government in proving liability. It did not change the Eleventh Circuit's analysis as to loss and restitution. Moreover, any reliance on a false certification theory is

(continued...)

Medicare pays a "fixed amount" for the services, the amount of restitution due Medicare is zero). *Accord United States v. Pikus*, No. 13 CR. 25 BMC, 2015 WL 3794456, at *3-4 (E.D.N.Y. June 17, 2015).[6]

### B.   Alternatively, the Government May Restrain Only the Portion of the Paid Claims Traced To Mr. Esformes, Not To the Facilities Generally or To Coconspirators

The government has taken the position that it may restrain an amount equivalent to the total amount of claims paid to "Esformes network" of facilities plus any amounts paid to alleged coconspirators, primarily the Delgado brothers. However, § 1345 May Restrain Only assets obtained (and still controlled) by Mr. Esformes personally, or assets of equivalent value.

For a separate reason, the Court should not expand the scope of any restraining order to encompass *any* of the Delgados Medicare claims. The government correctly notes that Mr. Esformes and the Delgados would normally be jointly and severally

---

[5](...continued)

now foreclosed by *Universal Health Services, Inc. v. United States*, 136 S.Ct. 1989 (2016), where the Supreme Court expressly conditioned the use of such a theory on the government establishing that "the claim does not merely request payment, but also makes specific representations about the goods or services provided." 136 S.Ct. at 2000. No such "specific representations" have been alleged in this case.

[6] In *United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007), the Eleventh Circuit also held that the "loss" in kickback cases for purpose of the Sentencing Guidelines was also zero. In *United States v. Bane*, 720 F.3d 848 (11th Cir. 2013), which was not a kickback case, the court in dicta questioned that aspect of *Medina* since there was no indication that the panel considered the potential impact of U.S.S.G. § 2B1.1, cmt. (n. 3(F)(v)(III). 720 F.3d at 825 n. 6. Despite that dicta, *Medina* continues to be followed. *See, e.g., United States v. Guerra*, 307 Fed. Appx. 283, 287  (11th Cir. 2009). Loss and restitution, however, are not calculated in the same manner, so *Liss* still controls.

liable for any portion of the alleged fraud attributed to the Delgado brothers. However, that would also mean that any proceeds forfeited by the Delgados should be deducted from the amount of Mr. Esformes's assets that the Court has the authority to restrain. The government cannot get the same amount twice.

The court file in the Delgados' case reveals that the government has knowingly *waived* any right to forfeit the sum attributed to their activities.  In this regard, we request that the Court take judicial notice of the court file in *United States v. Gabriel and Guillermo Delgado*, Case No. 14-cr-20359-JEM. The Superseding Indictment against the Delgados expressly sought to forfeit their assets under 18 U.S.C. § 982 and 21 U.S.C. § 853. *See Delgado*, DE93:15-17.  Although the Superseding Indictment did not quantify the maximum amount of the forfeiture being sought, it sought the proceeds of kickback crimes from March 2006 through "at least" September 2012.  DE93:5. These allegations are essentially identical to the Delgado portion of the Complaint. And, in addition to seeking an unspecified money judgment, the indictment sought the forfeiture of five parcels of real property.

Both brothers eventually entered guilty pleas. *Delgado*, DE 208, 212. Both agreements expressly required the Delgados to forfeit, and to assist the government in doing so, all the proceeds "accumulated as a result of illegal activities" and to agree to restraining orders. DE208:8-9, DE212:8-9. They were also required to transfer all real and personal property to the United States including the execution of quit claim

deeds. *Id.* After the Delgados were sentenced, the district court included in their Judgments the following provision: "**Forfeiture of the defendant's right, title and interest in certain property is hereby ordered consistent with the plea agreement. The United States <u>shall submit a proposed order of forfeiture within three business days</u> of this proceeding.**" *Delgado*, DE234:6, DE235:6 (underlining added). The docket sheets, however, reflect that the government never complied with the court's order, never submitted any proposed forfeiture orders and never even filed the restraining order contemplated by the plea agreements.

Joint and severable liability is normally imposed where multiple parties cause harm, the harm is indivisible, and there is no reasonable basis for apportioning the harm." Restatement (Second) of Torts, § 433A.  However, when multiple tortfeasors "become liable in tort to the same person for the same harm," they have a right to seek contribution for the amount paid in discharging the victim's claim that exceeds that tortfeasor's equitable share." *Whyte v. Alston Management, Inc.*, No. 10-81041-CIV-DIMITROULEAS, 2012 WL 11789773, at *1 (S.D. Fla. April 11, 2012), quoting Restatement (Second) of Torts § 886A.  *See generally Redwing Carriers, Inc.*, 94 F.3d 1489, 1513 (11th Cir 1996).

In this case, Guillermo Delgado, Gabriel Delgado and Philip Esformes would arguably be jointly and severally liable for all the Delgado-related aspects of the Complaint. However, the government has deliberately waived or abandoned its right

to seek *any* of the forfeiture from the Delgados – thereby threatening Mr. Esformes

with the entire bill. When the government does not pursue a forfeiture remedy, courts

have the equitable discretion to either compel the government to proceed or to

"abandon" the forfeiture. *Slocum v. Mayberry*, 15 U.S. 1, 10 (2 Wheat. 1) (1817). *See*

*also United States v. $8,850 in U.S. Currency*, 461 U.S. 555, 569 (1983) (noting that

equitable actions under *Slocum* are available). *See generally* 19 Am. Jur.2d

Corporations § 2393 (Nov. 201) ("The state may, by long delay in instituting

proceedings to forfeit a corporate franchise, waive, or be deprived by laches of the

right to do so.  Time, together with other elements, may make up a species of fraud

and estop even the sovereignty from exercising its legal rights.") (citations omitted).

Inasmuch as this Court would not have the authority to compel the government to

pursue its forfeiture rights against the Delgados, the Court should instead hold that

the government has abandoned its rights as to the Delgado aspect of this case.

### C.  Alternatively, the Government May Restrain Only the Amount of the Claims Traced to Mr. Esformes's Currently Held Assets

#### 1.  *The Plain Meaning of § 1345*

The Fraud Injunction Act, 18 U.S.C. § 1345, empowers the government to

enjoin people from committing certain fraud-based federal offenses and from

dissipating property traceable to these offenses (*i.e.*, "tainted property"). The Act does

not, however, enable the government to obtain "the functional equivalent of an order

of attachment" against all of a defendant's property. *United States v. Jones*, 652 F. Supp. 1559, 1560 (S.D.N.Y. 1986). Indeed, as detailed below, a plain reading of the Act reveals that in authorizing property freezes, the Act does not necessarily reach all of the property the accused may have illegally taken over time – it targets the illegal property that the accused actually has at the time the restraining order is entered.

To understand the property freezes authorized by § 1345(a))(2), the entire Act must be considered. The Act's first major section states "the Attorney General may commence a civil action in any Federal court to enjoin" a person who is "committing or about to commit a Federal health care offense." 18 U.S.C. § 1345(a)(1). The point of § 1345(a)(1), then, is to enable the Attorney General to stop fraudulent conduct before or while it is happening – not to remediate such conduct after the fact. This is reflected by the consistent use of the present tense in § 1345(a)(1), which authorizes injunctions against people who are "committing" or who are "about to commit" certain violations, versus speaking of people who have committed a violation. *Cf., e.g.*, 42 U.S.C. § 1320a-7a(k) (allowing injunctive relief against any person who "has engaged" in health care fraud). Federal courts have thus limited any grant of injunctive relief under § 1345(a)(1) to situations where the alleged fraudulent scheme to be stopped is "ongoing and there exists a threat of continued perpetration," thereby emphasizing that "the statutory equitable remedy [under § 1345] is not available for

solely past violations." *United States v. William Savran & Assocs., Inc.*, 755 F. Supp. 1165, 1178 (E.D.N.Y. 1991) (collecting examples).

Subsection 1345(a)(2) carries the same present-tense emphasis as (a)(1). It states that "the Attorney General may commence a civil action" to enjoin any person who is "alienating or disposing of property, or intends to alienate or dispose of property" that was "obtained as a result of" or "is traceable to" a banking or health care violation. Subsection 1345(a)(2) thus covers only those people who presently have tainted property (*i.e.*, property "traceable to" a violation). And this makes sense: a court cannot logically order a person to keep property they do not have; nor can a court rightfully order a person to stop using legitimate property.

This leads to § 1345(b), which also speaks in the present tense like § 1345(a). It states that where the Attorney General has filed suit under § 1345(a) to stop either fraudulent conduct or the dissipation of tainted property, the court may take any other action "warranted to prevent a continuing and substantial injury to the United States or to any person … for whose protection the action is brought." *Id.* This does not grant any new form of power to the court – it merely confirms that a court may use its traditional, limited equitable powers in enforcing §§ 1345(a)(1) and (a)(2). *See Jones,* 652 F. Supp. at 1559-60.

With this context in mind, the plain meaning of §§ 1345(a)(2)(A) and (B) becomes accessible. These provisions delineate two distinct forms of relief that the

Attorney General may choose between in seeking a court order under § 1345(a)(2) to prevent tainted property from being hidden or dissipated. As such, under § 1345(a)(2)(A), where a person "is alienating or disposing of" tainted property – or where a person "intends" to do this – the Attorney General may seek a court order to "enjoin such alienation or disposition of property." In some cases, this may be more than enough. For example, barring a jailed defendant from spending tainted cash in his personal bank account will preserve the status quo value of this cash. But in cases where a simple injunction will not protect the value of tainted property, § 1345(a)(2)(B) comes into play.

> Subsection (a)(2)(B), on the other hand, explicitly provides broader relief for situations where the property obtained through fraud is not as easily identified. It allows the government to prevent the withdrawing, transferring, removing, and dissipating of an amount of the defendant's assets equal to that obtained through fraud and to have a temporary receiver appointed to administer the assets until a final judgment is reached. In addition, the use of the phrase "any person" in subsection (a)(2)(B) appears to also authorize injunctions that prevent third parties from removing a defendant's assets.

*DBB, Inc.*, 180 F.3d at 1286.

This provision thus enables the government to preserve the status quo value of tainted property still in a defendant's control, if the tainted property "is not as easily identified." It also allows the court to accommodate hardships attendant to freezing assets, as well as third-party claims. On this score, consider a hypothetical fraud suspect who puts allegedly tainted cash into a bank account to pay his innocent

mother's medical care or his daughter's college tuition. Prohibiting "any person" from "dissipating" this account – including the mother, daughter, hospital and college – would preserve its value. It would also harm the mother and daughter, presuming they have no other way to pay for those expenses. Section 1345(a)(2)(B) permits a court to prohibit the use of either tainted property "or property of equivalent value." Hence, instead of freezing the allegedly tainted cash, the court may freeze other untainted property of equal value that the defendant holds (*e.g.*, real estate), constructively transferring the "tainted" status of the former cash onto the latter property. And the court may do the same where the value of tainted property is better preserved by freezing untainted property of equal value than by freezing the tainted property itself, which may be subject to depreciation (*e.g.*, freezing $100,000 in untainted cash rather than a tainted car valued at $100,000).

The phrase "or property of equivalent value" in § 1345(a)(2)(B) thus does not authorize the freezing of a person's untainted property as a mere substitute for tainted property that that may have already been dissipated. Instead, this phase codifies the far more limited notion that "restraining orders entered before forfeiture should be concerned with preserving assets equivalent in value to the potentially forfeitable property, and not necessarily the precise property." *United States v. Regan*, 858 F.2d 115, 121 (2d Cir. 1988) (interpreting the pre-trial asset freezes authorized under 18 U.S.C. § 1963(d)(1)(A)). And by codifying this notion, this phrase balances the

extraordinary injunctive reach of § 1345(a)(2)(B) to "any person" with a quantum of respect for the legal reality that "orders directed at third parties are strong medicine and should not be used where measures that are adequate and less burdensome on the third parties are available." Regan, 858 F.2d at 121.[7]

So, to recap: § 1345(a)(2) lets a court preserve the value of tainted property in one of two ways. The court may freeze actually tainted property – *i.e.*, property traceable to a federal health care violation. Or the court may freeze untainted property that is equal in value to a person's actually tainted property to preserve the status quo or to ensure that innocent third parties are still able to use actually tainted property. In practical terms, this means that where a person is accused of perpetrating a $15 million fraud and examination of their property reveals that they hold just a $5 million house traceable to the fraud and $10 million in cash acquired long before the fraud, the court may freeze either the $5 million tainted house or $5 million of the untainted cash as "property of equivalent value" to the tainted house – but not both and not all $15 million. Section 1345(a)(2) does not allow freezing everything to ensure the government a full recovery upon conviction. *See Caldwell v. United States*, 49 U.S. 366, 379-80 (1850) (holding that where a forfeiture-related law gives the

_____

[7] This reading of § 1345(a)(2)(B) consequently explains why (a)(2)(B) explicitly provides for the appointment of a temporary receiver while (a)(2)(A) does not. A temporary receiver may well be needed to ensure that third-party access to actually tainted property is not abused, and that untainted property is properly managed to preserve its value. *See, e.g., Regan*, 858 F.2d at 121 (affirming court appointment of a monitor to administer pretrial asset freeze affecting third parties).

government a disjunctive choice between two ways to forfeit property, the government may choose either option).

Indeed, were the plain terms of § 1345(a)(2) meant to be interpreted in this latter way – as a law enabling the government to impose a pretrial blanket freeze on a person's assets in an amount equal to the putative fraud committed by the person – then the law would so state. It does not. The clearest proof of this can be seen by comparing § 1345(a)(2) to 12 U.S.C. § 1818(i)(4), a banking law that actually does authorize prejudgment attachment. Both sections were enacted under the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act of 1990, Title XXV of the Crime Control Act of 1990, Pub. L. No. 101-647, § 2521, 104 Stat. 4859, 4864-65 (1990). *See DBB, Inc.*, 180 F.3d at 1284 (11th Cir. 1999) (using § 1818(i)(4) to interpret § 1345(a)(2)). Unlike § 1345(a)(2), § 1818(i)(4) is explicitly entitled "Prejudgment attachment." *Cf. Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (the "heading of a section" is a tool of statutory construction). The operative language of § 1818(i)(4), in turn, contains none of the terms in § 1345(a)(2) that limit the asset-freezing power of § 1345(a)(2) to tainted property. Section 1818(i)(4) instead provides that incident to a civil or administrative legal proceeding against an insured depository institution, a court may "prohibit[] any person subject to the proceeding from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property."

Accordingly, given the vast difference between a law like § 1818(i)(4) that reaches "any" property and a law like § 1345(a)(2) that only reaches property "traceable to" fraud, it is no surprise that most courts have enforced § 1345(a)(2) with a careful eye towards freezing only tainted property.[8] In *Brown,* for example, the Sixth Circuit reversed a property freeze under § 1345(a)(2) on all funds held by defendants "at any financial institution except for an allowed withdrawal of $10,000 per month for business expenses." 988 F.2d 658, 664 (6th Cir. 1993). The Sixth Circuit emphasized that only assets "related to the alleged fraud" were freezable and thus criticized the district court for failing to "distinguish between the proceeds from the alleged … fraud and [defendants'] untainted [business] funds." *Id.*

The government, however, has read § 1345(a)(2) in a way that would eliminate any need on its part to identify the amount of tainted property held by Mr. Esformes, much less distinguish this property from his untainted holdings. The government reads § 1345(a)(2) as allowing a court to freeze as much of a person's property as is

---

[8] *See, e.g., United States v. Cacho-Bonilla*, 206 F. Supp. 2d 204, 209 (D.P.R. 2002) (holding that § 1345 receiver could only administer property traceable to a violation); *United States v. Siriam*, 147 F Supp. 2d 914, 947 (N.D. Ill. 2001) (finding nothing in the language of § 1345 to show it "embrace[d] assets not only traceable to the violation but also assets sufficient to secure an ultimate money judgment"); *United States v. Fang*, 937 F. Supp. 1186, 1194, 1201 (D. Md. 1996) ("[A]ny assets to be frozen [under § 1345] must in some way be traceable to the allegedly illicit activity."); *United States v. Quadro Corp.*, 916 F. Supp. 613, 618-19 (E.D. Tex. 1996) (denying § 1345 freeze where the government failed to link "any specific assets" to an alleged fraud); *see also United States v. Mercy Reg'l Health Sys., Ltd.*, No. 08-cv-0188, 2008 U.S. Dist. LEXIS 19362, at *10 (S.D. Ill. Mar. 13, 2008) ("[T]he Court will only restrain assets in bank accounts … traceable to the violations alleged.").

needed to ensure that sufficient assets are available to satisfy any judgment requiring restitution or forfeiture. The government's reading of § 1345(a)(2) effectively rewrites this provision using the past tense and rendering key parts of it surplusage. Here is what § 1345(a)(2) would look like as construed by the government, with our highlighting (redacting) the language that is rendered surplusage by the government's construction:

> (2) If a person [has] is alienat[ed] or dispos[ed] of property **or intends to alienate or dispose of property**, obtained as a result of a banking law violation (as defined in section 3322 (d) of this title) or a Federal health care offense **or property which is traceable to such violation** the Attorney General may commence a civil action in any Federal court -
>
> > **(A) to enjoin such alienation or disposition of property; or**
> >
> > (B) for a restraining order to -
> >
> > > (i) prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of **any such property or** property of equivalent value; and
> > >
> > > (ii) appoint a temporary receiver to administer such restraining order.

Under the government's re-construction of § 1345(a)(2), the government may freeze a person's assets without ever needing to show that the person holds even a single dollar that is "traceable to" a banking or health care violation. The government need only show that sometime in the past, a person "alienat[ed]" (as opposed to "is

alienating") tainted property, thus letting the court freeze the person's untainted property in an amount "equivalent" to the alienated tainted property. This places § 1345(a)(2) in stark tension with every other part of § 1345 (which are all focused on present, not past, conduct), makes the simple injunction under § 1345(a)(2)(A) irrelevant (as this injunction only serves to restrict a person from alienating tainted property they now have), and detaches the "property of equivalent value" language in § 1345(a)(2)(B) from the words immediately before it ("any such property or") that most naturally serve to answer the question "equivalent to what?"

Supreme Court precedent express "a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment." *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 562 (1990). Indeed, the very goal of statutory interpretation is to "give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies the legislature was ignorant of the meaning of the language it employed." *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883). Finally, "[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *Botany Worsted Mills v. United States*, 278 U.S. 282, 288 (1929).[9]

---

[9] This principle is of particular relevance in dealing with forfeiture-related statutes, because "the legislature may provide that its forfeitures shall take effect differently from the course prescribed by the common law." *United States v. 1960 Bags of Coffee*, 12 U.S. 398, 408 (1814) (Story, J., concurring).

Yet, the reading of § 1345(a)(2) advanced by the government does not follow any of these principles. This reading instead elides those words in § 1345(a)(2) that limit when property may be frozen and what kinds of property may be frozen, thereby granting the government an unprecedented amount of "leverage" to "exert against a potential criminal fraud defendant." *Fang*, 937 F. Supp. at 1202. Such an outcome, in turn, squarely conflicts with the Supreme Court's decision in *Yates v. United States*, 135 S. Ct. 1074 (2015).

In *Yates*, the Supreme Court rejected "the Government's unrestrained reading" of 18 U.S.C. § 1519, which penalizes the destruction of records, documents, and tangible objects relevant to a federal investigation - a law the government argued could be read to reach the disposal of illegally-caught fish. 135 S. Ct. at 1078-79, 1081 (plurality op.). The Court noted that while it might be "advisable" for Congress to enact "a coverall spoliation of evidence statute," the Court could not morph § 1519 into such a broad statute absent "clear and definite" language in § 1519 supporting this view. Id. at 1088-89.

*Yates* thus stands for the simple proposition that a law should not be read to give extraordinary power to the government, however "advisable" this power might be, absent clear language in the law to support this reading. But here, the government reads § 1345(a)(2) to operate as a prejudgment attachment on all of a criminal defendant's property (tainted or not) – an extraordinary remedy – not by pointing to

clear and definite language in § 1345(a)(2) supporting this conclusion (*e.g.*, a putative section heading like "pre-judgment attachment"), but rather by ignoring the clear and definite language in the law supporting the exact opposite conclusion (*e.g.*, use of the present-tense and the "traceable to" requirement).

As such, the Court should reject this reading of § 1345(a)(2). The better reading of § 1345(a)(2) is one that gives meaning to every word in this provision while harmonizing this provision with every other part of the Fraud Injunction Act. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must … interpret [a] statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into a[] harmonious whole." (internal citations and quotation marks omitted)).

In conclusion, in order to freeze Mr. Esformes's property under § 1345(a)(2), the Court would first have to find that Mr. Esformes "is alienating or disposing" or "intends to alienate or dispose" of property obtained from or traceable to a health care offense. The Court could not freeze all of Mr. Esformes's property based on a combination of past conduct and speculative reasoning about his future conduct

Second, to freeze Mr. Esformes's property under § 1345(a)(2), the Court would have to identify the property held by Mr. Esformes that was "obtained from" or "traceable to" his alleged health care offense. This is so, because under § 1345(a)(2)(A) and (B), the only property that Mr. Esformes can be enjoined from

dissipating is either tainted property now in his possession or untainted property equal in value to the tainted property now in his possession.

Indeed, even if a defendant did obtain hundreds of millions of dollars through the offenses he is accused of, § 1345(a)(2) still requires the Court to determine how much of this vast sum is presently in his possession. As such, the only way the Court could freeze all of a defendant's property is by finding that all of his property could be traced to the alleged fraud. *Cf. United States v. Barnes*, 912 F. Supp. 1187, 1198 (N.D. Iowa 1996) (freezing under § 1345(a)(2) all bank accounts held by defendants because all the cash in these accounts was traceable to defendants' alleged fraud). The Court will not be able to make such a finding here, especially in light of Mr. Esformes's intent to  show that millions of dollars' worth of his property came from untainted sources.

## 2. *Legislative Intent*

Construing § 1345 to reach only tainted property presently in his control accords with its historical purpose: to prevent the concealment and dissipation of tainted property. Congress enacted the § 1345, as part of the Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, § 1205(a), 98 Stat. 1837, 2152 (1984). At that time, the Act did not explicitly authorize property freezes – it just allowed courts to enjoin imminent and ongoing fraudulent conduct. *See Jones*, 652 F. Supp. at 1559. It was only through the Comprehensive Thrift and Bank Fraud Prosecution and

Taxpayer Recovery Act of 1990 that § 1345 was finally amended to empower courts to freeze property. *See DBB, Inc.*, 180 F.3d at 1282. The Sixth Circuit effectively traces the course of this evolution in *Brown*, 988 F.2d at 660-61. *See also Fang*, 937 F. Supp. at 1192-94.

Ultimately, the main point to be taken from the historical genesis of § 1345, both before and after Congress amended it to authorize property freezes, is that the Act's core purpose has always been to prevent imminent or ongoing harm - not penalize or remediate such harm after the fact. As Congress took care to observe in explaining why it was necessary to adopt the Act in the first place: "Experience has shown that even after indictment or the obtaining of a conviction, the perpetrators of fraudulent schemes continue to victimize the public…. [T]he Attorney General should be empowered to bring suit to enjoin the fraudulent acts or practices." S. Rep. No. 98-225, at 402 (1983). And the original text of § 1345 - now present at § 1345(b) - bears out this understanding, empowering courts to enjoin fraud violations only so far "as is warranted to prevent a continuing and substantial injury to the United States."

That purpose did not change in 1990, when Congress amended the Act to give courts the power to freeze property traceable to fraudulent conduct. Indeed, as the Sixth Circuit notes: "By amending section 1345, Congress wanted to respond to the savings and loan scandal because 'executives of thrift institutions and other[s]

associated with them enriched themselves by fraudulently diverting immense amounts of funds from those institutions."' *Brown*, 988 F.2d at 662 (quoting H.R. Rep. No. 101-681(I)). Accordingly, to ensure these tainted funds were not concealed or dissipated before the government could recover them, Congress gave courts the power under § 1345(a)(2) to freeze these funds, "enhanc[ing] the United States' ability to prevent … the wrongful disposition of assets after … violations have occurred." Id. (emphasis added).

Even the government has acknowledged this to be the purpose of § 1345(a)(2), as may be seen in a 1997 bulletin published by the Executive Office for U.S. Attorneys which clarifies that the government "may feasibly seek an injunction [under § 1345(a)(2)] long after the underlying bank fraud or health care fraud has stopped if one can prove imminent  alienation or disposal of the proceeds of the fraud."[10] Indeed, § 1345(a)(2) enables a court to freeze a person's property to prevent them from hiding or spending tainted money. But once a person has spent this money, then any freeze on a person's property serves a totally different purpose: to remediate harm after the fact by guaranteeing a person's capacity for restitution. That punitive – as opposed to preventative – purpose cannot be found in the historical genesis of § 1345, and thus furnishes additional grounds for the Court to favor Mr. Esformes's

---

[10] *See* Michael Runyon (Asst. U.S. Att'y, M.D. Fla.) & David Jennings (Asst. U.S. Att'y, W.D. Wash.), *Practicing in the Field of Injunctions*, 45 USA BULLETIN, no. 2, April 1997, available online http://www.justice.gov/sites/default/files/usao/legacy/2007/01/11/usab4502.pdf (at PDF p.41).

prevention-driven interpretation of § 1345(a)(2) over one that treats this law as a broad authorization of prejudgment attachment.[11]

### 3.    *The extraordinary nature of prejudgment attachments*

Construing § 1345 to reach only tainted property accords with the traditional reach of federal equity practice, which does not include prejudgment asset freezes. Section 1345 explicitly provides that all proceedings under the Act, including ones to freeze property, are "governed by the Federal Rules of Civil Procedure." 18 U.S.C. § 1345(b). This places the Act within the ambit of federal equity practice – a tradition in which prejudgment attachment is "a type of relief that has never been available before." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 322 (1999). Indeed, the Supreme Court labeled the extreme remedy of pre-judgment attachment as the "nuclear weapon" of the law. 527 U.S. at 322.[12] *See also*

---

[11] *See United States v. Logal*, 106 F.3d 1547, 1551-52 (11th Cir. 1997) ("'[T]hough restitution resembles a judgment for the benefit of a victim, it is penal ….' "); *see also Johnson v. United States*, 135 S. Ct. 2551, 2566 n.1 (2015) (Thomas, J., concurring) ("[A] law imposing a monetary exaction as a punishment for noncompliance with a regulatory mandate is penal.").

[12] Although "procedural" sounding, the Supreme Court viewed this "type of relief" as anything but trivial:

> "A rule of procedure which allowed any prowling creditor, before his claim was definitely established by judgment, and without reference to the character of his demand, to file a bill to discover assets, or to impeach transfers, or interfere with the business affairs of the alleged debtor, would manifestly be susceptible of the grossest abuse. *A more powerful weapon of oppression could not be placed at the disposal of unscrupulous litigants.*" Wait, Fraudulent Conveyances, §73, at 110-111.

> The requirement that the creditor obtain a prior judgment is a *fundamental protection*
>
> (continued...)

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."). This tradition, in turn, furnishes another key reason why the Act's property-freezing power must be read in a far more restrained manner than sought by the government.

Congress may, of course, enable federal courts to grant forms of equitable relief beyond what has been traditionally available at common law. As the Supreme Court has explained, "[w]hen there are indeed new conditions that might call for a wrenching departure from past practice, Congress is in a much better position … to perceive them and to design the appropriate remedy." *Grupo*, 527 U.S. at 322. At the same time, any such remedy must be read with care. This follows from the longstanding judicial canon that statutes in derogation of common law are to be strictly construed  – or, put more precisely, "statutes will not be interpreted as changing the common law unless they effect the change with clarity." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 318 (2012).

In *United States v. Siriam*, 147 F. Supp. 2d 914 (N.D. Ill. 2001), the court rejected the government's argument that § 1345(a)(2) should be interpreted as

---

[12](...continued)
> in debtor-creditor law – rendered all the more important in our federal system by the debtor's right to a jury trial on the legal claim....

*Id. See also United States v. Razmilovic*, 419 F.3d 134, 137 (2d Cir. 2005) (finding that "[p]retrial restraint is a severe remedy independent of a right to damages or property following a finding of liability"); *United States v. Riley*, 78 F.3d 367, 370 (8th Cir. 1996) ("[p]reconviction restraints are extreme measures").

allowing the court to freeze not only tainted property but also "a sum that accounts for trebled damages and civil penalties." 147 F. Supp. 2d at 947. The court first highlighted the plain language of § 1345(a)(2), finding the statute meant "just what it says: that an injunction is authorized to put a hold on the fruits of the criminally fraudulent activity." *Id.* The court then noted there was "nothing in the language" of § 1345(a)(2) to support the government's view that § 1345(a)(2) further authorized a freeze on "assets sufficient to secure an ultimate money judgment." *Id.* And this led the court to emphasize the need for "caution in expanding the sweep of that authority to freeze assets beyond the specific grant of authority made by Congress," as this power was "not generally available" at common law. *Id*. at 948.

The Court should perform the same analysis here. Caution militates against accepting the government's view that § 1345(a)(2) authorized all of Mr. Esformes's property to be frozen to secure any future judgment requiring restitution or forfeiture. The Court should not wary of "creat[ing] a precedent of sweeping effect" without proper regard for the plain language of § 1345(a)(2) or the narrower manner in which this language can be read. *See De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 222 (1945).

### 4.      *The disfavored nature of forfeitures*

Section 1345(a)(2) is not only a statute in derogation of common law but also one that gives the government a tool in its quest to forfeit property.[13] This demands even more caution in how courts enforce the Act, because "[f]orfeitures are not favored" in the law and should be enforced "only when within both letter and spirit of the law."law." *United States v. One 1936 Model Ford V-8 De Luxe Coach*, 307 U.S. 219, 226 (1939). When "two constructions can be given to a statute, and one of them involves a forfeiture, [then] the other is to be preferred." *Farmers' & Mechanics' Nat'l Bank v. Dearing*, 91 U.S. 29, 35 (1875). On this score, the view of § 1345(a)(2) advanced by the government involves the blanket forfeiture of untainted property. The view of § 1345(a)(2) advanced by Mr. Esformes – and supported by most courts – does not. And that fact alone should be reason enough for this Court to favor Mr. Esformes's  interpretation of § 1345(a)(2).

### III.   The Sixth Amendment

### A.      Funds To Pay Counsel of Choice Should Be Released Under *Luis*

In *Luis v. United States*, 136 S.Ct. 1083 (2016), the Supreme Court construed the Sixth Amendment as requiring courts to exclude attorney's fees for a criminal defendant's counsel of choice from any restraints on substitute assets. Whether the

---

[13] While the Act merely freezes property *pendente lite* - rather than seizing it permanently - the Act still works a forfeiture. *Cf. Krimstock v. Kelly*, 306 F.3d 40, 43-44 (2d Cir. 2002).

Court need reach the Sixth Amendment question depends in large part on how the Court resolves the statutory construction issues in Section II. For example, if the Court agrees with Mr. Esformes's position that § 1345 permits only the restraint of the amount lost by Medicare, no restraining order would be appropriate inasmuch as kickback violations do not cause any monetary loss to Medicare. At the other extreme, if the Court were to adopt the government's expansive view of § 1345 by holding that it may freeze up to $464 million of Mr. Esformes's assets, then the Court must, in accordance with *Luis*, accommodate the payment of Mr. Esformes's attorneys fees from any assets that have not been directly traced to the alleged fraud. While many courts hold that before a defendant may use restrained assets he must first prove that he does not have access to unrestrained assets,[14] in this case even the government has not claimed that Mr. Esformes has access to assets in excess of $464 million (or even $231 million).[15] Accordingly, Mr. Esformes need not provide a detailed accounting of his assets in order to establish his right to the release of assets currently under restraint. Nor does the fact that family members have, until now, assisted him with the cost of his legal defense, deny Mr. Esformes the constitutional right to expend his own resources going forward to mount his criminal defense.

---

[14] *See United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998); *United States v.* Farmer, 274 F.3d 800 (4th Cir. 2001).

[15] The government has cited to an old financial statement of Mr. Esformes where he estimated his net worth at $78 million.

Even if all of Mr. Esformes assets could be traced directly to the alleged fraud, this Court would still have the discretion to carve out a portion for attorneys fees. This point was highlighted by the Deputy Solicitor General during the Supreme Court oral argument in *Luis* itself:

> MR. DREEBEN: Yes. I don't think there's an exception in the Sixth Amendment. Now, this is a statute in which the government proceeded through seeking a civil injunction and restraining order, ***and the district court does have discretion. It's not a flat rule that forbids the district court from releasing funds for counsel***.

> CHIEF JUSTICE ROBERTS: How does it work? Like the you know, the daughter's tuition bill comes due, you know, and it's whoever you know, who knows how much these days, $60,000. And the defendant cannot pay that?

> MR. DREEBEN: Not as a matter of right. ***But this is a civil statute in which the judge can exercise equitable discretion***. And if the defendant comes in and says--

> CHIEF JUSTICE ROBERTS: Well, why was it why would it be if he can exercise equitable discretion for the daughter's tuition, why why not when the Sixth Amendment is at stake? And, you know, counsel of choice, it turns on that, it would seem to me that if there's going to be a case in which equitable discretion will be exercised, it ought to be in that situation.

> MR. DREEBEN: Well, I don't think automatically so.

*See Luis v. United States*, No. 14-419 (U.S.), Oral Argument Transcript, Nov. 10, 2015, at p. 38 (emphasis added).

### B.    Alternatively, *Monsanto* Should Be Overruled

Although Mr. Esformes acknowledges that this Court would not have the authority to do so, in the alternative Mr. Esformes contends that the decision in *United States v. Monsanto*, 491 U.S. 600 (1989), should be overruled for the reasons alluded to in Justice Kagan's dissenting opinion in *Luis*:

> I find *United States v. Monsanto*, 491 U.S. 600  (1989), a troubling decision. It is one thing to hold, as this Court did in *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989), that a convicted felon has no Sixth Amendment right to pay his lawyer with funds adjudged forfeitable. Following conviction, such assets belong to the Government, and "[t]here is no constitutional principle that gives one person the right to give another's property to a third party." *Id.*, at 628. But it is quite another thing to say that the Government may, prior to trial, freeze assets that a defendant needs to hire an attorney, based on nothing more than "probable cause to believe that the property will ultimately be proved forfeitable." *Monsanto*, 491 U.S., at 615, 109 S.Ct. 2657. At that time, "the presumption of innocence still applies," and the Government's interest in the assets is wholly contingent on future judgments of conviction and forfeiture. *Kaley v. United States*, 571 U.S. ——, ——, 134 S.Ct. 1090, 1096–1097 (2014). I am not altogether convinced that, in this decidedly different circumstance, the Government's interest in recovering the proceeds of crime ought to trump the defendant's (often highly consequential) right to retain counsel of choice.
>
> But the correctness of *Monsanto* is not at issue today. Petitioner Sila Luis has not asked this Court either to overrule or to modify that decision; she argues only that it does not answer the question presented here. And because *Luis* takes *Monsanto* as a given, the Court must do so as well.
>
> On that basis, I agree with the principal dissent that *Monsanto* controls this case. *See ante*, at 1105 – 1106 (opinion of KENNEDY, J.).

*Luis*, 136 S.Ct. at 1112 (Kagan, J., dissenting).

## IV.   PROCEDURAL ISSUES

### A.   The Burden of Proof

The "first step" in a § 1345 proceeding "for the court to determine how much of the alleged" $231.7 million "in Medicare revenues is traceable to health care fraud." *United States v. Luis*, 966 F. Supp. 2d 1321 (S.D. Fla. 2013) (Huck, J.),[16] citing *Brown*, 988 F.2d at 664 ("The district court froze all of the Browns' funds held at any financial institution except for an allowed withdrawal of $10,000 per month for business expenses. In doing so, the district court failed to distinguish between the proceeds from the alleged Medicare fraud and untainted funds from the seventy-five percent of the Browns' business that is unrelated to Medicare claims. As a result, we remand the case so that the district court can reevaluate the nature of the assets that it froze. The court may freeze only those assets related to the alleged fraud."); *United States v. William Savran & Associates, Inc.*, 755 F. Supp. 1165, 1184 (E.D.N.Y. 1991) (hearing must resolve whether "some or all of the amounts on deposit in the [restrained] account . . . are not proceeds [of the alleged fraud].").

Under Rule 65, courts may enter a preliminary injunction only if the plaintiff demonstrates by *a preponderance of the evidence* that: (1) there is a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury exists

---

[16] Judge Huck's opinion was initially affirmed by the Eleventh Circuit, 564 Fed. Appx. 493, but the Supreme Court reversed on other grounds, 136 S.Ct. 1083 (2016).

if an injunction is not granted; (3) the threatened injury to the plaintiff outweighs any harm that an injunction may cause the defendants; and (4) issuing the injunction will not harm the public interest. *See Levi Strauss & Co. v. Sunrise Intern. Trading Inc.*, 51 F.3d 982, 985 (11th Cir.1995); *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1218 (S.D. Fla. 2014); *FHR TB, LLC*, 865 F. Supp. 2d at 1191. When the government is the plaintiff, courts have relieved it of the obligation of proving "irreparable injury." *See United States v. Narco Freedom, Inc.*, 95 F. Supp. 3d 747, 754 (S.D.N.Y. 2015) (citations omitted); *United States v. Livdahl*, 356 F. Supp. 2d 1289, 1293-94 (S.D. Fla. 2005). However, contrary to the government's argument in its initial *ex parte* motion (*see* DE4: 1, n. 1), there is no basis for relaxing the burden of persuasion on the government's obligation to prove it is likely to prevail on the merits.

> Although proof of irreparable harm is not required, concerns about fairness do not drop entirely from the equation. A preliminary injunction is a form of equitable relief. And the Court therefore must consider the hardships that the public currently faces and that the defendant will endure if the injunction is granted.... "We scarcely mean to imply that judges are free to set to one side all notions of fairness because it is the [government], rather than a private litigant, which has stepped into court....

*Narco Freedom, Inc.*, 95 F. Supp. 3d at 755 (citations omitted).

Admittedly, courts are split on the burden of proof governing § 1345 proceedings.  In recognition of the fact that § 1345 expressly requires the application

of the Federal Rules of Civil Procedure (and hence Rule 65), the better reasoned decisions have held that the government must prove its allegations by a preponderance of the evidence. *See, e.g.*, *Brown*, 988 F.2d at 663; *United States v. Williams*, 476 F .Supp. 2d 1368, 1374 (M.D. Fla.2007); *United States v. Siriam*, 147 F. Supp. 2d 914, 938 (N.D. Ill. 2001); *United States v. Barnes*, 912 F. Supp. 1187, 1198 (N.D. Iowa 1996); *United States v. Quadro Corp.*, 916 F. Supp. 613, 617 (E.D. Tex.1996). Other courts have held that only a showing of probable cause is required. *See, e.g.*, *Luis*, 966 F. Supp. 2d at1326;  *United States v. Livdahl*, 356  F. Supp. 2d 1289, 1294 (S.D. Fla. 2005); *United States v. Fang*, 937 F. Supp. 1186, 1197 (D. Md. 1996); *United States v. Davis*, No. 88–1705–CIV–ARONOVITZ, 1988 WL 168562, at *1 (S.D. Fla. 1988). *Cf. United States v. Legro*, 284 Fed.Appx. 143, 145 (5th Cir.2008) (recognizing disagreement about whether probable cause or preponderance of the evidence standard applies to state a claim for injunctive relief under § 1345 and declining to resolve the issue).

 None of the Southern District of Florida cases adopting the "probable cause" standard have articulated a reason *why* that standard should apply, much less *how* that standard comports with § 1345's explicit incorporation of the Federal Rules of Civil Procedure. The *Fang* court is the sole case analyzing the issue and that court, while finding the probable cause standard to be "somewhat curious" believed that it was not materially different from the preponderance standard to make any difference. *United*

*States v. Fang*, 937 F. Supp. 1186, 1194, 1201 (D. Md. 1996)  The *Fang* court,

however, showed that the use of probable cause in the § 1345 context had its origin

in *United States v. Belden*, 714 F.Supp. 42 (N.D.N.Y.1987), which in turn relied upon

*United States Postal Serv. v. Beamish*, 466 F.2d 804 (3d Cir.1972) – a case construing

a different statute, 39 U.S.C. § 3007, which expressly established "probable cause"

as the standard for issuing a preliminary injunction.[17] Congress was presumably aware

of the express "probable cause" language in § 3007 but did not incorporate it when

enacting § 1345.

Instead of mandating the use of a "probable cause" standard, Congress chose

to incorporate the civil rules and, indeed, limited the use of criminal procedural rules

to discovery. And, injunctions are by their very nature an "extraordinary and drastic

remedy, not to be granted unless the movant clearly established the 'burden of

persuasion....'" In short, there appears to be no basis whatsoever for importing the

diluted "probable cause" standard from criminal procedure into a civil proceeding

expressly governed by the civil rules. "To hold otherwise would provide the United

States a substantial procedural advantage over traditional civil plaintiffs, which is not

mandated by the language of section 1345." *Brown*, 988 F.2d at 663.  Moreover, and

again contrary to the government, the burden never shifts to the defendant. *See*

_____

[17] Section 3007 provides that "the United States district court ... shall ... upon a showing of probable cause to believe [that § 3005] is being violated, enter a temporary restraining order and preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure...."

DE4:16 (arguing that once the government establishes probable cause, the burden should shift to the defendant to prove that the "funds or assets are not related to the fraud or are beyond the equivalent value of the fund taken through the fraud").[18]

Even in cases acknowledging the use of a "probable cause" standard may be appropriate for some purposes have held that since "monetary disputes" between private parties are normally governed by the preponderance standard, the preponderance standard would still apply in § 1345 cases where the "ownership" of property is challenged. *See United States v. Payment Processing Center, LLC*, 461 F. Supp.2d 319, 323 (E.D. Penn. 2006). "Moreover, the probable cause inquiry is traditionally reserved for *ex parte* proceedings, including arrest warrants, search warrants, and § 1345 complaints; not for civil disputes over legal title to property." *Id.* The court in *Payment Processing Center* indicated that the defendants did not challenge the restraints issued under a probable cause standard but applied a preponderance standard to a bank's claim of superior title to some of the property. *Id.*

## B.   <u>Gross Proceeds Versus Net Profits</u>

The government seeks to restrain the total amount of Medicare claims paid to Mr. Esformes's facilities regardless of the otherwise bona fide nature of the services

---

[18] The court in *Fang* rejected the government's burden shifting theory, noting that "[i]n conventional preliminary injunction analysis, the burden of persuasion always remains upon the party seeking preliminary injunctive relief; it never shifts. [Citations omitted.] There is no reason to vary that rule in the § 1345 context." *Fang*, 937 F. Supp. at 1195-96.

and the expenses incurred by the facilities in rendering them. In other kickback cases, the government has urged the Eleventh Circuit to adopt a more limited approach. *See* Brief of the United States, *United States v. Cardona*, No. 13-15840-EE, 2014 WL 7335591 (11th Cir. Dec. 22, 2014).  In that case, the Appellate Section of the United States Attorneys Office argued that courts should use the "following formula for calculating the net improper benefit conferred on the defendants by Medicare" in kickback cases:

> First, the Court must calculate the number of patient episodes of care (claims) that resulted from the defendants' payment of kickbacks. This number is obtained by dividing the total amount of kickbacks paid to known patient recruiters ... by the kickback amount paid per patient.... This yields [the total number of] claims that were tainted by kickbacks.
>
> The second step is to approximate how much Medicare paid [the Esformes's network] for each claim. This figure is obtained by dividing the total amount paid by Medicare to [the Esformes network] .... by the total number of claims billed by [the network] to the Medicare program during the course of the charged conspiracy. This results in an average payment by Medicare to [the network] per claim.
>
> The third step in this analysis is to calculate the gross improper benefit that Medicare conferred on [the network]. This is accomplished by multiplying the average payment by Medicare per claim ... by the total number of claims that resulted from known kickback payments....
>
> ***Finally, in order to determine the net improper benefit conferred by the defendants by Medicare, a subtraction for legitimate direct costs incurred by the defendants must be made***....

*Id*. at *16-17.

In *Cardona*, the evidence established that "on average, the defendants incurred direct costs of approximately 23% of the Medicare payment for any given claim." *Id.* The costs included the salaries "paid to the nurses and therapists who visited the beneficiaries in an episode of care (claim)." *Id.* Thus, the government argued that the gross claim amount should have been reduced by 23%. *Id.*

As set forth above, to the extent that Medicare paid a fixed fee for a medically necessary service that was actually rendered, there is no loss or restitution due at all to Medicare even if a patient was referred for services in exchange for a "kickback."

## C.    **The Hearing Itself**

The government will no doubt argue, as it did in the *Luis* litigation, that since it need only show "probable cause," it may rely solely on an agent's affidavit. However, even Judge Huck, who accepted the use of a "probable cause" standard, rejected the government's argument, holding that the defendant was permitted to cross-examine the agent but not the cooperating witnesses. *Luis*, 906 F. Supp. 2d at 1328-29. This is a civil, not a criminal, case, and nothing in § 1345 authorizes the Court to rely on the grand jury's *ex parte* finding of probable cause. To the contrary, § 1345 expressly limits the use of criminal procedures to discovery matters.

We respectfully submit that Judge Huck only got it half right. Since probable cause is *not* the appropriate standard, and since this is not a criminal case that can piggy back on the grand jury's finding of probable cause, the normal civil rules

should apply – as the plain and unambiguous language of § 1345 provides. Therefore, Mr. Esformes should have the full right of cross-examination, as he would at any other preliminary injunction hearing, including those where a government agency is the plaintiff. *See, e.g., Federal Trade Commission v. Sterling Precious Metals, LLC*, 894 F. Supp. 2d 1378 (S.D. Fla. 2012).

Moreover, the use of a diluted probable cause standard to bar the payment of attorney's fees to pay counsel of choice would be difficult to reconcile with *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 66 (1989), which held that seizures (books) that affect First Amendment rights could not justified on a mere probable cause finding. Seizures that interfere with the exercise of Sixth Amendment rights should likewise require more than probable cause.

The use of hearsay should also be precluded.  Hearsay is typically admissible at a hearing on a preliminary injunction but not at a hearing for a permanent injunction. *See Levi Strauss & Co. v. Sunrise Intern. Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). Although the government may characterize the injunction as preliminary, the injunction would effectively restrain Mr. Esformes's assets through the criminal trial. Its effect on Mr. Esformes right to counsel, therefore, would be permanent because it "will completely eviscerate his right to counsel of choice." *United States v. Kaley*, 579 F.3d 1246, 1266 (11th Cir. 2009) (Tjoflat, J., concurring). "'[W]hile the [Sixth Amendment] deprivation is nominally temporary, it is 'in that

respect effectively a permanent one.' 'The defendant needs the attorney *now* if the attorney is to do him any good.'" *United States v. E-Gold, Ltd.*, 521 F.3d 411, 417-18 (D.C. Cir. 2008) (citations omitted). The use of hearsay, therefore, would be inappropriate given "the character and objectives of the injunction proceeding." *Levi Strauss*, 51 F.3d at 985.

Even in proceedings where the Federal Rules of Evidence are held to not apply – *e.g.*, supervised release revocation proceedings – the Eleventh Circuit has held that "the admissibility of hearsay is not automatic" because defendants "are entitled to certain minimal due process requirements." *United States v. Frazier*, 26 F.3d 110, 114 (11th Cir. 1994). "Among these minimal requirements is the right to confront and cross-examine adverse witnesses." *Id.* In deciding whether to rely on hearsay, "the court must balance the defendant's right to confront adverse witnesses against the grounds asserted by the government for denying confrontation." *Id*. In addition, "the hearsay statement must be reliable." *Id*.

Hearsay testimony prevents the confrontation of the declarant and unreliable hearsay "undermines the accuracy of the fact-finding process." *Farrish v. Mississippi State Parole Bd.*, 836 F.2d 969, 978 (5th Cir. 1988). Hearsay that does not fall within a firmly-rooted exception is "presumptively unreliable." *United States Steel, LLC v.Tieco, Inc.*, 261 F.3d 1275, 1287 (11th Cir. 2001). While hearsay may come in various forms and have different degrees of reliability, *see, e.g., United States v.*

*Penn*, 721 F.2d 762, 765-67 (11th Cir. 1983) (lab reports regarding the presence of drugs in a person were admissible in probation revocation hearing because they came from a company whose business it was to conduct such tests and there was general corroboration that defendant had been taking drugs), the unsworn statements of cooperating witnesses who are looking to reduce their sentences must fall at the least reliable end of the spectrum.[19]

The *exclusive* reliance on hearsay presents particular concerns. *See, e.g., McBride v. Johnson*, 118 F.3d 432, 438 (5th Cir. 1997) (reversing a state parole board's revocation of a defendant's parole where the revocation was based solely on "a police officer's testimony as to what the alleged victim . . . told the officer."); *accord Russell v. State*, 982 So.2d 642, 646 (Fla. 2008) (holding that "hearsay evidence may not form the sole basis for revocation"). The unfairness is exacerbated when the hearsay is introduced through an FBI agent's **summary** of unsworn information supposedly provided by cooperators. There is simply no meaningful way to confront or disprove that information. The absence of verbatim statements from cooperators makes it impossible to probe inconsistencies. The absence of an oath raises questions about their veracity. *See Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) (finding of probable cause requires a consideration of the totality of

---

[19] The Supreme Court has held that in criminal cases, reliability is measured only by whether it has been "test[ed] in the crucible of cross-examination." *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

the circumstances, including the veracity, reliability, and basis of knowledge of the informants). Allowing the government to financially cripple an accused by meeting a minimal standard of proof with a minimal evidential showing threatens both an individual and societal constitutional harm. It compromises symmetry and harms the adversary system, which depends on parity of skill to achieve reliable results. The government could, in virtually every fraud case, control the strength and identity of its adversary based on unsworn information from nameless and faceless witnesses. Due process requires more.

## CONCLUSION

For all of the foregoing reasons, the Court should either deny the government's motion for a preliminary injunction/restraining order in its entirety or, in the alternative, limit the scope of any such order consistent with the Court's rulings on the other issues raised herein.

Respectfully submitted,

**BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.**
201 South Biscayne Boulevard, Suite 1300
Miami, FL  33131
Tel: (305) 371-6421

By:   */s/ Howard Srebnick*
**ROY BLACK, Esq.**
Fla. Bar No. 126088
**HOWARD SREBNICK, Esq.**
Fla. Bar No. 919063

**G. RICHARD STRAFER, ESQ.**
  Fla. Bar No. 389935
**JACKIE PERCZEK, ESQ.**
  Fla. Bar No. 0042201

**CARLTON FIELDS**
**MICHAEL PASANO**
  Florida Bar No. 0475947
100 S.E. 2nd Street, 4200 Miami Tower
Miami, Florida 33131-2114
Tel: (305) 530-0050

**TACHE, BRONIS, CHRISTIONSON**
  **& DESCALZO, P.A.**
**MARISSEL DESCALZO, ESQ.**
  Fla. Bar. No 669318
150 S.E. 2nd Avenue, Suite 600
Miami, Florida 33131
Tel: (305) 537-9565

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 5, 2016, I served all counsel of record

by electronically filing the foregoing with the Clerk of Court using the CM/ECF.

/s/ *Howard Srebnick*