UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-23148-CV-WILLIAMS

UNITED STATES OF AMERICA,

    *Plaintiff,*

v.

PHILIP ESFORMES,

    *Defendant.*

_____/

**MOTION TO DISMISS AND/OR MOTION FOR JUDGMENT ON THE PLEADINGS,
INCORPORATED MEMORANDUM OF LAW AND REQUEST FOR HEARING**

Defendant PHILIP ESFORMES, through undersigned counsel, respectfully

moves to either dismiss the Complaint for failure to state a claim upon which relief

can be granted under Fed. R. Civ. P. 12(b)(6) and/or for judgment on the pleadings

under Fed. R. Civ. P. 12(c),[1] because the Complaint fails to state claims upon which

relief can be granted and/or fails to allege fraud with particularity as required by Fed.

R. Civ. P. 9(b).  Mr. Esformes requests a one-hour oral argument to aid the Court in

---

[1] Since the pleadings have not been closed, a Rule 12(b)(6) motion to dismiss is still
timely. Even when the time period for filing a Rule 12(b)(6) motion has lapsed, courts
must still reach the merits by treating the motion as a motion for judgment on the
pleadings under Rule 12(c). *See Patel v. Contemporary Classics of Beverly Hills*, 259
F.3d 123, 125 (2d Cir. 2001) (collecting cases).

resolving the legal issues presented in this motion. In support of this motion, Mr. Esformes states:

1.     On July 20, 2016, the government filed an *ex parte* Complaint seeking injunctive relief under 18 U.S.C. § 1345, alleging that Mr. Esformes engaged in a conspiracy between 2009 and 2016 "to commit health care fraud, conspiring to pay and receive health care kickbacks, and by paying and receiving kickbacks in connection with" the Medicare program "in violation of 18 U.S.C. §§ 1349 & 371, and 42 U.S.C. §§ 1320a-7b(b)(1)(A) & (b)(2)(AA)." DE1:17. The Complaint alleges that the fraudulent scheme involved 18 listed Skilled Nursing Facilities (SNFs) and Assisted Living Facilities (ALFs). The Complaint alleges that those 18 facilities collected $221 million in paid claims. DE1:15. Of that total, the government concedes that it has traced only $19,160,000 directly to Mr. Esformes. DE:16-17.

2.     Most of the 74 paragraphs of the Complaint either describe the legal framework for the Medicare program and the SNFs and ALFs generally, *see* ¶¶ 4-21, 27, 58-61, or repeat the conclusory accusation that Mr. Esformes' conduct was "fraudulent" without identifying with particularity what Mr. Esformes actually (supposedly) did, *see* ¶¶ 6, 22, 56, 63, 71-72. With some minor exceptions discussed below, the Complaint contains only allegations about kickbacks paid or received for referrals of bona fide patients seeking medically necessary services.  *See* ¶¶ 23-26,

28-32. However, nearly all of these allegations describe the conduct of alleged co-conspirators, including brothers Guillermo and Gabriel Delgado, Nelson Salazar, Jose Morales, and an unidentified "patient broker," not Mr. Esformes. *See* ¶¶ 37-55. The Complaint asserts that the government has "consensual recordings" backing up its claim that Mr. Esformes was "the leader of this fraudulent" kickback scheme, but the Complaint does not identify or quote from any of them. *See* ¶ 56. Other paragraphs merely trace Medicare payments to the so-called "Esformes Network" and assert that the billings were in "excess of $1 billion" and that Mr. Esformes eventually received some of the profits from the payments. *See* ¶¶ 61-68. While these paragraphs support the fact that Mr. Esformes ran profitable businesses, they say nothing about why doing so was "fraudulent."

      3.     In addition to kickbacks paid or received for bona fide patients needing medically necessary services, the Complaint asserts that "the Esformes Network" billed Medicare "for services that were not medically necessary" and for "services not provided at all." *See* ¶¶ 57, 60, 61; *see also* ¶¶ 22, 24, 25 (referring to billings "for services *purportedly* provided....") (emphasis added). However, ***the Complaint does not identify a single patient or service fitting the description of "unnecessary" or non-existent.*** While the Complaint refers obliquely to the "cycling" of patients

through the facilities, *see* ¶¶ 22, 28, the Complaint leaves it to the reader to speculate why that would be illegal or the services unnecessary.

4.     Nor does the Complaint contain any factual assertions about what Mr. Esformes *personally* did. While the Complaint asserts that Mr. Esformes "sold ... patients to any provider willing to pay him kickbacks," *see* ¶ 22, again not a single patient is mentioned; no dates of these "sales" are identified; and the purchaser "providers" are also unidentified.  As noted above, most of the conduct attributed to Mr. Esformes was actually conduct committed by others. *See, e.g.,* ¶ 24 ("Esformes, through the Delgado brothers.....").

5.     Throughout the Complaint, the government asserts that Mr. Esformes "paid" both "physicians" and "physician assistants" to "induce them" to refer patients. *See* ¶¶ 22, 24, 26, 29, 35, 38, 48. However, not a single physician is identified in this "billion" dollar fraud spanning seven years. Nor does the Complaint assert when the payments occurred, or how much they were. Similarly, only *one* physician assistant (Arnaldo Carmouze) is mentioned in the Complaint.  *See* ¶¶ 24-25, 28,

6.     The Complaint also asserts that Mr. Esformes paid and received kickbacks from "providers."  *See* ¶ 31. Yet, not a single "provider" is identified, nor are any dates or amounts identified. Moreover, in that same paragraph, the government alleges that Mr. Esformes received kickbacks "disguised" as "charitable

-4-

donations." However, the Complaint fails to articulate how charitable donations could be illegal. As discussed *infra*, in most instances, they are not.

7.     In the portion of the Complaint claiming that Mr. Esformes was responsible for the conduct of the Delgado brothers, the government alleges that the Delgados negotiated consulting contracts – which the government calls "sham" with not a shred of factual support – with various unidentified health care providers for "gaining access" to the facilities. *See* ¶ 31. At least some of these "providers" were apparently "pharmacies." *See* ¶ 22. The Delgados were indicted for that same allegation and moved to dismiss it for failure to state a claim, arguing that the charged conduct was entirely legal – and indeed actually encouraged by Congress and Medicare. *See infra*.  The government negotiated plea bargains with the Delgados, so the court ultimately denied the motion as moot without addressing the merits.

8.     Although the criminal Indictment of Mr. Esformes cannot be used to save this defective Complaint, the Indictment is nearly as vague as the Complaint. It too claims that some unidentified portion of the services were either unnecessary or not provided, but only identifies two such claims, both in September 2011, involving the same patient and totaling only *$157*.  *See* Indictment, at pp. 13-14.

9.     Yet, in its most recent filing herein, the government doubles down and continues to assert that Mr. Esformes was "wrong" in describing the Complaint as

limited to kickbacks, asserting that Mr. Esformes has also been charged "with paying and receiving kickbacks for patients who *did not need* the medical services billed." *United States Reply In Support of Its Motion For Preliminary Injunction* (DE 79), at p. 4, n. 3. The government then cites only to *Paragraph 56* of the Complaint. We assume that was a typographical error, as ¶ 56 says nothing about medically unnecessary services. Paragraph 57 simply asserts that unidentified "Medicare beneficiaries" have provided unidentified "information" that they were used to bill Medicare "for services that were not medically necessary." As previously noted, however, no patients, dates or services are identified. Not one.

10.    The Complaint plainly does not meet the heightened pleading requirements of Rule 9(b), because it fails to supply sufficient facts supporting the overblown accusations about a "billion" dollar fraud.

## MEMORANDUM

### I.    LEGAL STANDARDS

Rule 12(b)(6) requires a plaintiff to allege sufficient facts to support a claim that could entitle the plaintiff to relief. Fed. R. Civ. P. 12(b)(6). The complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation and citation omitted). In deciding such a motion, the Court is limited to the

allegations presented in the Complaint. *United States ex rel. Keeler v. Eisai, Inc.*, 568 Fed. Appx. 783, 792 (11th Cir. 2014) (per curiam) (affirming dismissal of False Claims Act case alleging kickback violations "for the reasons set forth in the district court's scholarly and thorough January 31, 2013, Order and its April 1, 2013, clarification Order," citing Case No. 09-22302-CV-Williams (S.D. Fla.)).

Although the Court accepts as true well-pleaded facts, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678 (citation omitted). To survive a motion to dismiss, a complaint must provide more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," and should push the claim "across the line from conceivable to plausible." *Id.* at 678, 680 (citation omitted). And, "'conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal.'" *Keeler*, 568 Fed. Appx. at 793 (citation omitted).

In addition, Rule 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Contrary to the government, Complaints under § 1345 are not exempt from the particularity requirement of Rule 9(b). *See United States v. Nutri-Colony, Inc.*, No. C-91-1332-DLJ, 1991 WL 1078202 (N.D. Cal. May 23, 1991) (denying government's

-7-

motion for a preliminary injunction for violating Rule 9(b)); *United States v. Payment Processing Center, LLC*, No. 09-0725, 2006 WL 2990392 (E.D. Penn. Oct. 18, 2006) (dismissing in part government Complaint for lack of particularity under Rule 9(b)).[2]

The particularity requirement "serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370-71 (11th Cir. 1997) (internal quotation marks omitted). As this Court held in *Keeler* – a civil False Claims Act case alleging that a pharmaceutical manufacturer paid medical providers to use its drugs for off-label purposes – under Rule 9(b) a Complaint "must set forth 'facts as to time, place, and substance of the defendant's alleged fraud' and 'the details of the [defendant's] allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Keeler*, 568 Fed. Appx. at 793, quoting *United States ex rel Clausen v. Laboratory Corp. of Am., Inc.*, 290 F.3d 1301, 1309–10 (11th Cir. 2002) (quotation omitted); *accord United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302 (11th Cir.2010). "Underlying schemes and other wrongful activities that

---

[2] In the *United States' Reply In Support of Its Motion For Preliminary Injunction*, the government asserts without citing *any* authority that Rule 9(b) "does not apply" in § 1345 cases. DE79:11, n. 8. The Court should reject that argument based on the cases cited in the text. *Cf. Keeler*, 568 Fed. Appx. at 795 (rejecting argument that Rule 9(b) did not apply to *qui tam* actions alleging violations of the False Claims Act).

result in the submission of fraudulent claims are included in the 'circumstances constituting fraud or mistake' that must be pled with particularity pursuant to Rule 9(b)." *United States ex. rel. Karvelas v. Melrose–Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir.2004). Particularization is needed "to prevent '[s]peculative suits against innocent actors for fraud' and charges of guilt by association." *Keeler*, 568 Fed. Appx. at 793, quoting *Clausen*, 290 F.3d at 1308 (citation omitted).

## II.   DISCUSSION

### A.   The Allegations About Unnecessary or Non-Existent Services

The government's accusations that Mr. Esformes committed health care fraud by causing the submission of claims for services that were not provided or were medically unnecessary remain just that, accusations.  The Complaint does not identify a single billing for a single patient that meets those criteria, much less describe the services or the amount of the payment(s).  These allegations are far *less* detailed than in *Keeler* or *Clausen*. The Complaint here is as conclusory as the one dismissed by the Fifth Circuit in *United States ex rel Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1998), where the government merely alleged that 40% of the claims submitted by the defendants were "for services rendered in violation of the anti-kickback statute or the Stark laws" and "were for services that were not medically necessary," with "no further allegations in support of his claim."

-9-

Similarly, in *United States ex rel. Butler v. Magellan Health Servs., Inc.*, 101 F. Supp. 2d 1365 (M.D. Fla. 2000), a medical director brought a qui tam action against several healthcare providers, including his former employers. *Id.* at 1367. The plaintiff alleged that, as part of a scheme to submit fraudulent claims to Medicare, the defendants "fraudulently extended and reduced the duration of patient stays without regard to medical necessity" and "encouraged unnecessary patient admissions by waiving Medicare deductibles and CHAMPUS co-payments [and] then submitt[ed] false claims derived from these unnecessary admissions." *Id.* The defendants moved to dismiss because the allegations were not specifically pled in accordance with Rule 9(b). The district court granted the motion, criticizing the plaintiff for alleging a scheme but no "specific occurrences or facts" relating to "content" or "time or place" of the false claims or "the manner in which they were submitted." *Id.* at 1369-70.

The First Circuit recently affirmed the dismissal of a False Claims Act complaint alleging unnecessary services in *United States ex rel Hagerty v. Cyberonics, Inc.*, No. 16-1304, 2016 WL 7321224 (1ˢᵗ Cir. Dec. 16, 2016). In that case, the Complaint, while containing a "long list of healthcare providers" who billed the services, did "not allege whether these providers submitted reimbursement claims" for specific unnecessary services or procedures, did not "allege how many false claims these providers purportedly submitted or how Cyberonics' actions caused

their submission." 2016 WL 7321224, at *4. The First Circuit distinguished its earlier precedents which found a "close call" when a complaint *did* identify "'as to each of the eight medical providers (the who), the illegal kickbacks (the what), the rough time periods and locations (the where and when), and the filing of the false claims themselves.'" *Id.* (citation omitted).

The Complaint in this case does not even come close to that level of specificity, and is also less detailed than the one dismissed in *Hagerty*. *See also Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013-14 (11th Cir. 2005) (affirming dismissal of qui tam complaint because, although the relator "provided the 'who,' 'what,' 'where,' 'when,' and 'how' of improper practices," "he failed to allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government"). The same result of dismissal is required here. The Complaint offers no specifics – in the form of documentary exhibits or well-pled allegations regarding dates, amounts or participants – about the submission of any false claims for unnecessary or non-existent services. All the government offers are broad-sweeping, conclusory allegations of wrongdoing. These allegations cannot sustain a fraud claim under Rule 9(b) as a matter of law. *See also Altenel, Inc. v. Millennium Partners, L.L.C.*, 947 F. Supp. 2d 1357, 1362-63 (S.D. Fla. 2013) (Williams, J.) (dismissing fraud claims, in

-11-

part, because they were "not sufficiently pleaded under the heightened pleading standard applicable to fraud claims").

### B.   <u>The Kickback Allegations Generally</u>

Although not as totally bareboned as the unnecessary services accusation, most of the kickback allegations are equally deficient. There are few paragraphs delineating the who, what, where, when or how for the vast majority of the assertions of "fraud."[3] Only one physician assistant is named and no physicians at all are identified. "If Rule 9(b) is to carry any water, it must mean that an essential allegation and circumstance of fraudulent conduct cannot be alleged in such conclusory fashion." *Clausen*, 290 F.3d at 1312-13 & n. 21. Other than in the Delgado allegations, the identities of the "providers" are also left for speculation. *See Keeler*, 568 Fed. Appx. at 799 (dismissing kickback allegations in part because "there are scarcely any allegations that any doctor or facility that received such payments filed a claim for reimbursement – and none that are pleaded with any degree of particularity" and criticizing the Relator for "fail[ing] to connect the scheme to particular instances of fraud or misrepresentation"). Since the government has been investigating Mr. Esformes for years, there is no reason to excuse the government

_____

[3] A few paragraphs of the Complaint come close to passing muster under Rule 9(b). For example, ¶ 38 at least provides an outline of what the government claims the Delgados did – create phony invoices – but it does not identify the "physicians" or any dates and amounts of the alleged kickbacks.

from strict compliance with Rule 9(b). *See Keeler*, 568 Fed. Appx. at 802 ("Most concerning ... is that many of the details that were required to have been pleaded and should have been known to Relator are absent from the Complaint."). And since the government wants this Court to rely upon the unsubstantiated allegations to freeze Mr. Esformes' assets, not merely to allow a civil *qui tam* action to go forward, the Court should demand more, not less, particularity. *See also D.H.G. Prop., LLC v. Ginn Co., LLC*, No. 3:09-CV-735-J-34JRK, 2010 WL 5584464 (M.D. Fla. Sept. 28, 2010) (dismissing plaintiff's inadequately pled fraud claim and noting that while the complaint set forth plaintiff's "theory regarding the overall fraudulent scheme ... it is devoid of any specificity as to the fraudulent actions of [defendants]").

### C.    Implied Certification Theory

In *Keeler*, the Court believed that a fraud claim based upon an implied certification theory could be viable if pled correctly. *See Keeler*, 568 Fed. Appx. at 799. *Keeler*, however, was decided before the Supreme Court restricted the use of the certification theory in *Universal Health Services, Inc. v. United States*, 136 S.Ct. 1989 (2016). In that case, Court held that "the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, *but also makes specific representations about the goods or services provided*; and second, the defendant's failure to disclose noncompliance with

-13-

material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." 136 S.Ct. at 2001 (emphasis added). The Complaint contains no allegations that Mr. Esformes or his entities made any "specific representations about the goods or services provided." Hence, the government has failed to state a claim under an implied certification theory, much less one detailed enough to satisfy Rule 9(b).

### D. Charitable Donations As Illegal Kickbacks

The Complaint alleges that Mr. Esformes committed health care fraud by allegedly requiring unnamed providers to make unspecified donations to unidentified charities. While counsel can envision a circumstance where such conduct might be illegal,[4] there certainly are no allegations in the Complaint from which the Court or Mr. Esformes can assess the purported illegality. If Mr. Esformes, for example, were to ask a vendor to make a donation to the United Way, we fail to see how that would be illegal. The Office of Inspector General has issued several advisory opinions concerning when, if ever, charitable donations can be deemed illegal kickbacks. *See, e.g.,* OIG Advisory Opinions, Nos. 10-11 (July 30, 2010); 08-02 (Feb. 5, 2008); 05-11

---

[4] For example, the New York Attorney General is reportedly investigating President-Elect Donald Trump's family charity for, among other things, using charitable donations to pay for a portrait painting displayed in one of his resorts and to pay off law suit damage awards unrelated to the charity.

(Aug. 16, 2005); 01-02 (March 27, 2001). Most of these arrangements were considered lawful.

In *United States ex rel. Nehls v. Omincare, Inc.*, No. 07 C 05777, 2013 WL 3819671 (N.D. Ill. July 23, 2013), Mr. Esformes' father, Morris, was accused of violating the anti-kickback statutes and OIG Advisory Opinion 08-02 for soliciting donations to the Chabad of Ormond Beach, a Jewish religious school now called the Esformes Hebrew Academy. 2013 WL 3819671, at *17. The issue was vigorously disputed and the district court noted:

> This factual scenario presents a more difficult question because the relator has not presented evidence that these donations inured to the benefit of either the referral source, Morris, or his immediate family member, Philip. For instance, there is no evidence that Morris or Philip controlled or were employed by the school.

*Id.* Because Nehls' other accusations passed muster, the court declined to reach the issue. In this case, neither Mr. Esformes nor the Court can tell what the government's theory is regarding the charitable donations. Accordingly, the accusations cannot possibly satisfy Rule 9(b) and should be stricken.

### E.   The Defective Allegations of Financial Harm to Medicare

Even if the Court were to conclude that the kickback allegations are somehow sufficient, the government's requested remedy – an asset freeze – should be denied as unsupported. Medicare is not financially injured – much less "substantially"

-15-

injured as required by § 1345 – when a provider pays a kickback to secure the referral of bona fide patients. *See United States v. Porter*, 591 F.2d 1048, 1055 (5th Cir. 1979) (noting that the government conceded that it did not suffer any "pecuniary loss" from a pure kickback scheme). Since the Medicare program pays fixed rates for services performed, it suffers no *financial* harm or loss from a pure kickback scheme. *See United States v. Liss*, 265 F.3d 1220, 1231-32 (11th Cir. 2001). *Accord United States v. Pikus*, No. 13-CR-25-BMC, 2015 WL 3794456, at *3-4 (E.D.N.Y. June 17, 2015) (adopting the *Liss* holding). Accordingly, the relief sought by the government is not supported by the allegations in the Complaint.

### F.  The Delgado Pharmacy Allegation

In *United States v. Delgado*, Case No. 14-CR-20359-Martinez (S.D. Fla.), the government charged the Delgado brothers with some of the same kickback allegations that are in the instant civil Complaint and the parallel criminal case against Mr. Esformes.  The Delgados moved to dismiss the kickback charges, alleging that their marketing business had lawfully crafted an arrangement between a pharmacy and various ALFs and SNFs in which the pharmacy would provide its services to the residents/patients in those facilities. *See Delgado* DE187, 188-1. As it has tried to do in this case, the government characterized the arrangement as a "sham" designed to conceal illegal kickbacks. Objectively rephrased, the government contended that it

was a crime for a pharmacy to pay third parties (employees or independent contractors) to market the pharmacy's services to the owners of ALFs and SNFs which, in turn, would recommended that their residents/patients utilize that pharmacy when filling prescriptions that were then billed to federal health care programs. The Delgados argued that the marketing agreements were not shams but legal under the statutory and regulatory "safe harbors" for personal services contracts, *see* 42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(d), and/or a form of constitutionally-protected commercial speech.

ALFs, SNFs and long-term care facilities ("LTFs") have at least one common denominator: Their disabled or elderly residents typically take a variety of medications on a daily basis. One of the clear expectations of agencies that license ALFs, SNFs and LTFs is that medications will frequently be delivered and dispensed to residents by staff members *of the facilities*, rather than by off-site pharmacists. Contrary to the government, there is nothing sinister about pharmacies entering into contracts to supply facility-wide services to the residents of ALFs, SNFs and LTFs. On the contrary, state and federal law *encourage* such arrangements. And, for SNFs, Congress has gone even further, *requiring* them to provide resident-patients with "pharmaceutical services (including procedures that assure the accurate acquiring,

-17-

receiving, dispensing, and administering of all drugs and biologicals) to meet the needs of each resident." 42 U.S.C. § 1396r(b)(4)(A)(iii); *see also* 42 C.F.R. § 483.60.[5]

Florida law extends similar rights to residents of ALFs. Florida ALFs are thus required to provide "[a]ccess to adequate and appropriate health care" to their residents, Fla. Stat. § 429.28(1)(j), and are authorized to provide residents with assistance in storing and dispensing medication, Fla. Stat. § 429.256(3). Residents of ALFs, who are mentally and physically able to do so, may choose their own pharmacies and store and administer their medications themselves and ALFs "may not require residents" to receive services from specific third parties (such as pharmacies or health care providers). *See* 58A-5.0182(3)(c), F.A.C.; 58A-5.0182(7)(a), F.A.C.; 58A-5.0185(8)(c), F.A.C. However, with the permission of residents or their caretakers, ALFs may assume full responsibility for obtaining, storing and administering medications. *See* 58A-5.0182(5)(2), 6(d)(3), 7(c), F.A.C.; 58A-5.0185(2)-(6), F.A.C. Florida law thus contemplates that ALFs will develop arrangements with one or more pharmacies to service their residents.

---

[5] HHS regulations governing LTFs actually *require* that residents use a specific pharmacy or pharmacies. *See* 56 Fed. Reg. 48826, 48834 (Sept. 26, 1991). Numerous other provisions of federal law contemplate that LTFs may *either* have pharmacies on site *or* enter into contracts with off-site pharmacies to provide services to their residents. *See* 42 U.S.C. § 1395w-112(b)(4)(A)(i) and (b)(5); 42 U.S.C. § 1395w-27(f)(3)(B); 42 C.F.R. § 403.816(b)(2).

Since most ALFs and SNFs are too small to support in-house pharmacies, they contract with outside pharmacies to have medications dispensed to the facilities on behalf of their residents for administration by the staff.  ALFs and SNFs then assume the traditional role of pharmacist in counseling residents needing assistance concerning the drugs.  *See* 64B16-27.820(2), F.A.C. (requiring pharmacists to offer counseling to patients except for "inpatients" of "institution[s] where other licensed health care practitioners are authorized to administer the drug(s)").  Simply put, federal and state law cannot, on the one hand, encourage ALFs and SNFs to enter into contracts with pharmacies for the intended purpose of providing medications to residents which are then billed to health care programs, and, on the other hand, criminalize the advertising or marketing efforts of the pharmacies to acquire the statutorily authorized business. That is why they are exempt from the Anti-Kickback statute through safe harbors. *See generally United States ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045 (N.D. Ill. 2002).

If the government contends that the contracts used by the Delgados were "shams," the government must plead more than rhetoric. *Cf. United States v. Starks*, 157 F.3d 833, 835-36 (11th Cir. 1998) (noting that the defendants did not personally provide any medical services in exchange for their payments).  And, even if the Delgados' marketing contracts did not technically meet all the criteria for the safe

-19-

harbor, that would not necessarily mean that they were unlawful. *See* 64 Fed. Reg. 63518, 63521, 6325 (Nov. 19, 1999).[6]

## CONCLUSION

For all of the foregoing reasons, the Court should either dismiss the Complaint in its entirety or strike all the allegations which fail to comply with Rule 9(b). Since the only even plausibly viable allegations involve nothing more than kickbacks, and since the Medicare Program does not suffer any cognizable financial loss from paying claims for bona fide services provided to patients who were referred to a provider through kickbacks, the government's motion for a preliminary injunction should also be denied. *See Nutri-Colony, Inc.*, 1991 WL 1078202, at * 7 (denying injunction sought under § 1345 where the government failed to demonstrate "any harm to consumers, despite over nine years of investigation").

Pursuant to Local Rule 7.1(a)(3)(A), on January 9, 2017, undersigned served a copy of this motion upon government counsel who indicated that the government will oppose the relief requested.

---

[6] *See, e.g.,* OIG Advisory Opinion No. 98-15 (Nov. 2, 1998) (finding that a pharmacy which provided home infusion therapies could lawfully enter into a contract with a state university that operated a hemophilia center due to the structure of the contract); OIG Advisory Opinion No. 98-10 (Sept. 8, 1998) (approving contract with sales agent to negotiate contracts for a manufacturer of disposable medical supplies, even though the sales agent was paid a percentage of his sales as a commission).

Respectfully submitted,

**BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.**
201 South Biscayne Boulevard Suite 1300
Miami, FL  33131
Tel (305) 371-6421

By:    */s/ Roy Black*
    **ROY BLACK, Esq.**
     Fla. Bar No. 126088
    **HOWARD SREBNICK, Esq.**
     Fla. Bar No. 919063
    **JACKIE PERCZEK, ESQ.**
     Fla. Bar No. 0042201
    **G. RICHARD STRAFER, ESQ.**
     Fla. Bar No. 389935

    **CARLTON FIELDS**
    100 S.E. 2nd Street, 4200 Miami Tower
    Miami, Florida 33131-2114
    Telephone (305) 530-0050

By:    /s/ Michael Pasano
    **MICHAEL PASANO**
     Florida Bar No. 0475947

    **TACHE, BRONIS, CHRISTIANSON & DESCALZO**
    150 S.E. 2nd Avenue, Suite 600
    Miami, Florida 33131
    Tel (305) 537-9565

By:    /s/ Marissel Descalzo
    **MARISSEL DESCALZO, ESQ.**
     Fla. Bar. No 669318

### CERTIFICATE OF SERVICE

I certify that on January 9, 2017, my office served by email all counsel of record.

s/ Howard Srebnick
**HOWARD SREBNICK, Esq**.