# EXHIBIT B

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**Canoe Creek Holdings LLC**

This Limited Liability Company Agreement of Canoe Creek Holdings LLC(the "Company"), dated as of November 24, 2013, is entered into by and among the members of the Company whose names are set forth on the signature pages hereto and listed on Exhibit A hereto.  Capitalized terms used and not otherwise defined herein have the meanings set forth in Section 1.1.

RECITALS:

WHEREAS, the Company was formed on August 30, 2013 as a limited liability company pursuant to the provisions of the Delaware Limited Liability Company Act, as amended from time to time (the "Act");

WHEREAS, the Company was initially governed in accordance with the Act by and between the Company and Abraham Shaulson ("Shaulson"), as the initial sole Member; and

WHEREAS, effective as of the date hereof, as a result of the company issuing (the "Assignment") a 24.99% membership interest in the Company to SMAK Real Estate LLC, a Florida limited liability company ("SMAK"), Shaulson and SMAK desire to adopt this Agreement to give effect to the Assignment and to set forth the obligations of the Members and provide for the governance of the Company.

NOW, THEREFORE, the Company is hereby continued pursuant to the Act and this Agreement and the parties hereby agree as follows:

**ARTICLE I**
**CERTAIN DEFINED TERMS**

Section 1.1     Certain Defined Terms.

The following capitalized terms are used herein as defined below:

"Act" has the meaning set forth in the Recitals.

"Additional Member" means, any Person admitted to the Company as a Member in accordance with this Agreement on or after the date hereof in its capacity as a Member.

737256v1

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in the Member's Capital Account, as of a specified time, after giving effect to the following adjustments:

(a)     credit to such Capital Account any amounts that such Member is deemed obligated to restore pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) and the penultimate sentences of Treasury Regulations Section 1.704-2(g)(1) and Treasury Regulations Section 1.704-2(i)(5); and

(b)     debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affiliate" of a Person means another Person directly or indirectly controlling, controlled by, or under common control with, such Person; for this purpose, "control" of a Person means the power (whether or not exercised) to direct the policies, operations or activities of such Person by or through the ownership of, or right to vote, or to direct the manner of voting of, securities of such Person, or pursuant to law or agreement, or otherwise.  If the Person is a natural person, Affiliate shall include all Family Members of such Person.  If the Person is an entity, Affiliate shall include all Family Members of a natural person that controls the entity.

"Agreement" means this Limited Liability Company Agreement, including any Exhibits and Schedules hereto, as supplemented, amended or restated from time to time in the manner provided herein.

"Available Cash" means, the amount of cash on hand, subject to the retention and establishment of Reserves or payment to third parties of such funds as may be necessary with respect to the reasonable business needs of the Company as determined by the Board, which shall include the payment or the making of provision for the payment when due of the Company's obligations.

"Board" or "Board of Directors" means the Board of Directors of the Company.

"Capital Account" has the meaning set forth in <u>Section 4.2</u>.

"Capital Contributions" means the amounts contributed to the Company by the Members in accordance with <u>Article IV</u>.

"Carrying Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes; provided, however, that (i) the initial Carrying Value of any asset contributed to the Company shall be adjusted to equal its gross fair market value at the time of its contribution and (ii) the Carrying Values of all assets held by the Company shall be adjusted to equal their respective gross fair market values (taking Code Section

7701(g) into account) upon an adjustment to the Capital Accounts of the Members described in <u>Section 4.2</u>.  The Carrying Value of any asset whose Carrying Value was adjusted pursuant to the preceding sentence thereafter shall be adjusted in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(g).

"Certificate of Formation" has the meaning set forth in <u>Section 2.1</u>.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, or any corresponding or succeeding provisions of applicable law.

"Company" has the meaning set forth in the Preamble.

"Damages" has the meaning set forth in <u>Section 7.5</u>.

"Defaulting Member" has the meaning set forth in <u>Section 4.1</u>.

"Delaware Arbitration Act" has the meaning set forth in <u>Section 11.5</u>.

"Director" or "Directors" means the Person(s) elected to the Board of Directors from time to time by a Majority-in-Interest of the Members. A Director is hereby designated as a "manager" of the Company within the meaning of Section 18-101(10) of the Act.

"Election Period" has the meaning set forth in <u>Section 8.1</u>.

"Family Members" means, for any natural person, (a) a member of the specified person's immediate family, whether by blood or adoption, which shall include his or her spouse, siblings, parents or parents' spouses (or surviving spouses) and descendants and (b) a trust, corporation, limited liability company, partnership or other entity, the beneficial interests of which are held directly or indirectly by such natural person or one more persons described in clause (a).

"Fiscal Year" means the calendar year, unless changed pursuant to <u>Section 6.3</u>.

"Interest" means the entire limited liability company interest of a Member in the Company, as provided in this Agreement or by applicable law, and all rights, powers, duties and obligations of such Member in and with respect to the Company, including without limitation, the Member's interest in the Company's Profits, Losses and distributions of Available Cash and the Member's right to vote or consent to actions and decisions by the Company.

"Majority-in-Interest of the Members" means, at any time, the Members holding more than fifty percent (50%) of the outstanding Percentage Interests.

"Management Agreement" means the agreement of the Director in the form attached hereto as Exhibit C. The Management Agreement shall be deemed incorporated into, and a part of, this Agreement.

"Member" means the initial Members and shall also include such Persons as may hereafter be admitted to the Company as an Additional Member or substitute member of the Company in accordance with this Agreement, each in its capacity as a member of the Company, but does not include any Person who has ceased to be a Member.

"Millennium" means Millennium Management, L.L.C., a Florida limited liability company.

"Non-Defaulting Members" has the meaning set forth in Section 4.1.

"Non-Transferring Members" has the meaning set forth in Section 8.1.

"Offer Notice" has the meaning set forth in Section 8.1.

"Offered Interests" has the meaning set forth in Section 8.1.

"Officer" means an officer of the Company described in Section 7.2.

"Percentage Interest" means, as to a Member, such Member's percentage of the Interests held by all Members as set forth after the Member's name on Exhibit A, as amended from time to time.

"Permitted Transfers" has the meaning set forth in Section 8.1.

"Person" means, without limitation, a natural person or a corporation, joint stock company, limited liability company, partnership, joint venture, association, trust, government or governmental authority, agency, instrumentality or other entity, and any group of any of the foregoing acting in concert.

"Profit" or "Loss" means, for any Fiscal Year, the Company's taxable income or loss, respectively, for such Fiscal Year as computed for federal income tax purposes (including all items required to be separately stated), increased by items of income which are exempt from federal income tax and reduced by expenditures which, under federal income tax law, are neither deductible nor properly chargeable to a capital account, other than  amounts required to be specially allocated pursuant to Section 5.2; provided, however, that for book purposes gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Carrying Value of such property, notwithstanding that the adjusted tax basis of such property differs from its Carrying Value.

"Project" shall mean that certain 120 bed skilled nursing home located in the City of St. Cloud, Osceola County, Florida, doing business as Southern Oaks Healthcare Center.

"Purchaser" has the meaning set forth in <u>Section 8.1</u>.

"Reserves" means such cash amounts as are reserved, in the reasonable discretion of the Board, from time to time for the payment of actual or anticipated operating and capital expenses, contingent liabilities and other obligations or liabilities of the Company.

"Securities Act" has the meaning set forth in <u>Section 3.3</u>.

"Transfer" means, with respect to any Interest (or any portion thereof or interest therein) any action or intended action to sell, exchange, assign, transfer, give, donate or otherwise voluntarily, involuntarily or by operation of law dispose of, or any action or intended action to pledge, escrow, hypothecate, mortgage, grant or create an option to acquire or a security interest in or lien upon, or otherwise voluntarily, involuntarily or by operation of law encumber in any way, any Interest.

"Transferee" means any Person who receives an Interest (or any portion thereof or interest therein) as a result of a Transfer.

"Transferor" means any Person who made or makes a Transfer of an Interest (or any portion thereof or interest therein).

"Treasury Regulation" means any final, temporary or proposed regulation promulgated under the Code.  Any reference to a specific section shall include any amendments or successor provision thereto.

Section 1.2   <u>Titles and Captions</u>.  The titles and captions of the Articles and Sections of this Agreement are for convenience of reference only and do not in any way define or interpret the intent of the parties or modify or otherwise affect any of the provisions hereof and shall not affect the construction or interpretation of any provision hereof.

Section 1.4   <u>Conventions</u>.  Whenever the context so requires, each pronoun or verb used herein shall be construed in the singular or the plural sense and each capitalized term defined herein and each pronoun used herein shall be construed in the masculine, feminine or neuter sense as the context requires.  The terms "herein," "hereto," "hereof," "hereby," and "hereunder," and other terms of similar import, refer to this Agreement as a whole, and not to any section or other part hereof. References in this Agreement to "including," "includes" and "include" shall be deemed to be followed by "without limitation."

## ARTICLE II
## FORMATION AND PURPOSE

Section 2.1   <u>Formation</u>.  The Company was formed as a Delaware limited liability company pursuant to the Act upon the filing of the Certificate of Formation of the Company (as amended from time to time, the "Certificate of Formation") with the

Secretary of State of the State of Delaware on August 30, 2013. The execution and filing of the Company's Certificate of Formation, all pursuant to the Act, are hereby authorized, ratified and confirmed by the Members. Hereafter, the Board shall cause to be executed and filed, on behalf of the Company, such amendments to the Certificate of Formation, and such assumed name certificates and affidavits, additional instruments and amendments thereto, as may from time to time be necessary or appropriate to carry out this Agreement and enable the Company to conduct its business in accordance with applicable laws.

Section 2.2    Name and Place of Business.  The name of the Company shall be "Canoe Creek Holdings LLC".  The Company may do business under that name and under any other name or names designated by the Board.  The principal place of business of the Company shall be c/o Millennium Management, L.L.C., 10800 Biscayne Boulevard, Suite 600, Miami, Florida 33161, or such other place or places as the Board determines.

Section 2.3    Office and Registered Agent.  The Company's initial registered office and registered agent at that address shall be as set forth in the Certificate of Formation.  The registered office and registered agent may be changed by the Board from time to time by the filing of the address of the new registered office and/or the name of the new registered agent with the Delaware Secretary of State pursuant to the Act and by giving notice to each of the Members in the manner provided in this Agreement.

Section 2.4    Term.  The term of the Company commenced on the date the Certification of Formation was filed as set forth in Section 2.1 and shall continue in perpetuity until the Company is dissolved in accordance with either the provisions of this Agreement or the Act.

Section 2.5    Purposes.  The purposes of the Company shall be to

(a)    acquire, own, hold, manage, finance, encumber, lease and sell the Project and any interest therein and to contract for the operation, maintenance, management and development of the Project; and

(b)    do all things necessary, convenient, suitable or proper for the accomplishment of or in furtherance of any of the purposes set forth herein, and to do every other act or acts incidental to or arising from or connected with any of such purposes.

Section 2.6    No State Law Partnership.  The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member shall be a partner or joint venturer of any other Member by virtue of this Agreement, for any purposes other than federal and, if applicable, state and local tax purposes, and neither this Agreement nor any other document entered into by the Company or any Member shall be construed to suggest otherwise.  The Members intend that the Company shall be treated as a partnership for federal, state and local income tax purposes, and each Member and the Company shall file all tax returns and

-6-

shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

## ARTICLE III
## MEMBERS

Section 3.1    Original and New Members.

(a)    Original Member.  Shaulson was admitted to the Company as its original sole Member upon his execution and delivery of the Certificate of Formation.

(b)    New Members.  Ayintova has been admitted as a new Member as of the date of this Agreement.

Section 3.2    Additional Members.  Additional Members may be admitted to the Company (a) with the consent of the Board or (b) as a result of a Permitted Transfer under Section 8.1.  Each Additional Member shall be admitted to the Company as a Member on the first date on which both of the following shall have occurred: (i) its execution of a counterpart to this Agreement and (ii) receipt by the Company of such Person's required Capital Contribution, if any.

Section 3.3    Representations and Warranties of Members.  Each Member hereby represents and warrants to and covenants with the Company and each other Member that:

(a)    such Member has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto;

(b)    such Member has reviewed and evaluated all information necessary to assess the merits and risks of its investment in the Company and has had answered to its satisfaction any and all questions regarding such information;

(c)    such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time;

(d)    such Member is acquiring its Interest for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof;

(e)    Interests have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any other jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified, or exempt from registration and qualification, under the Securities Act and such other applicable securities laws, and the provisions of this Agreement have been complied with;

(f)    such Member, and each member of such Member, is an "accredited investor" as such term is defined in Regulation D under the Securities Act;

-7-

(g)     the execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained, and will not contravene or result in a default under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound;

(h)     the decision of such Member to acquire an Interest in the Company has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the properties, business, prospects or condition (financial or otherwise) of the Company which may have been made or given by any other Member, or by any agent or employee of any other Member;

(i)     this Agreement is valid, binding and enforceable against such Member in accordance with its terms;

(j)     the funds used by such Member to invest in the Company are derived (i) from transactions that do not violate United States law or, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated and (ii) from permissible sources under United States law and, to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated;

(k)     such Member (i) is not under investigation by any governmental authority for, and has not been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any anti-money laundering laws, (ii) has not been assessed civil or criminal penalties under any anti-money laundering laws and (iii) has not had any of its funds seized or forfeited in any action under any anti-money laundering laws; and

(l)     the statements set forth with respect to such Member in <u>Exhibit B</u> hereto are accurate.

Section 3.4     <u>Limitation of Liability of Members</u>.  Except as otherwise provided in this Agreement or as required by applicable law, no Member shall have any personal liability whatsoever in such Member's capacity as a Member, whether to the Company, to any of the other Members, to the creditors of the Company, or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the Company, and shall be liable only to make such Member's Capital Contribution to the Company and any other payments which may be expressly required under this Agreement.

Section 3.5     <u>Intentionally Deleted.</u>

Section 3.6     <u>Rights and Duties of Members</u>.  Except as may be otherwise required by law, no Member shall have any power or authority to act for and bind the

Company in its capacity as such. To the extent that the rights, powers, duties, obligations and liabilities of the Members are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

**ARTICLE IV**
**CAPITAL CONTRIBUTIONS;**
**CAPITAL ACCOUNTS**

Section 4.1     Capital Contributions.

(a)     Initial Contributions.  It is acknowledged and agreed that the Members have made the Capital Contributions set forth next to their names on Exhibit A, which amounts will constitute Capital Contributions for all purposes of this Agreement.

(b)     Additional Contributions.  No additional Capital Contributions shall be required unless the Board of Directors approves such Capital Contributions.  All additional Capital Contributions shall be made pro-rata in accordance with each Member's Percentage Interest.  Exhibit A shall be updated from time to time to reflect additional Capital Contributions.

(d)     Failure to Pay.  If, after ten (10) days advance written notice, any Member is unable or unwilling to contribute his portion of any required Capital Contributions (the "Defaulting Member"), the other Members (the "Non-Defaulting Members") shall have the right, but not the obligation, to fund such amount pro-rata based upon their Percentage Interests.  In such event, the Percentage Interest of the Defaulting Member will be reduced and the Percentage Interests of the Non-Defaulting Members will be proportionately increased to reflect the dilution to the Defaulting Member.  Such adjustments to Percentage Interests will be determined based on the total Capital Contributions made by all the Members.

Section 4.2     Establishment and Determination of Capital Accounts.  A capital account ("Capital Account") shall be established for each Member on the books of the Company initially reflecting an amount equal to such Member's initial Capital Contribution to the Company. Each Member's Capital Account shall be (a) increased by any additional Capital Contributions made by such Member pursuant to the terms of this Agreement and such Member's share of Profits, the amount of any Company liabilities that are assumed by such Member and any other items of income and gain allocated to such Member pursuant hereto, (b) decreased by such Member's share of Losses, any distributions to such Member of cash or the fair market value (as determined by the Board) of any other property (net of liabilities assumed by such Member and liabilities to which such property is subject) distributed to such Member, the amount of any liabilities of such Member that are assumed by the Company, and any other deduction allocated to such Member pursuant hereto, and (c) adjusted as otherwise provided by the Code and the Treasury Regulations, including but not limited to, the rules of Treasury Regulation Section 1.704-1(b)(2)(iv)(f). Any references in this Agreement to the Capital Account of

-9-

a Member shall be deemed to refer to such Capital Account as the same may be increased or decreased from time to time as set forth above.

Section 4.3    No Liability for Capital Contributions.  No Member shall (a) be personally liable for the return of any portion of the Capital Contributions of the Members, the return of which shall be made solely from the Company's assets, or (b) be required to cure any deficit Capital Account.

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

Section 5.1    Allocations of Profits and Losses.

(a)    Profits and Losses.  Except as otherwise provided in this Agreement, Profits and Losses (and, to the extent necessary, individual items of income, gain, loss, deduction or credit) of the Company shall be allocated among the Members in accordance with their Percentage Interest; provided that the Losses allocated pursuant to this Section 5.1(a) shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some, but not all, of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to this Section 5.1(a), the limitation set forth in this Section 5.1(a) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to the Members under Section 1.704-1(b) (2) (ii) (d) of the Regulations.  In the event that there are any remaining Losses in excess of the limitations set forth in this Section 5.1, such remaining Losses shall be allocated among the Partners in proportion to their respective Percentage Interests.

(b)    Tax Allocations.  For United States federal, state and local income tax purposes, items of income, gain, loss, deduction and credit shall be allocated to the Members in accordance with the allocations of the corresponding items for Capital Account purposes under Section 5.1(a), except that items with respect to which there is a difference between tax and book basis will be allocated in accordance with Section 704(c) of the Code, the Treasury Regulations thereunder and Treasury Regulation Section 1.704-1(b)(4)(i).

Section 5.2    Regulatory and Special Allocations.  Notwithstanding the provisions of Section 5.1:

(a)    Minimum Gain and Nonrecourse Debt.  Allocations made in respect of minimum gain and nonrecourse debt shall be made in accordance with Treasury Regulations Section 1.704-2.

(b)    Qualified Income Offset. The Company shall comply with the qualified income offset requirement in Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

Section 5.3    Section 754 Election.  Upon the decision of the Board, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of Company

property as permitted and provided in Sections 734 and 743 of the Code. Such election shall be effective solely for federal (and, if applicable, state and local) income tax purposes and shall not result in any adjustment to the Carrying Value of any Company asset or to the Member's Capital Accounts (except as provided in Treasury Regulations Section 1.704-1(b)(2)(iv)(m)) or in the determination or allocation of Profit or Loss for purposes other than such tax purposes.

Section 5.4    Distributions of Available Cash.  Except as provided in Section 5.5, distributions of Available Cash, if any, shall be made as determined by the Board to the Members pro-rata in accordance with their respective Percentage Interests.

Section 5.5    Tax Distribution.

(a)    Distribution Obligation.  Notwithstanding any of the provisions of Section 5.4 to the contrary, the Company shall, to the extent of Available Cash, either prior to, together with or subsequent to any distribution pursuant to Section 5.4, make a distribution to each of the Members of amounts intended to enable such Members (or any person whose tax liability is determined by reference to the income of any such Member) to discharge their United States federal, state and local income tax liabilities arising from the allocations made pursuant to (or based upon) Section 5.1.  The amount distributable to each Member pursuant to this Section 5.5(a) shall be (A) 40% multiplied by (B) an amount equal to (i) the Net Cumulative Income (as defined below) allocable to such Member in the most recently concluded year or other relevant period less (ii) the amount of all distributions made to such Member pursuant to this Section 5.5 with respect to any prior year or other period, and shall be distributed within ninety (90) days after the end of year or other period to the Members, pro-rata, in proportion to their respective allocation of net income for such year or period. "Net Cumulative Income" means with respect to any Member the excess of the net income allocated to such Member or its permitted transferees for all years in which it or its permitted transferee was a Member over the net losses allocated to such Member or its permitted transferees for all years in which it or its permitted transferees was a Member.

(b)    Certain Reductions.  The aggregate amount distributable to any Member pursuant to this Section 5.5 for any year or other relevant period of the Company shall be reduced by all amounts distributable or previously distributed to such Member pursuant to this Section 5.4 or Sections 5.5 for such year or period.  The amount distributable to any Member for any year or other period pursuant to Section 5.4 shall be reduced by the amount distributed to such Member pursuant to this Section 5.5 for such year or period, and the amount so distributed under this Section 5.5 shall be deemed to have been distributed to the extent of such reduction pursuant to Section 5.4 for purposes of making the determinations required by Section 5.4.

## ARTICLE VI
## FISCAL MATTERS

Section 6.1    Tax Returns.  At the expense of the Company, the Board shall prepare and file, or shall cause to be prepared and filed, all federal and any required state, local and foreign income and other tax returns for the Company for each Fiscal Year.

Section 6.2    Fiscal Year and Other Elections.  The Fiscal Year shall coincide with the taxable year of the Company and end on December 31 of each year or such other date as the Board may select pursuant to applicable law.  All other accounting decisions and elections required or permitted to be made by the Company for tax purposes under applicable law shall be made by the Board.

Section 6.3    Books and Records.  The Board shall maintain or cause to be maintained at the principal place of business of the Company, or at such other place as the Board may determine, complete and accurate books and records of the assets, results of operations, financial condition, and other business and affairs of the Company, including without limitation:

(a)     a current list of the Members, setting forth the name, address and Capital Contributions of each;

(b)     a copy of this Agreement and any amendments hereto; and

(c)     a copy of the Company's income tax and information returns and reports, if any, for each of the three most recently ended Fiscal Years.

Section 6.4    Bank Accounts. The Company shall maintain one or more accounts (including, but not limited to, brokerage, custodial, checking, cash management and/or money market accounts) in such banks, brokerage houses or other financial institutions as the Board may determine.  All amounts deposited by or on behalf of the Company in those accounts shall be and remain the property of the Company.  All withdrawals from such accounts shall be made only by the Board or a Person authorized by the Board.  No funds of the Company shall be kept in any account other than a Company account, and funds of the Company shall not be commingled with the funds of any other Person; and no Member, the Board or Person authorized by the Board shall apply, or permit any other Person to apply, such funds in any manner, except for the benefit of the Company.

Section 6.5    Reports to Members.

(a)     Schedule K-1.  As soon as practicable after the end of each Fiscal Year, the Company shall distribute to each Member a copy of its Schedule K-1 to the Partnership Tax Return (Form 1065).

(b)     Inspection.  Each Member or his or its duly authorized representative may, upon reasonable advance notice, inspect at such Member's own expense, for a purpose reasonably related to its Interest, during the normal business hours of the Company, any of the Company's books and records.

(c)     Financial Statements.  The Board may cause reviewed financial statements of the Company to be completed each year and delivered to the Members.

## ARTICLE VII
## MANAGEMENT

Section 7.1     Management of the Company.

(a)     Board of Directors.     The business and affairs of the Company shall be managed by or under the direction of a Board of one or more Directors designated by the a Majority-in-Interest of the Members.  A Majority-in-Interest of the Members may determine at any time the number of Directors to constitute the Board.  The authorized number of Directors may be increased or decreased by a Majority-in-Interest of the Members at any time upon notice to all Directors.  The initial number of Directors shall be one.  Each Director elected, designated or appointed by a Majority-in-Interest of the Members shall hold office until a successor is elected and qualified or until such Director's earlier death, resignation, expulsion or removal.  Each Director shall execute and deliver the Management Agreement attached hereto as Schedule C.  Directors need not be a Member.  The initial Director of the Company is listed on Schedule D hereto.

(b)     Powers.  The Board of Directors shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise.  The Board of Directors has the authority to bind the Company.

(c)     Meeting of the Board of Directors.  The Board of Directors of the Company may hold meetings, both regular and special, within or outside the State of Delaware.  Regular meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board.  Special meetings of the Board may be called by the President on not less than one day's notice to each Director by telephone, facsimile, mail, telegram, e-mail or any other means of communication, and special meetings shall be called by the President or Secretary in like manner and with like notice upon the written request of any one or more of the Directors.

(d)     Quorum: Acts of the Board.  At all meetings of the Board, a majority of the Directors shall constitute a quorum for the transaction of business and, except as otherwise provided in any other provision of this Agreement, the act of a majority of the Directors present at any meeting at which there is a quorum shall be the act of the Board. If a quorum shall not be present at any meeting of the Board, the Directors present at such meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.  Any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board or committee, as the case may be.

(e)     Electronic Communications.  Members of the Board, or any committee designated by the Board, may participate in meetings of the Board, or any committee, by means of telephone conference or similar communications equipment that allows all Persons participating in the meeting to hear each other, and such participation in a meeting shall constitute presence in Person at the meeting.  If all the participants are

-13-

one conference or similar communications equipment, the meeting
held at the principal place of business of the Company.

ttees of Directors.

The Board may, by resolution passed by a majority of the whole
Board, designate one or more committees, each committee to
consist of one or more of the Directors of the Company.  The
Board may designate one or more Directors as alternate members
of any committee, who may replace any absent or disqualified
member at any meeting of the committee.

In the absence or disqualification of a member of a committee, the
member or members thereof present at any meeting and not
disqualified from voting, whether or not such members constitute a
quorum, may unanimously appoint another member of the Board
to act at the meeting in the place of any such absent or disqualified
member.

Any such committee, to the extent provided in the resolution of the
Board, shall have and may exercise all the powers and authority of
the Board in the management of the business and affairs of the
Company.  Such committee or committees shall have such name or
names as may be determined from time to time by resolution
adopted by the Board.  Each committee shall keep regular minutes
of its meetings and report the same to the Board when required.

ensation of Directors; Expenses.  The Board shall have the authority
ion of Directors.  The Directors may be paid their expenses, if any, of
gs of the Board, which may be a fixed sum for attendance at each
d or a stated salary as Director.  No such payment shall preclude any
g the Company in any other capacity and receiving compensation
of special or standing committees may be allowed like compensation
ittee meetings.

oval of Directors.  Unless otherwise restricted by law or this
ector or the entire Board of Directors may be removed or expelled,
se, at any time by a Majority-in-Interest of the Members, and any
any such removal or expulsion may be filled by action of a Majority-
embers.

ctors as Agents.  To the extent of their powers set forth in this
ectors are agents of the Company for the purpose of the Company's
tions of the Directors taken in accordance with such powers set forth
hall bind the Company.  Notwithstanding the last sentence of Section
except as provided in this Agreement or in a resolution of the
or may not bind the Company.

-14-

## ARTICLE VII
## MANAGEMENT

Section 7.1    Management of the Company.

(a)    Board of Directors.    The business and affairs of the Company shall be managed by or under the direction of a Board of one or more Directors designated by the a Majority-in-Interest of the Members.  A Majority-in-Interest of the Members may determine at any time the number of Directors to constitute the Board.  The authorized number of Directors may be increased or decreased by a Majority-in-Interest of the Members at any time upon notice to all Directors.  The initial number of Directors shall be one.  Each Director elected, designated or appointed by a Majority-in-Interest of the Members shall hold office until a successor is elected and qualified or until such Director's earlier death, resignation, expulsion or removal.  Each Director shall execute and deliver the Management Agreement attached hereto as Schedule C.  Directors need not be a Member.  The initial Director of the Company is listed on Schedule D hereto.

(b)    Powers.  The Board of Directors shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise.  The Board of Directors has the authority to bind the Company.

(c)    Meeting of the Board of Directors.  The Board of Directors of the Company may hold meetings, both regular and special, within or outside the State of Delaware.  Regular meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board.  Special meetings of the Board may be called by the President on not less than one day's notice to each Director by telephone, facsimile, mail, telegram, e-mail or any other means of communication, and special meetings shall be called by the President or Secretary in like manner and with like notice upon the written request of any one or more of the Directors.

(d)    Quorum: Acts of the Board.  At all meetings of the Board, a majority of the Directors shall constitute a quorum for the transaction of business and, except as otherwise provided in any other provision of this Agreement, the act of a majority of the Directors present at any meeting at which there is a quorum shall be the act of the Board. If a quorum shall not be present at any meeting of the Board, the Directors present at such meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.  Any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board or committee, as the case may be.

(e)    Electronic Communications.  Members of the Board, or any committee designated by the Board, may participate in meetings of the Board, or any committee, by means of telephone conference or similar communications equipment that allows all Persons participating in the meeting to hear each other, and such participation in a meeting shall constitute presence in Person at the meeting.  If all the participants are

-13-

participating by telephone conference or similar communications equipment, the meeting shall be deemed to be held at the principal place of business of the Company.

    (f)   <u>Committees of Directors</u>.

    (i)   The Board may, by resolution passed by a majority of the whole Board, designate one or more committees, each committee to consist of one or more of the Directors of the Company. The Board may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.

    (ii)   In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member.

    (iii)   Any such committee, to the extent provided in the resolution of the Board, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Company. Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board. Each committee shall keep regular minutes of its meetings and report the same to the Board when required.

    (g)   <u>Compensation of Directors; Expenses</u>. The Board shall have the authority to fix the compensation of Directors. The Directors may be paid their expenses, if any, of attendance at meetings of the Board, which may be a fixed sum for attendance at each meeting of the Board or a stated salary as Director. No such payment shall preclude any Director from serving the Company in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

    (h)   <u>Removal of Directors</u>. Unless otherwise restricted by law or this Agreement, any Director or the entire Board of Directors may be removed or expelled, with or without cause, at any time by a Majority-in-Interest of the Members, and any vacancy caused by any such removal or expulsion may be filled by action of a Majority-in-Interest of the Members.

    (i)   <u>Directors as Agents</u>. To the extent of their powers set forth in this Agreement, the Directors are agents of the Company for the purpose of the Company's business, and the actions of the Directors taken in accordance with such powers set forth in this Agreement shall bind the Company. Notwithstanding the last sentence of Section 18-402 of the Act, except as provided in this Agreement or in a resolution of the Directors, a Director may not bind the Company.

-14-

Section 7.2    Officers.

(a)    Officers.  The initial Officers of the Company shall be designated by Shaulson. The additional or successor Officers of the Company shall be chosen by the Board and shall consist of at least a President, a Secretary and a Treasurer.  The Board of Directors may also choose one or more Vice Presidents, Assistant Secretaries and Assistant Treasurers.  Any number of offices may be held by the same person.  The Board may appoint such other Officers and agents as it shall deem necessary or advisable who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board.  The salaries of all Officers and agents of the Company shall be fixed by or in the manner prescribed by the Board.  The Officers of the Company shall hold office until their successors are chosen and qualified.  Any Officer may be removed at any time, with or without cause, by the affirmative vote of a majority of the Board.  Any vacancy occurring in any office of the Company shall be filled by the Board.  The initial Officers of the Company designated by the Member are listed on Schedule E hereto.

(b)    President.  The President shall be the chief executive officer of the Company, shall preside at all meetings of the Board, shall be responsible for the general and active management of the business of the Company and shall see that all orders and resolutions of the Board are carried into effect.  The President or any other Officer authorized by the President or the Board shall execute all bonds, mortgages and other contracts, except:  (i) where required or permitted by law or this Agreement to be otherwise signed and executed; (ii) where signing and execution thereof shall be expressly delegated by the Board to some other Officer or agent of the Company, and (iii) as otherwise permitted in Section 7(c).

(c)    Vice President.  In the absence of the President or in the event of the President's inability to act, the Vice President, if any (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Directors, or in the absence of any designation, then in the order of their election), shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President.  The Vice Presidents, if any, shall perform such other duties and have such other powers as the Board may from time to time prescribe.

(d)    Secretary and Assistant Secretary.  The Secretary shall be responsible for filing legal documents and maintaining records for the Company.  The Secretary shall attend all meetings of the Board and record all the proceedings of the meetings of the Company and of the Board in a book to be kept for that purpose and shall perform like duties for the standing committees when required.  The Secretary shall give, or shall cause to be given, notice of all meetings of the Member, if any, and special meetings of the Board, and shall perform such other duties as may be prescribed by the Board or the President, under whose supervision the Secretary shall serve.  The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Board (or if there be no such determination, then in order of their election), shall, in the absence of the Secretary or in the event of the Secretary's inability to act, perform the duties and

-15-

exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Board may from time to time prescribe.

(e)     Treasurer and Assistant Treasurer. The Treasurer shall have the custody of the Company funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Board. The Treasurer shall disburse the funds of the Company as may be ordered by the Board, taking proper vouchers for such disbursements, and shall render to the President and to the Board, at its regular meetings or when the Board so requires, an account of all of the Treasurer's transactions and of the financial condition of the Company. The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board (or if there be no such determination, then in the order of their election), shall, in the absence of the Treasurer or in the event of the Treasurer's inability to act, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Board may from time to time prescribe.

(f)     Officers as Agents. The Officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Board not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business and the actions of the Officers taken in accordance with such powers shall bind the Company.

(g)     Duties of Board and Officers. Except to the extent otherwise modified herein, each Director and Officer shall have fiduciary duties identical to those of directors and officers of business corporations organized under the General Corporation Law of the State of Delaware.

Section 7.3     Interested Members.

Related Party Transactions. No contract or other transaction between or among the Company and one or more of its Members or the Board or any Affiliate of a Member or the Board or any other Person in which one or more of the Members or the Board are partners, members, managers, directors or officers, or have a substantial financial interest shall be either void or voidable for this reason alone or by reason that such Member or the Board is present at the meeting of the Members which approves such contract or transaction, or that his consent was given for such contract or transaction, if the material facts as to such Member's or Affiliate's interest in such contract or transaction and as to any such common partnership, membership, managership, directorship, officership or financial interest are disclosed in good faith or known to the Members or the Board who consent to such contract or transaction. If there was no such disclosure or knowledge, to the fullest extent permitted by law, the Company may avoid the contract or transaction.

Section 7.4     Intentionally Deleted.

Section 7.5     Company Indemnification. To the fullest extent permitted by law, the Company shall indemnify each Director, Member (acting in its capacity as a Member)

and their legal representatives, agents, Affiliates, members, stockholders, officers, successors and assigns, and hold each of them harmless from and against any Damages suffered or incurred by such Person, as such, or any of them in the course of serving in any office of, or otherwise representing or acting for or on behalf of the Company, except to the extent that a judgment or other final adjudication adverse to such Person establishes (a) that such Person's acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (b) that such Person gained in fact a financial profit or other advantage to which such Person was not legally entitled; provided, however, that, any other provision hereof notwithstanding, any such indemnification shall be solely from the net assets of the Company, and no Member shall be required to make any additional Capital Contribution or otherwise pay any amount from such Member's own assets as a result thereof. The Company may procure insurance in such amounts and covering such risks as the Board deems appropriate to fund any indemnification required or permitted to be made hereunder.

Section 7.6    Competitive Activity.  Notwithstanding any duty otherwise existing at law or in equity, nothing in this Agreement shall be deemed to restrict in any way the rights of any Director or any Member, or of any Affiliate of any Member, to conduct any business or activity whatsoever, and no Member or Director shall be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business.  The organization and operation of the Company shall be without prejudice to the Director's or Members' respective rights (or the rights of their respective Affiliates) to create, maintain, expand or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom.  Each Member and the Director waives any rights the Member or Director might otherwise have to share or participate in such other interests or activities of any Director or any other Member or such Member's Affiliates.

Section 7.7    Compensation.  Unless approved by the Board, no Member shall be entitled to compensation for services performed on behalf of the Company.

## ARTICLE VIII
## TRANSFERS

Section 8.1    Transfer Limitations.

(a)    Restrictions.  Except for Transfers permitted by Section 8.1(b) or Section 8.1(c) ("Permitted Transfers"), no Member may directly or indirectly Transfer all or any portion of its Interests.  No Member may voluntarily resign from the Company. Any Member who resigns from the Company in violation of this Agreement shall not be entitled to receive any consideration therefor.  Any purported Transfer (whether voluntarily or involuntarily or by operation of law) in violation of this Agreement shall, to the fullest extent permitted by law, be null and void and shall not bind the Company and any purported transferee of such Interest will under no circumstances have the right to participate in any decisions or vote on any matters involving the Company.

-17-

(b)     Transfers to Affiliates.  Any Member may Transfer all or any portion of its Interest to any of its Affiliates provided that such Transferee assumes the Transferor's obligations under, complies with, and agrees to be bound by the provisions of this Agreement.

(c)     Rights of First Offer.

(i)     A Member may Transfer all, but not part, of its Interests (such Member being referred to herein as the "Transferor" and the Interests which it proposes to Transfer being referred to herein as the "Offered Interests") to a bona fide third party purchaser or another Member who is not an Affiliate of the Transferor (a "Purchaser") if the Transferor first complies with the requirements of this Section 8.1(c).  Prior to any Transfer of the Offered Interests, the Transferor shall notify the other Members (the "Non-Transferring Members") in writing of (i) its bona fide intention to Transfer the Offered Interests, (ii) the Percentage Interest represented by the Offered Interests and (iii) the price and the terms and conditions, if any, upon which it proposes to Transfer the Offered Interests (the "Offer Notice"), and the Non-Transferring Members shall have the right to elect to purchase all, but not part, of the Offered Interests.

(ii)     Each Non-Transferring Member may elect, by delivery of written notice to the Transferor and each other Non-Transferring Member, within twenty (20) days immediately following the receipt of the Offer Notice (the "Election Period"), to acquire the Offered Interests for the price and upon the terms and conditions set forth in the Offer Notice.  If the total amount of the Offered Interests specified in the elections to purchase by the Non-Transferring Members exceeds the Offered Interests available for purchase, then each Non-Transferring Member electing to purchase will be deemed to have elected to purchase that amount of Offered Interests equal to the amount obtained by multiplying the amount of Offered Interests available for purchase by the so electing Non-Transferring Members by a fraction (x) the numerator of which is the Percentage Interest then held by such Non-Transferring Member and (y) the denominator of which is the total Percentage Interest then held by all Non-Transferring Members electing to purchase the Offered Interests.

(iii)     The purchase price for all Offered Interests so elected to be purchased by the Non-Transferring Members shall be paid to the Transferor within thirty (30) days after the end of the Election Period.

(iv)     If the Non-Transferring Members do not elect to purchase all of the Offered Interests as provided in this Section 8.1(c), then the Transferor may, for a period of thirty (30) days from the end of the Election Period, Transfer all, but not part, of the Offered Interests to any one Purchaser selected by the Transferor for a price not less than the price, and otherwise upon the same terms, set forth in the Offer Notice.

-18-

(v)     Notwithstanding the foregoing provisions of clauses (i) through (iv) of this <u>Section 8.1(c)</u> regarding rights of first offer, such provisions shall not apply to Transfers of Interests permitted by <u>Section 8.1(b)</u>.

(d)     <u>Transferee Obligations</u>.  In the event of a Permitted Transfer, the Transferee shall be admitted as a Member only if such Transferee accepts and agrees to be bound by this Agreement by executing a counterpart hereof, expressly assumes all of the obligations of the Transferor hereunder and executes and delivers such other agreements, instruments, certificates, affidavits, opinions of counsel and other documents as the Board may reasonably require in order to admit such new Member.

(e)     <u>Percentage Interests Adjustment</u>.  Following a Permitted Transfer, the respective Percentage Interests of the Members will be adjusted, and <u>Exhibit A</u> will be updated, by the Board (without obtaining the approval of the Members) to reflect the relative changes in the ownership of Interests by Members after such Permitted Transfer.

## ARTICLE IX
## INTENTIONALLY DELETED

## ARTICLE X
## DISSOLUTION AND LIQUIDATION

Section 10.1   <u>Dissolution</u>.  Subject to the provisions of applicable law, the Company shall be dissolved upon the first of the following events to occur:

(a)     the sale or disposition of all or substantially all of the Company's assets and the collection of all of the proceeds of such sale;

(b)     the written agreement by a Majority-in-Interest of the Members to dissolve the Company;

(c)     any time there are no Members unless the Company is continued in accordance with the Act; and

(d)     the entry of a judicial decree of dissolution of the Company pursuant to the Act.

A Member ceasing to be a Member of the Company shall not, in and of itself, result in the dissolution of the Company.

Section 10.2   <u>Liquidation</u>.

(a)     <u>Distribution of Assets</u>.  Upon a dissolution of the Company, the Board shall take or cause to be taken a full account of the Company's assets, indebtedness and liabilities as of the date of such dissolution and shall, subject to the provisions of this Agreement, proceed with reasonable promptness to liquidate the Company's assets and to terminate its business and affairs.  The Company's assets, or the proceeds from the liquidation thereof, shall be applied in cash or in kind in the following order:

(i)      First, to the satisfaction of all liabilities and obligations of the Company, including expenses of the liquidation and obligations and liabilities to the Members including compensation payments (other than on account of their Capital Accounts or liabilities for distributions under applicable law), by payment or the establishment of Reserves for contingent, conditional or unmatured liabilities of the Company as are deemed necessary or desirable by the Board; provided, however, that such Reserves shall be deposited in escrow with a bank for the purpose of disbursing such Reserves for the payment of such contingent, conditional or unmatured liabilities and, at the expiration of such period as the Board may determine, for the purpose of distributing the remaining balance in accordance with clause (ii) below; and

(ii)      Second, to the Members in accordance with their respective Percentage Interests.

(b)      Certificate of Cancellation.  Following the liquidation of the Company, the Board shall file a Certificate of Cancellation of the Company with the Office of the Secretary of State of the State of Delaware.

Section 10.3      Continuing Liabilities and Other Obligations.  Except as otherwise expressly provided herein, to the fullest extent permitted by law, no reconstitution, dissolution, liquidation or termination of the Company shall relieve, release or otherwise discharge any Member, or any of that Member's successors, assigns, heirs or legal representatives, from any previous breach or default of, or any obligation or other liability theretofore incurred or accrued under, any provision of this Agreement or applicable law, and, to the fullest extent permitted by law, any and all liabilities, claims, demands or causes of action arising from any such breaches, defaults, obligations and liabilities shall survive any such reconstitution, dissolution, liquidation or termination.

Section 10.4      Final Statement.  As soon as practicable after the dissolution of the Company, the Board shall cause a statement of the Company's assets and liabilities to be prepared as of the date of such dissolution and furnished to the Members.

## ARTICLE XI
## MISCELLANEOUS

Section 11.1      Notices.  All notices and other communications required or permitted to be given pursuant to this Agreement shall be in writing, and shall be deemed duly given as follows:  (a) on the date delivered if personally delivered, (b) on the date sent by telecopy with automatic confirmation by the transmitting machine showing the proper number of pages were transmitted without error, (c) on the next business day if sent overnight to the Company and the other parties by Federal Express or other recognized overnight courier service, or (d) five (5) business days after mailing, if mailed by certified or registered mail, return receipt requested, in each case addressed to the parties at their respective addresses set forth on the books and records of the Company or such other address as may be specified in a notice given by a party to the Company and the other parties in accordance with the provisions hereof.

737256v1

Section 11.2   Amendment.  No amendment of this Agreement (other than updating the information on Exhibit A or adding Additional Members in accordance with this Agreement) or the Certificate of Formation shall be valid or effective, unless in writing and approved by a Majority-in-Interest of the Members.

Section 11.3   Waiver.  No course of dealing or omission or delay on the part of any party hereto in asserting or exercising any right hereunder shall constitute or operate as a waiver of any such right.  No waiver of any provision hereof shall be effective, unless in writing and signed by or on behalf of the party to be charged therewith.  No waiver shall be deemed a continuing waiver or waiver in respect of any other or subsequent breach or default, unless expressly so stated in writing.

Section 11.4   Governing Law.  This Agreement shall be governed by, interpreted and enforced in accordance with the laws of the State of Delaware, without regard to choice or conflict of laws principles that would defer to the substantive laws of any other jurisdiction.

Section 11.5   Dispute Resolution.  Any claim, controversy or dispute among the parties with respect to the construction, application or enforcement of this Agreement or arising out of a breach hereof shall be settled by arbitration, which shall be conducted in Miami-Dade County, Florida and shall be administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, including the Emergency Interim Relief Procedures, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  Notwithstanding any provision of the Agreement to the contrary, this Section 11.5 shall be construed to the maximum extent possible to comply with the laws of the State of Delaware, including the Uniform Arbitration Act (the "Delaware Arbitration Act").  If, nevertheless, it shall be determined by a court of competent jurisdiction that any provision or wording of this Section 11.5 shall be invalid or unenforceable under the Delaware Arbitration Act, or other applicable law, such invalidity shall not invalidate all of this Section 11.5.  In that case, this Section 11.5 shall be construed so as to limit any term or provision so as to make it valid or enforceable within the requirements of the Delaware Arbitration Act or other applicable law, and, in the event such term or provision cannot be so limited, this Section 11.5 shall be construed to omit such invalid or unenforceable provision.

Section 11.6   Severability.  The provisions hereof are severable and in the event that any provision of this Agreement shall be determined to be invalid or unenforceable in any respect by a court of competent jurisdiction, the remaining provisions hereof shall not be affected, but shall, subject to the discretion of such court, remain in full force and effect, and any invalid or unenforceable provision shall be deemed, without further action on the part of the parties hereto, amended and limited to the extent necessary to render such provision, as so amended and limited, valid and enforceable.

Section 11.7   Counterparts. This Agreement may be executed and delivered in multiple counterparts (and transmitted by telecopier or email), with the same effect as if the parties executing the counterparts had all executed one counterpart.

Section 11.8   <u>Further Assurances</u>.  Each party hereto shall promptly execute, deliver, file or record such agreements, instruments, certificates and other documents and take such other actions as the Board may reasonably request or as may otherwise be necessary or proper to carry out the terms and provisions of this Agreement and to consummate and perfect the transactions contemplated hereby.

Section 11.9   <u>Assignment</u>.  Except as otherwise provided herein, this Agreement, and any right, interest or obligation hereunder (including the Interests) may not be assigned by any party hereto except as otherwise provided herein.  Any other purported assignment shall, to fullest extent permitted by law, be void and without effect.

Section 11.10  <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and permitted assigns.  This Agreement is not intended, and shall not be deemed, to create or confer any right or interest for the benefit of any Person not a party hereto.

Section 11.11  <u>Entire Agreement</u>.  This Agreement constitutes the entire understanding and agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior written or oral agreements and understandings relating thereto.  All exhibits referenced in or attached to this Agreement are deemed to be incorporated into and made a part of this Agreement.

Section 11.12  <u>Legal Representation</u>.  The parties acknowledge and agree that (a) they have participated in the negotiation of this Agreement and it is intended by the parties that no provision of this Agreement be construed against or interpreted to the disadvantage of any party by any arbitrator, court or government or judicial authority by reason of such parties being deemed to have structured or drafted such provisions and (b) they have had the opportunity to consult their own attorneys in the negotiation, preparation and execution of this Agreement.

Section 11.13  <u>Counsel</u>.  Each of the Members (a) acknowledges that the law firm of Wilk Auslander LLP has been engaged by Shaulson to represent Shaulson in the negotiation of this Agreement (other than Shaulson, Wilk Auslander LLP does not represent any of the Members in their capacity as a Member), (b) agrees that no conflict of interest exists for Wilk Auslander LLP to so act, and (c) consents, for purposes of this Agreement, and the transactions contemplated hereby and thereby, to Wilk Auslander LLP representing Shaulson in connection therewith.

[SIGNATURES ON FOLLOWING PAGES]

737256v1

**IN WITNESS WHEREOF,** the Members have duly executed and delivered this Limited Liability Company Agreement of Canoe Creek Holdings LLC as of the date first set forth above.

Members:

Abraham Shaulson

**SMAK REAL ESTATE LLC,**
a Florida limited liability company


By:_____
    Name:
    Title:

-23-

**IN WITNESS WHEREOF,** the Members have duly executed and delivered this Limited Liability Company Agreement of Canoe Creek Holdings LLC as of the date first set forth above.

Members:

_____
Abraham Shaulson

**SMAK REAL ESTATE LLC,**
a Florida limited liability company

By: _____
Name: _Norman Ginsberg_
Title: _manager_

-23-

## **Exhibit A**

Capital Contributions

| Name of Member | Amount of Capital Contribution | Percentage Interest |
|---|---|---|
| Abraham Shaulson | | 75.01% |
| SMAK Real Estate LLC | | 24.99% |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Total:                    $                    100%

A-1

## **Exhibit B**

1. <u>Contemplated Actions</u>.  The Member is not contemplating either the filing of a petition by it under state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property, and has no knowledge of any Person contemplating the filing of any such petition against it.

2. <u>Other Agreements; Defaults</u>.  The Member is not a party to any agreement or instrument or subject to any court order, injunction, permit or restriction which might adversely affect the assets or the business, operations or condition (financial or otherwise) of the Company.  The Member is not in violation of any agreement which violation could reasonably be expected to have an adverse effect on the assets, business, operations or condition, financial or otherwise, of the Company.

3. <u>Tax Filings</u>.  The Member has filed (or has obtained effective extensions for filing) all federal, state and local tax returns required to be filed by it and has paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by the Member.  The Member believes that its tax returns properly reflect its income and taxes for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

4. <u>Solvency</u>.  No petition in bankruptcy has been filed against the Member in the last seven (7) years, nor has the Member in the last seven (7) years ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors.

5. <u>Full and Accurate Disclosure</u>.  All evidence of the Member's identity provided in connection with the investment in the limited liability company interests of the Company is genuine, and all related information is accurate.

737256v1

SCHEDULE C

Management Agreement

November 2̄9̄ 2013

Canoe Creek Holdings LLC
c/o Millennium Management, L.L.C.
10800 Biscayne Blvd., Suite 600
Miami, Florida 33161

Re:  Management Agreement – Canoe Creek Holdings LLC

Ladies and Gentlemen:

For good and valuable consideration, each of the undersigned Persons, who have been designated as directors of Canoe Creek Holdings LLC, a Delaware limited liability company (the "Company"), in accordance with the Limited Liability Company Agreement of the Company, dated as of November 2̄9̄, 2013, as it may be amended or restated from time to time (the "LLC Agreement"), hereby agree as follows:

1.      Each of the undersigned accepts such Person's rights and authority as a Director under the LLC Agreement and agrees to perform and discharge such Person's duties and obligations as a Director under the LLC Agreement, and further agrees that such rights, authorities, duties and obligations under the LLC Agreement shall continue until such Person's successor as a Director is designated or until such Person's resignation or removal as a Director in accordance with the LLC Agreement.  Each of the undersigned agrees and acknowledges that it has been designated as a "manager" of the Company within the meaning of the Delaware Limited Liability Company Act.

2.      So long as any obligation of the Company is outstanding, each of the undersigned agrees, solely in its capacity as a creditor of the Company on account of any indemnification or other payment owing to the undersigned by the Company, not to acquiesce, petition or otherwise invoke or cause the Company to invoke the process of any court or governmental authority for the purpose of commencing or sustaining an involuntary case against the Company under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Company or any substantial part of the property of the Company, or ordering the winding up or liquidation of the affairs of the Company.

C-1

737256v1

3.      THIS MANAGEMENT AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, AND ALL RIGHTS AND REMEDIES SHALL BE GOVERNED BY SUCH LAWS WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

Initially capitalized terms used and not otherwise defined herein have the meanings set forth in the LLC Agreement.

This Management Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Management Agreement and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned have executed this Management Agreement as of the day and year first above written.

_____
Abraham Shaulson

C-2

737256v1

SCHEDULE D

DIRECTORS

1.  Abraham Shaulson

737256v1

## SCHEDULE E

| OFFICERS | TITLE |
|---|---|
| Abraham Shaulson | President |
| Nelson Robaina | Vice President and Secretary |
| Esti Rosenberg | Vice President and Treasurer |

E-1